IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

LEONARD E. LOPEZ,                 )
                                  )
                 Plaintiff,       )
                                  )
         vs.                      )    1:12-cv-02259-RPM
                                  )
UNITED STATES OF AMERICA,         )
                                  )
                 Defendants.      )
_____

TRIAL TO COURT - DAY 1
TRANSCRIPT OF PROCEEDINGS
_____

          Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

on the 15th day of December, 2014, in Courtroom A, the United

States Courthouse, Denver, Colorado.


APPEARANCES

For the Plaintiff:        James M. Leventhal, Esq.
                          Leventhal & Puga, P.C.
                          950 South Cherry Street,
                          Suite 600
                          Denver, CO  80246

                          DezaRae D. LaCrue, Esq.
                          Leventhal & Puga, PC
                          950 South Cherry Street
                          Suite 600
                          Denver, CO  80246



          Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

APPEARANCES: (Continued)

For the Plaintiff:        Natalie Brown, Esq.
Franklin D. Azar & Associates, P.C.
14426 East Evans Avenue
Aurora, Colorado, 80014-1474


For the Defendants:       Mark S. Pestal, Esq.
U.S. Attorney's Office-Denver
1225 17th Street East
Suite 700
Denver, CO  80202


Zeyen Julian Wu
U.S. Attorney's Office-Denver
1225 17th Street
Suite 700
Denver, CO  80202

```
1                    P R O C E E D I N G S

2       (At 8:30 a.m. on December 15, 2014, in the United States

3    District Court at Denver, Colorado, before the HONORABLE

4    RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5    parties present, the following proceedings were had:)

6       THE COURT:  Please be seated.  Good morning.

7       MR. PESTAL:  Good morning, Your Honor.

8       THE COURT:  We're here for trial of 12-cv-2259, Leonard

9    E. Lopez against the United States.  So we'll enter your

10   appearances for the record.

11      MR. LEVENTHAL:  Good morning, Your Honor, Jim Leventhal

12   and Natalie Brown on behalf of the plaintiff Mr. Leonard

13   Lopez.

14      THE COURT:  Thank you.

15      MR. PESTAL:  Good morning, Your Honor, Mark Pestal,

16   Assistant United States Attorney on behalf of the United

17   States.  And with me at counsel table is Zeyen Wu, another

18   Assistant United States Attorney and Manny Jiron, our legal

19   assistant.

20      THE COURT:  All right.  Well, I'm pretty familiar with

21   this case from our pre-trial proceedings, but if you want to

22   --are there any preliminaries before we start the trial?

23      MR. LEVENTHAL:  Not on behalf of plaintiff, Your Honor.

24      THE COURT:  All right.

25      MR. PESTAL:  No thank you, Your Honor.
```

1      THE COURT:  All right.  Do you want to make an opening

2  statement for the plaintiff?

3      MR. LEVENTHAL:  I do, Your Honor.

4      THE COURT:  All right.  Please proceed.

5      MR. PESTAL:  Oh, Your Honor, the only issue would be

6  sequestration of witnesses under Rule 650.  For openings I

7  know that doesn't matter, but the defendant would request

8  sequestration.

9      THE COURT:  All right.  Well, are there any witnesses

10  present?

11      MS. BROWN:  Yes, Your Honor, Mrs. Lopez is present.

12      THE COURT:  All right.  Well, she's excluded.  I assume

13  she's going to be a witness.

14      MS. BROWN:  She is going to be a witness.

15      THE COURT:  Yeah.

16      MS. BROWN:  Yes, Your Honor.

17      THE COURT:  All right.  And then I'll have to rely on

18  counsel to identify witnesses because we don't have a bailiff

19  as you know.

20          All right.  Mr. Leventhal--

21      MR. LEVENTHAL:  Thank you, Your Honor.

22      THE COURT:  --I mean the experts are not excluded.

23      MR. PESTAL:  That's what I was about to mention, Your

24  Honor.

25      THE COURT:  Yeah.

1          MR. PESTAL:  Thank you.

2          THE COURT:  All right.  Proceed please.

3          MR. LEVENTHAL:  Thank you, Your Honor.  Your Honor, this

4    case is about a surgery that was performed on March 5th,

5    2010, by Dr. Glenn Kindt who at that time was 80 years old

6    and who four months prior to the surgery had relinquished his

7    privileges to do some surgeries at the at the VA hospital.

8          THE COURT:  That was cranial, right?

9          MR. LEVENTHAL:  That was cranial surgeries.

10          THE COURT:  Right.

11          MR. LEVENTHAL:  But there was no investigation done as

12    to why he relinquished his privileges.  It was also performed

13    by Dr. Samuel Waller who at that time was a second year

14    neurosurgical resident.

15          The surgery took three and a half hours, almost

16    twice as long as it should have.  The incision was 11

17    centimeters, almost twice as long as it should have been,

18    maybe even more than as twice as long, and resulted in the

19    removal of a nerve root at L5.

20          The medicine in this case, Your Honor, is that this

21    was a single level what's known as discectomy, which has been

22    described by the doctors involved in the case as a bread and

23    butter surgery for spine surgeons.

24          It was a surgery that was necessitated as a result

25    of a car crash that Mr. Lopez had been in when he was in Iraq

1   in 2--in the 1990s in which he--the car--the vehicle he was

2   driving in hit a hole, he hit his head and suffered a

3   herniated disc in his low back.

4          A herniation is the bulging of the disc material

5   pressing on a nerve and that's what happened here was there

6   was pressure on the L5 nerve on the left side; that's

7   important, Your Honor, because he had left-sides problems

8   from that point on.

9          The MRI, which the Court will see, says this is a

10  left-sided herniation, left-sided bulge.  And I say that's

11  important because the Government has prepared an exhibit

12  which I just saw that shows that this was central and not on

13  the left-side and that's part of their defense.

14         The standard of care, the rule that applies to a

15  procedure like this, is first do no harm.  And that a nerve

16  root in a procedure like this one should never be removed.

17  If it is removed it's substandard care.

18         The consequence of the surgery was severe pain in

19  Mr. Lopez's left foot.  And what the Court will see is that

20  the L5 nerve which is below that--it's almost as low as you

21  can get on the spine--intricate--there's a--this is a

22  Dermatome chart--may I approach the Court?

23     THE COURT:  Yeah.

24     MR. LEVENTHAL:  This is what's known as a Dermatome

25  chart and it tells you--

1      THE COURT:  We've got to be sure you're on the recording

2   though.

3      MR. LEVENTHAL:  Okay.

4      THE COURT:  I--you know, I can see it from--

5      MR. LEVENTHAL:  All right.  So let me show it to you and

6   then I will take it away.

7      THE COURT:  Yeah, okay.

8      MR. LEVENTHAL:  This is L5--and I'll repeat that on the

9   back--and going down the left side it goes right down and

10  into the foot.

11     THE COURT:  All right.  It's okay.

12     MR. LEVENTHAL:  What I just demonstrated for the Court

13  and would show the Court what's known as a Dermatome chart

14  which says what the nerves do and then it goes down to the

15  foot.

16          Now, what a nerve does, a spinal nerve does, is

17  that it is a nerve that is responsible for pain, sensation,

18  some motor function, it can be responsible for sweating and

19  those types of things.

20          An injury to a nerve typically results in a primary

21  injury which can be numbness, pain, tingling, but there can

22  be a secondary problem and not everybody who has a nerve

23  injury has a secondary problem which now is called Complex

24  Regional Pain Syndrome.  It used to be called Reflex

25  Sympathetic Dystrophy.  It was first indentified in the civil

1    war by a doctor who's name is Ware Mitchell, who was talking

2    about nerve injuries and he said this pain which is typically

3    a burning pain can be so severe that it can reduce a brave

4    man to a coward; those were Ware Mitchell's words.

5            Mr. Lopez after the surgery woke up with severe--

6    and this is documented in the medical records--horrific pain

7    on the top of his left foot, the exact location where this

8    nerve supplies, ten out ten pain, burning pain.

9            The medical records of that incident and evaluation

10   done not too long after that said this was a major event,

11   this pain got a little bit better with significant narcotics

12   while he was in the hospital and then got worse and

13   continued.  And I'll go into that in just a bit.

14           What's not contested in this case is that if a

15   surgeon removes a nerve root in a surgery like this one where

16   the nerve is not encased in tumor and it has no plan to take

17   it out, where there's no reason to remove the nerve root as

18   it was in this case that that's substandard care.

19           And when I say that's not contested that's the

20   testimony of Dr. Arle, the defense expert from Harvard and

21   the testimony of the plaintiff's expert Dr. Poffenbarger both

22   neurosurgeons.

23           The standard of care also is that surgeons doing

24   this surgery should use loupes or magnification.  Both Dr.

25   Arle and Dr. Poffenbarger said that a reasonable neurosurgeon

1    practicing at this time should use loupes or magnification.

2    They've never done a surgery themselves without using loupes

3    or magnification.  Obviously to make sure that what--they can

4    see what they're doing.

5           The description in this case by Dr. Poffenbarger is

6    that there was anatomical confusion; that there was confusion

7    about where they were, what they were doing, that the surgery

8    lasting twice as long as it should have, and the incision

9    being twice as long as it should be demonstrates that.

10          After--while the surgery was going on the biting

11   instrument known as a Kerrison was noted to have a piece of

12   nerve on it.  Dr. Kindt testified that it was clearly nerve;

13   he could see it, it was not microscopic, it was not

14   invisible, he could see it and described it as nerve root.

15          The operative note says that a nerve root, a small

16   nerve root was removed.  The government in its answer to this

17   lawsuit admitted that a nerve was removed.  We know for sure

18   that neither the surgeon who operated, in this case it was

19   Dr. Waller, and I'll go into the evidence of that in a

20   minute, nor Dr. Glenn Kindt the attending, used magnification

21   or a loupe during this procedure.

22          One of the--one of the issues that has to be proven

23   in a case like this is causation.  And I will tell the Court

24   that causation is not an issue in this case.  Dr. Arle, the

25   defense witness, the records, everyone say that Leonard Lopez

 1   suffered a severe nerve injury resulting in Complex Regional
 2   Pain Syndrome to his left foot.
 3        Dr. Arle was asked a question, is Mr.--was Mr.
 4   Lopez's pain and the pain problem related to surgery and he
 5   said, yes, it was related to this surgery, caused by this
 6   surgery, so that's not an issue.
 7        One of the issues and the Court is well aware of
 8   this is who did the surgery.  And so what we have is
 9   significant evidence, overwhelming evidence that the
10   procedure was performed by Dr. Waller.
11        We have Dr. Glenn Kindt who testified in his
12   deposition that it was his practice, his habit, to allow the
13   residents, even second year residents, to perform these
14   surgeries under his supervision; that was his standard.
15        Dr. Kindt testified that he allowed Dr. Waller;
16   that Dr. Waller did the surgery.  He described what Dr.
17   Waller did.  He said that the nerve was on Dr. Waller's
18   Kerrison when it was pulled out.  And we've designated that
19   testimony.
20        We also have the operative note which lists both
21   Dr. Kindt and Dr. Waller as the surgeons, but it doesn't
22   really distinguish who did what.  But then a nursing record
23   of the surgery lists Dr. Waller as the surgeon.
24        But there's more, Exhibit 15 is a document that we
25   obtained from the VA hospital which documents, memorializes

1    the procedures that Dr. Waller did in 2010.  Dr. Waller is

2    going to testify and tell you that as a second year resident

3    he would have been lucky to even watch a procedure like this.

4    But that document, Exhibit 15, identifies those procedures

5    that he was second assistant on, those procedures that he was

6    first assistant on and those procedures that he was the

7    surgeon.

8            You'll see that document and that document lists

9    him as the surgeon on at least nine--nine back surgeries--

10   sorry seven back surgeries.  It lists him as the first

11   assistant on nine and second assistant on three in 2010 at

12   the time this was happening.

13           What we do know is that how much a resident is

14   allowed to do varies all over the country.  It depends on the

15   neurosurgeon.  Some neurosurgeons allow them to do more; some

16   allow them to do less.

17           There are neurosurgical residencies that have been

18   suspended because the neurosurgeons have not allowed the

19   residents to do enough.

20           In this particular case as Dr. Kindt testified it

21   was his habit, his custom to allow the resident to do the

22   procedure and that's what happened.

23           We have a credentialing claim, and the

24   credentialing claim deals with whether or not Dr. Kindt

25   should have been doing or even participating in this

1    procedure.

2            I've already gone into the fact that four months

3    earlier he gave up his privileges to do cranial procedures

4    but nobody investigated why.  Dr. Arle when he reviewed Dr.

5    Kindt's deposition said Dr. Kindt appeared in his deposition

6    to him to be confused and have cognitive problems.  The

7    question was, well, what was his--and that was in 2012--and

8    then there was a question in the deposition about well what

9    was his--do you think the VA knew about that.  And he said I

10   do.

11           And the question was well why do you believe that

12   and he said because these people worked with him every day.

13   They would have recognized that he had cognitive problems and

14   he was confused.

15           But then Dr. Arle goes on to say--and this is

16   somewhat amazing that a neurosurgeon with cognitive and--

17   problems--and confusion can still function as a high level

18   neurosurgeon.  I'll leave the Court to decide whether that

19   makes any sense.

20           We have retained a Dr. Shershow.  Dr. Shershow is a

21   doctor who--part of what he's done over the years has done

22   evaluations for what is now known as the Joint Commission

23   formally known as JCAHO, evaluating hospitals on whether they

24   have met JCAHO and Joint Commission Standards.

25           He's well aware of what physician privileging and

1  credentialing requires.  And he'll tell you that this

2  hospital did not do an investigation and they should have

3  done an investigation as to why Dr. Kindt dropped his

4  privileges.

5        He'll tell you that despite the fact that Dr. Kindt

6  went from full operating privileges of brain and spine to

7  only being able to see patients under the supervision of

8  another physician.  And that's what happened between 2009 and

9  2011.  By 2011 he was only allowed to see patients in clinic

10 under supervision of another physician and not operate at

11 all.

12        There is no evidence that there was any

13 investigation as to why and what was going on with Dr. Kindt

14 that lead to that dramatic change.

15        Dr. Shershow will testify not only the very

16 importance of how investigations are done and privileging but

17 he'll testify that the VA hospital well before Mr. Lopez's

18 surgery breached the standard of care and the manner in which

19 they approached this process.

20        I want to talk to you a little bit about the

21 defense in this case and exactly what that is and what you

22 can expect.  The defense in this case initially was that no

23 nerve was taken.  In Dr. Waller's deposition, Dr. Waller

24 said, oh, that wasn't a nerve, although he says I don't

25 remember anything about this procedure, but since the

```
 1   pathology showed no nerve there can't be a nerve.

 2            The response to that the Court has before it an

 3   admission by the U.S. that a nerve was removed.  Dr. Arle,

 4   the defense expert, admits that a nerve was removed.  The

 5   question about the pathology and that the nerve is not found

 6   in pathology is part of the confusion that rings through this

 7   whole process about what was being done and what wasn't being

 8   done.

 9            Dr. Kindt said I'm not sure we sent it down there.

10   There's confusion about what was sent, what wasn't sent.  The

11   operative note says no complications but then describes a

12   nerve being removed; that's a major complication.

13            There's--there's a claim that--that--by the defense

14   that this is aberrant anatomy, a conjoined nerve not

15   mentioned in the operative note, not to be found anywhere in

16   the medical records that it was a conjoined nerve.  But even

17   if it was, even if it was a neurosurgeon's obligation is to

18   identify it, protect it, and make sure it's not injured.

19            The U.S. has actually--and I just saw this minutes

20   ago--prepared a demonstrative exhibit that claims that this

21   bulging disc pressing on the nerve was behind the spine; that

22   it wasn't lateral.  But the MRI taken before surgery shows

23   it's on the left side, which is consistent with the left-side

24   pain that Mr. Lopez had.

25            I anticipate that one of the things you're going to
```

1    say is that boy if you remove a nerve then the dura, the

2    membrane, the fibrous membrane that surrounds nerves and the

3    spinal cord had to be injured and there should have been a

4    dura leak.

5            What they do to look for a dura leak is they look

6    for it, they did, they then did a procedure called a Valsalva

7    maneuver which is a procedure which will on many occasions

8    reveal a dura leak.  No leak is documented but what is

9    documented and what we know for sure is after the procedure

10   Mr. Lopez was required to lie flat for 24 hours.  Every

11   doctor testifying before you in this case will tell you they

12   don't do that unless there is a dura leak.

13           You're going to hear that one of the defenses is

14   well if a nerve root was removed then Mr. Lopez should have

15   not just this horrific pain but also a deficit, a deficit in

16   his motor function.

17           Well, the L5 nerve--one of the things it does is it

18   can cause sciatic pain and that's why he went in for the

19   surgery.  His pain had gotten so bad he couldn't deal with it

20   and that's why he went in for the surgery because he had this

21   really bad leg pain.  But it can also cause a foot drop.

22           Now, a foot drop is when you can't lift up your

23   foot.  What we know and we have an expert, his name is Dr.

24   Barolat, who is a treating doctor for Mr. Lopez.  He's a

25   world renowned neurosurgeon or practices at PSL who will tell

1   you that in his opinion Mr. Lopez likely has a deficit.  But

2   he's in so much pain that he can't tell whether that deficit

3   is a result of a nerve injury to a motor portion of that

4   nerve or whether it's from pain.

5           And, Your Honor, you'll actually be able to see Mr.

6   Lopez trying to lift up his foot.  He walks on the left-side

7   of his foot because the pain on the bottom of his foot and

8   the top of his foot is so severe he walks, he sits with his

9   leg on the left-side.

10          When you ask him to pull up his foot, his foot

11  shakes and he tries to do it, but if you do it on the other

12  one you can see it pulls it up without problem.

13          It's also true that you can have this injury

14  without having a motor component but we believe the evidence

15  is substantial that there is a motor component.

16          You're also going to hear that while Mr. Lopez had

17  significant problems before and that's true that's why he had

18  the surgery.  This nerve problem that he had which dates back

19  to the--the accident or the incident in Iraq resulted in him

20  having sciatic pain, which is pain going down your back,

21  through your leg, to the top of your foot.  And he did have

22  pain and that pain did not preclude him from working,

23  although he did miss a little bit of work.

24          His income was in the 90,000s in the last few years

25  he was able to work, but it got to the point where he had to

1   have the surgery so he went to see Dr. Kindt.   And Dr. Kindt
2   assured him that he had done--that Dr. Kindt had done
3   hundreds if not over a thousand of these procedures without
4   problem.
5          The purpose of the procedure is to remove pressure
6   on the nerve.   Once that pressure is removed then that pain,
7   that sciatic pain is relieved.   So what happens in this case
8   he has the procedure, his back pain is better, his sciatic
9   pain is 50 percent better, but he's left with this horrific
10  life altering devastating pain in his foot.
11         Well, what was the treatment for that.   Well, we do
12  know that in 2012 his pain doctors gave up, they said there's
13  nothing else we can do, but he had a nerve stimulator put in
14  by Dr. Barolat.   He wears that stimulator; he has that
15  stimulator and he can adjust how much electricity is going
16  through his leg, and it helps him, it provides relief that he
17  describes as about 40 percent, you know, substantial.   His
18  pain has gone from a 10 to a 7, but in spite of that, Your
19  Honor, this man is on Oxycontin, Methadone, and a nerve drug
20  that he takes every day, morning, noon, and night.   But the
21  pain gets so bad that sometimes he has to add more of the
22  Oxycontin.
23         One of the defenses in this case is that the nerve
24  was invisible.   Now, that's an interesting defense.   Dr.
25  Arle--and actually if you look at the trial management order

1   the government is saying that Dr. Kindt and Dr. Waller

2   removed an invisible nerve.  It was a rootlet, just part of

3   the nerve root, but just really tiny invisible nerve.

4        So on the one hand they admit that a nerve was

5   removed.  The evidence is overwhelming that Dr. Waller

6   described this nerve in his deposition as angle-haired size

7   which is absolutely consistent with what you'd see.  It's in

8   the record that it was removed; it shows that it was removed;

9   they've admitted it's removed but now they're saying that

10  what they removed wasn't a nerve at all.

11       It's just a coincidence they're going to argue that

12  they thought they removed a nerve and saw a nerve at L5 which

13  they admit caused his pain, but what they removed wasn't a

14  nerve at all.  But they did remove an invisible nerve.  I

15  have a tough time even trying to explain it to you.  It

16  doesn't make much sense.

17       We know that this has had a devastating effect on

18  Mr. Lopez.  Dr. Arle conceded--the defense expert from

19  Harvard--conceded that this pain got so severe that Mr. Lopez

20  had to quit working.  He did quit working.  He worked as hard

21  as he could and he continued to work after the surgery for a

22  while but he couldn't do it.  He--as he will tell you his

23  pride, his--he could no longer rely on other people not

24  because they wouldn't do it, they were more than willing to

25  do things for him but because he didn't think it was right.

1   So he gave up his job.  His day now is--is waking up in the

2   morning, taking a shower, reading the paper, watching TV,

3   going back to sleep.

4           He tries to do things.  You're going to hear that

5   he's tried to actually play golf, but he doesn't really play

6   golf.  He rides around in a golf cart to be with his brothers

7   and he's given that up.  He can't do it because he's always

8   on the left side of his foot.

9           He used to go for walks, he used to do all sorts of

10  things but now what he does is simply try to manage his pain

11  and that is what he's going to live with for the rest of his

12  life.  As he describes it he no longer has a life, it's just

13  pain all the time.

14          This nerve stimulator is expensive; it has to be

15  replaced every five or six years.  You're going to hear about

16  that; you're going to hear about the fact that he needs

17  assistance, a certain number of hours a week, about 10 to 12

18  hours and you're going to hear that the cost of doing this,

19  his economic cost is about $1,136,400.00.

20          And that doesn't include, and we're going to ask

21  the Court to consider, is the fact that Leonard really can't

22  drive, shouldn't be driving.  He does but shouldn't be

23  driving.

24          And there's another complicating factor that's

25  occurred in this case and that is Mr. Lopez's wife, Eva

1    Lopez, has been diagnosed with cancer.  We don't know her

2    prognosis, she's going in this week--or next week for an

3    evaluation, it's breast cancer, it's recurrent.  But whether

4    that is going to be curable and receptacle or treatable with

5    Chemo and radiation we don't know.

6             But his reliance on her to do these things for him

7    may not be present forever.  We do know that before this

8    happened he did a lot of things around the house.  He cleaned

9    as he said everything but the bathrooms because his wife

10   wouldn't let him do that; that he vacuumed, he did all sorts

11   of things and--and was very involved and now he can't do

12   those things.

13            In conclusion what's happened is that this

14   procedure, this confused procedure lasting twice as long as

15   it should have, with an incision twice as long as it should

16   have been, was performed by a second year resident under the

17   supervision of an neurosurgeon who should have not been

18   supervising him resulted in a nerve injury that resulted in

19   the secondary problem.

20            And I want to just go into the secondary problem

21   for one second, used to be that they thought when somebody

22   developed this kind of pain in the foot that they considered

23   amputating the foot or amputating the extremity where the

24   pain was.  But it has long been recognized that when they

25   have the secondary problem the problem is central, it's in

1   their spinal cord, their brain and that amputating the foot

2   does not help.  It doesn't relieve the pain.

3            One of the most common results of people who

4   develop this type of severe, horrific, constant burning pain,

5   is that the patient commits suicide.  It's--it's throughout

6   the medical literature.

7            Dr. Barolat and the treatment he's provided for Mr.

8   Lopez has been a Godsend for him, but he still has seven out

9   of ten pain requiring Oxycodone and Methadone and that's why

10  we're here.  Thank you.

11       THE COURT:  All right.  Thank you.

12            Mr. Wu, do you wish to open for the defendant?

13       MR. WU:  Yes, Your Honor.

14       THE COURT:  Thank you.

15       MR. WU:  Good morning, Your Honor.

16       THE COURT:  Good morning.

17       MR. WU:  Your Honor, it's undoubtedly regrettable that

18  the plaintiff has experienced significant foot pain since his

19  discectomy.

20            But first the pathology report in evidence will

21  show that there was no nerve root found in the sample removed

22  from Mr. Lopez.  But even if a small nerve root was removed

23  Mr. Lopez's attempt to place blame on Dr. Waller, who was a

24  junior resident, whose role in the surgery was quite limited,

25  will be not be supported by the weight of the evidence.

1          The evidence will show that Dr. Waller did not

2    injure Mr. Lopez in any way during the surgery.  Second, even

3    if Dr. Kindt did remove a small nerve it does not logically

4    explain plaintiff's pain syndrome which can occur for a

5    multitude of reasons, including preexisting nerve injury or a

6    properly performed discectomy.

7          There will also be insufficient evidence to

8    conclude that the VA should not have allowed Dr. Kindt, a

9    very careful and competent surgeon for many years, to operate

10   at the VA hospital in 2010.

11          A patient deciding whether to undergo surgery must

12   weigh the risks and the benefits.  In Mr. Lopez's case he had

13   back problems for many years as you heard.  Those injuries

14   worsened as time passed.  The pain that began in his back

15   spread to his leg.  Mr. Lopez had a herniated disc low in his

16   back at the L5-S1 level.

17          He described his pain prior to surgery as pins and

18   needles from his lower back through his buttocks all the way

19   down to the bottom of his foot.  The severe and widespread

20   pain led him to choose surgery.

21          And before any surgery a patient must review a

22   consent form that describes the potential benefits but also

23   the potential risks of the medical procedure that he's about

24   to undergo.  In Mr. Lopez's case this informed consent which

25   he reviewed and signed--

1      MR. LEVENTHAL:  Excuse me, Your Honor, and I apologize

2   for interrupting him, but we do not have a claim that there

3   was no consent in this case.

4      THE COURT:  I understood that.  Okay.

5      MR. WU:  The form specifically listed on explained

6   symptoms of pain is a potential risk of spinal surgery.  The

7   form also explained that the surgery has what's known as a

8   morbidity rating; that is that the surgery doesn't guarantee

9   successful outcome and his preexisting condition may not

10   resolve or a new condition or complication may develop.

11          In this case Mr. Lopez's preexisting back and leg

12   pain was improved by the surgery but there was a recognized

13   complication of other symptoms of pain.

14          The procedure that Mr. Lopez has was a discectomy.

15   The neurosurgeons in this case will testify that the research

16   has shown that a small percentage of discectomies have some

17   negative outcome such as the need for additional surgery or

18   increased pain.  Every surgery carries with it potential

19   risks and recognized complications.

20          In the case of a surgery involving a person's

21   nervous system atypical effects such as Mr. Lopez's current

22   diagnosis of Complex Regional Pain Syndrome is a potential

23   risk.

24          To perform a discectomy the surgeon first makes an

25   incision into the back above the L5-S1 vertebrae.  Because

1    Mr. Lopez was a larger individual the incision had to be long

2    enough to allow the surgeons to see the disc area below the

3    thicker layers of adipose or fatty issue.  The surgeons first

4    separate the muscle and other journal layers to access the

5    vertebrae.  Then a piece of vertebrae must be removed to

6    reach the herniated disc.

7           A small incision is made in the disc material.

8    This allows the surgeon to excise the part of the disc that's

9    interfering with the nearby nerve root.

10          During the surgery the major nerve roots in the

11   area of the surgery are retracted away from the operative

12   field, this is done to protect the nerves from damage.  Once

13   the disc that has impinged the nerve root is removed the

14   wound is then closed.  The patient is transferred to a

15   post-anesthesia care unit before being transferred to the

16   surgical ward for recovery.

17          The evidence will show there's no breach in the

18   standard of care required for discectomy in this case.

19   First, Mr. Lopez claims that doctors Kindt and Waller

20   breached the standard of care by removing a piece of nerve

21   from his back, but that is not what the evidence will show.

22          The evidence will show first that Dr. Kindt

23   performed the bulk of the surgery.  Dr. Kindt was the person

24   who near the end of the surgery removed a piece of disc

25   material from Mr. Lopez's back.  And attached to that piece

1  of disc was a string-like piece of tissue.

2        Dr. Waller who was in the operating room will

3  testify that he observed Dr. Kindt remove the tissue.  And

4  you will also hear this confirmed by Dr. Kerry Brega, who is

5  the current chair of the neurosurgery practice at the VA.

6  Dr. Brega spoke to Dr. Kindt outside the operating room

7  moments after the surgery.  Dr. Kindt told Dr. Brega that he

8  had removed a string-like material from Mr. Lopez's back.

9        Dr. Kindt who performs dozens of discectomies a

10  year now has no specific memory whether it was he or Dr.

11  Waller who removed the tissue.  But as you will hear Dr.

12  Kindt at that point in his career was in the habit of

13  teaching residents, if you will, by example.

14        Dr. Kindt performed the majority of this procedure

15  and most other surgeries on his own even when medical

16  residents were present.

17        In contrast Dr. Waller was only a second year

18  resident at the time of Mr. Lopez's surgery.  He was a

19  limited participant with a limited role in the procedure.

20        The evidence will show that at that point in Dr.

21  Waller's training he was not yet experienced in using the

22  Kerrison or pituitary, another instrument used in the

23  surgery, to cut this material from the disc space.

24        After Dr. Kindt removed what he thought might be a

25  piece of nerve both he and Dr. Waller searched for the

1   telltale signs of root nerve damage.  The membrane that

2   surrounds the spinal cord is called the dura as you've heard.

3   When a full nerve root is removed or torn there's a tear in

4   the dura and typically leakage of fluid called cerebrospinal

5   fluid into the operative field.

6           The evidence will not show that Dr. Kindt tore the

7   dura.  The evidence will not show that cerebrospinal fluid

8   leaked into the operative field.

9           What the evidence will show that Dr. Kindt was

10  concerned about the anomalous string-like piece of material

11  that came out with the piece of disc material that he had

12  removed.

13          Both Dr. Kindt and Dr. Waller looked for a tear in

14  the dura or a spinal fluid leak.  They extensively examined

15  the dura and the area around the disc but they found nothing.

16          The evidence will show that Dr. Kindt was still

17  concerned so he then had the anesthesiologist perform what is

18  known as a Valsalva maneuver.  In the Valsalva maneuver the

19  anesthesiologist manually controls a patient's breathing.

20  This increases the pressure in the patient's spine.  It

21  allows a surgeon to determine whether there has been a tear

22  in the dura and to see if there's been a spinal fluid leak.

23  The anesthesiologist performed the maneuver and no spinal

24  fluid leakage or dura tear was observed.

25          Another sign of nerve root damage is that the

1    anesthetized patient will involuntarily move his limp if the
2    nerve has been impacted or cut.  You will not hear evidence
3    that Mr. Lopez jumped or moved at all when Dr. Kindt removed
4    the string-like material from Mr. Lopez's back.
5            Dr. Kindt who realized at the time of the surgery
6    that he couldn't conclusively identify the material that he
7    removed but preparing for the worst had the material sent to
8    the pathology department for examination.
9            Doctors Kindt and Waller thought at the time of the
10   surgery thought that the material might be nerve tissue.  As
11   the evidence will show this was reflected in their operative
12   report.  But a definitive determination can only be made on
13   examination by a pathologist.  And after a typical discectomy
14   the removed material is not sent to pathology but Dr. Kindt
15   did have a specific concern in this case.
16           He and Dr. Waller followed the procedure and sent
17   the material in question to pathology for confirmation of
18   their suspicions, but the pathology report came up negative.
19           The evidence will show that it was not Dr. Kindt or
20   Dr. Waller who found that there was no nerve removed, it was
21   the pathologist who ultimately concluded that no nerve tissue
22   was in the material removed from Mr. Lopez's back as you will
23   see in Exhibit 1-G.   To quote the report only fiber
24   cartilage and bone was found in the sample.  Removal of disc
25   material alone does not cause Complex Regional Pain Syndrome.

1          Mr. Lopez's discectomy was successful in

2    alleviating his debilitating back and leg pain.  It also

3    resulted in this unexplained severe pain in his left foot,

4    which was diagnosed as Complex Regional Pain Syndrome.

5          It's undisputed that this pain occurred only after

6    Mr. Lopez's surgical procedure.  However, there will be

7    evidence about Complex Regional Pain Syndrome.  Number one,

8    this pain syndrome can occur even in the absence of any

9    specific nerve damage.

10         Second, the pain syndrome is a very unlikely result

11   if a full nerve root was actually removed or cut.  The

12   evidence will show that Mr. Lopez did not have symptoms of a

13   nerve root injury, there will be no evidence of loss of motor

14   function; there would be no evidence that Mr. Lopez had a

15   foot drop.  These facts indicate that a nerve root was not

16   removed.

17         Finally even if the small strand of material that

18   was removed from Mr. Lopez's back was a small piece of nerve

19   the existence of such nerves was an anatomical anomaly.

20         You will hear testimony from Dr. Jeffrey Arle, a

21   neurosurgeon at Harvard University.  His review of the case

22   concluded that Dr. Kindt acted appropriately and could not

23   have been expected to know about the unusual piece of nerve

24   that may have been removed.  Dr. Arle will also testify that

25   the standard of care in 2010 did not require the use of

1    loupes or a microscope to perform the procedure and this will
2    be confirmed by Dr. Kindt's colleague, Dr, Kerry Brega.
3            Dr. Arle will also testify that the small piece of
4    material could not have been visualized in the surgical field
5    to avoid its removal.  It was not visible on the pre-
6    operative MRI.
7            In short, the location and placement of a potential
8    nerve strand was an anatomical anomaly.  It was unusual,
9    unforeseeable, and unavoidable even with the exercise of due
10   care.
11           And the evidence will show that the causes of Mr.
12   Lopez's Complex Regional Pain Syndrome are not well
13   understood.  The condition can result from a variety of
14   pressures on nerves including preexisting disc herniation and
15   other back problems combined with the general stress of
16   surgery, a situation that was facing Mr. Lopez here.
17           Surgery does not typically produce this pain
18   syndrome but the evidence will show that Complex Regional
19   Pain Syndrome can occur after a surgery completely free of
20   complications.
21           In his second claim Mr. Lopez contends that the VA
22   should not have extended operating privileges to Dr. Kindt in
23   December of 2009.  Dr. Kindt is a neurosurgeon trained at the
24   University of Michigan.  Dr. Kindt had chaired the University
25   of Colorado's neurosurgery department for 20 years.  He had

1   practiced at the VA and the university for over 30 years at

2   the time of the surgery.

3        The objective evidence will not show that Dr. Kindt

4   was somehow impaired because of his age.  Those who knew him

5   regarded him as an exemplary surgeon and colleague.  He had a

6   30 year history of performing thousands of procedures at both

7   the University of Colorado and the VA.

8        At the time of Dr. Kindt's re-credentialing and Mr.

9   Lopez's surgery there was close scrutiny of Dr. Kindt's

10  credentials and privileges at the VA.  However, the VA found

11  no indication that his ability to perform spinal surgery was

12  in any way diminished, let alone so diminished that he should

13  not have been re-credentialed.

14        In 2009 the VA re-credentialed and re-privileged

15  Dr. Kindt for two years, which covered the period of Mr.

16  Lopez's surgery.  Physicians are re-credentialed at least

17  every two years at the VA.  And without being properly

18  credentialed and privileged a physician cannot practice at

19  the VA.

20        As you'll hear from Dr. Tom Whitehill, the former

21  surgery service chief at the VA, and Rick Maestas, the head

22  of the credentialing and privileging office at the VA, the

23  Denver VA takes this process quite seriously.  They keep two

24  sets of redundant records to track when each physician is

25  scheduled for re-credentialing.

1           Approximately three months prior to this scheduled

2    expiration of privileges the medical staff office lead by Mr.

3    Maestas notifies the physician and begins the

4    re-credentialing process.  Re-credentialing requires the

5    completion and compilation of a large volume of documents and

6    information, this includes among other items, a delineation

7    of the types of work and privileges the physician is

8    authorized to have, current and adequate licensure, a check

9    for tort claims, physical health certification, and peer

10   references.

11          The service chief for the area of practice for each

12   physician must recommend the physician's re-credentialing.

13   It also requires that the physician be reviewed by the VA's

14   Professional Standards Board.  This body is comprised of the

15   service chiefs of each of the medical specialties at the VA.

16          Before re-credentialing any physician, the board

17   meets to discuss the physician's quality of care; part of the

18   information considered by the board during re-credentialing

19   in 2009 were six month case reviews for each physician,

20   including Dr. Kindt.  As Dr. Whitehill will testify every six

21   months at that time each physician would have five to six of

22   his or her cases randomly sampled.  A committee of physicians

23   would conduct a thoroughly analysis of these cases to check

24   for any issues.

25          You'll hear from Dr. Whitehill, Mr. Maestas, and

1  Dr. Brega this process was completed for Dr. Kindt at the end

2  of 2009 and all the requirements I previously mentioned

3  including licensure check, searches for tort claims, peer

4  references, and consideration of sample cases were completed

5  on time and in accordance with the VA's policies and

6  procedures.

7            And at that time there was a close evaluation of

8  Dr. Kindt's capacity to perform surgery.  And, in fact,

9  because Dr. Kindt's privileges changed from his prior

10 re-credentialing period they were very specific conversations

11 about the types of privileges Dr. Kindt was to have at the VA

12 in 2009.

13           You will hear testimony from Dr. Whitehill, who as

14 the service chief, had conversations with the director of the

15 hospital and the chief of service for the hospital about Dr.

16 Kindt.

17           He also spoke to Dr. Brega and to Dr. Kevin

18 Lillehei, the chair of the neurosurgery department at the

19 University of Colorado about Dr. Kindt's ability to continue

20 performing surgery.

21           Dr. Whitehill as a surgery service chief felt a

22 great responsibility to ensure that the patients were

23 receiving the best care possible.  In the end Dr. Whitehill,

24 Dr. Brega, Dr. Kindt, and the Professional Standards Board

25 decided that Dr. Kindt would not need privileges for cranial

1   surgery.

2          You will hear testimony from Dr. Whitehill and Dr.

3   Brega that despite all the close attention paid to Dr.

4   Kindt's operating privileges at that time there were no

5   issues raised or observed by anyone in the process about Dr.

6   Kindt's cognitive or physical abilities to perform surgeries.

7          The evidence will not show that the VA knew or

8   should have known that Dr. Kindt was so cognitively impaired

9   that he must be found unfit to perform surgery.  Dr. Kindt

10  was properly re-credentialed at the very end, December of

11  2009, and that was only three months prior to Mr. Lopez's

12  surgery.

13          But sadly in recent years some of Dr. Kindt's

14  cognitive faculties had deteriorated.  In 2011 Dr. Kindt

15  relinquished all surgical privileges at the VA.  However, at

16  that time he retained surgical privileges at the University

17  of Colorado.

18          Nonetheless you will hear from his colleagues Dr.

19  Brega, Dr. Waller, and Dr. Whitehill that in 2009 and 2010

20  Dr. Kindt displayed none of the concerning signs that were

21  later observed.  Any indications that Dr. Kindt had issues

22  were only observed well after Dr. Kindt's re-credentialing,

23  which was five years ago in December of 2009.

24          Furthermore none of these symptoms were evident to

25  any college or medical staff during the time period around

1   Mr. Lopez's surgery in March of 2010.

2          Mr. Lopez continues to receive medical care today

3   at the VA.  He still experiences some pain but its level of

4   severity has been greatly reduced by the implantation of the

5   nerve stimulating device.  This device is expected to

6   continue to alleviate the pain symptoms Mr. Lopez still

7   experiences.

8          While recognized surgical complications are rare

9   they are an unfortunate risk of surgery.  It's natural to try

10  to ascribe blame for the outcomes in this case but there's

11  insufficient evidence to establish that Mr. Lopez's condition

12  was a result of any wrongful conduct on the part of Dr.

13  Waller or Dr. Kindt.

14          Accordingly Mr. Lopez is not entitled to recovery

15  on his claims for medical negligence and negligent

16  privileging and credentialing.  Thank you, Your Honor.

17      THE COURT:  All right.  Just checking what I have here

18  on the witness list and exhibits.  Now, is Dr. Kindt expected

19  to testify?

20      MS. BROWN:  Your Honor, we are unsure.  We have been

21  given some information by Dr. Kindt's attorney that perhaps

22  he is not competent to testify.  We have not spoken with Dr.

23  Kindt since March of 2013 when we took his deposition.  We--

24  he is under subpoena to come here on Wednesday and I think

25  we'll just have to see how he is on Wednesday morning.

 1      THE COURT:  Well, you submitted a transcript with some
 2  identifying excerpts.
 3      MS. BROWN:  I did that because I don't know whether
 4  we're going to be able to--
 5      THE COURT:  Understood.
 6      MS. BROWN:  --present--yeah.
 7      THE COURT:  But the way this looks is you've edited out
 8  of the transcript anything that's not designated.
 9      MS. BROWN:  We did, but I'm happy to give you a full
10  transcript if the Court would like.
11      THE COURT:  No.
12      MS. BROWN:  Yeah.
13      THE COURT:  I don't know what the defendant's position
14  is going to be with respect to this transcript so--but we
15  don't have to deal with that this morning.  It is however
16  that if his testimony is going to be by this deposition I of
17  course can read that a--not during open court time.
18      MS. BROWN:  Correct.
19      THE COURT:  Okay.  All right.  So we're ready for the
20  first witness?
21      MS. BROWN:  We are.  Our first witness is in the witness
22  room.  I think Ms. LaCrue maybe went to get him, it's Dr.
23  Shershow.
24      THE COURT:  All right.
25          (Pause.)

1      MS. BROWN:  And, Your Honor, we have some stipulated

2  exhibits also.

3      THE COURT:  All right.  Well, let's swear the witness.

4                    JOHN C. SHERSHOW,

5  called as a witness on behalf of the Plaintiff, having been

6  first duly sworn, was examined and testified as follows:

7      THE CLERK:  Please be seated.  Please state your full

8  name and spell your last name.

9      THE WITNESS:  John C. Shershow, M.D., S-H-E-R-S-H-O-W.

10     THE COURT:  All right.  Now, I prefer to deal with the

11  exhibits as we go along--

12     MS. BROWN:  Okay.

13     THE COURT:  --and not have a--and if it's stipulated

14  simply identify that it is stipulated as you introduce it.

15     MS. BROWN:  Thank you, Your Honor.

16                    DIRECT EXAMINATION

17  BY MS. BROWN:

18  Q    Dr. Shershow--

19     MS. BROWN:  I'm going to start with Exhibit 24 which is

20  Dr. Shershow's CV which is a stipulated exhibit.

21     THE COURT:  All right.  It's received.

22     (Plaintiff's Exhibit 24 was received in evidence.)

23     MS. BROWN:  And I'm not sure who is in charge of making

24  that a little less fuzzy.  Is it--is it my glasses or--

25     THE COURT:  Can--can you use the machine?

1     MS. BROWN:  This one--well--

2     THE COURT:  You know--

3     MS. BROWN:  --I don't think it's a big deal.  I'm not

4  worried about it.

5  Q    (by Ms. Brown)  Dr. Shershow, I want to talk to you

6  about your education to begin with, where did you go to

7  undergraduate and medical school?

8  A    Undergraduate I went to Harvard College in Cambridge,

9  Massachusetts.  And that was followed by medical school at

10  the University of Southern California in Los Angeles.

11  Q    Since completing your--well, what was your residency in?

12  A    I did a rotating internship at the Los Angeles County

13  University of Southern California School of Medicine.  The

14  first two years of a residency was at the same institution;

15  the third year of my residency was at Yale University School

16  of Medicine.

17  Q    And what was your area of specialty?

18  A    I--I--I--my residency was in psychiatry.

19  Q    As part of your medical practice since completing your

20  residency, have you been involved hospital administration

21  including credentialing and privileging?

22  A    I have been, yes.

23  Q    And please tell the Court what your experience is in

24  terms of hospital administration including credentialing and

25  privileging of physicians?

1  A    I will make it as brief as possible, in 1989 I--I left

2  the private practice and became a--as we call it a surveyor

3  or an inspector might be an easily understood term for the

4  Joint Commission, which is the National Accrediting

5  Organization for all hospitals in America.

6          As part of that job inspecting hospitals I--

7  credentialing and privileging is a major part of the survey.

8  And in every survey at least a half a day is spent by the

9  surveyor looking at the credentialing and privileging process

10 in great depth.

11         I also--during the time I was a Joint Commission

12 surveyor, which was about 15 years, I became the medical

13 director of a large hospital in New York, Kings County

14 Hospital, and subsequently a large hospital in New Jersey,

15 which was known then as Northwest Covenant Hospital.

16         As part of my duties as medical director I was

17 intimately involved in every aspect of course of

18 credentialing and privileging and had charge of compiling of

19 records; sat on the credentials committee.

20         Since leaving full-time administration I've

21 consulted to hundreds of hospitals throughout the nation,

22 primarily about issues of Joint Commission or accreditation,

23 quality of care.

24         As part of my consulting activities I have been

25 intimately involved in again every aspect of credentialing

1   since it's a major part of accreditation.  And I would say

2   the last seven to eight years in my work as a legal

3   consultant such as I'm doing today I have been involved in

4   quite a few credentialing cases.

5   Q    Have you also been involved in teaching credentialing

6   and privileging?

7   A    Yes.  While I was with the Joint Commission they have an

8   active educational arm which teaches hospital staffs and

9   physicians the proper way to do credentialing and privileging

10  and I was one of their faculty members and taught enumerable

11  courses, weekend courses, weeklong courses, for medical

12  staffs on credentialing and privileging.

13       MR. WU:  Your Honor, I'm having some trouble hearing the

14  witness.

15       THE COURT:  All right.  If you'll speak up just a little

16  doctor.

17       THE WITNESS:  I'll try to speak louder.

18       THE COURT:  You might sit a little closer to the

19  microphone.

20       THE WITNESS:  Okay.

21       MS. BROWN:  Your Honor, at this time I'd ask that Dr.

22  Shershow be recognized as an expert in hospital

23  administration including credentialing and privileging of

24  physicians.

25       THE COURT:  Any objections?

1       MR. WU:  Objection, it hasn't been established.

2       THE COURT:  Overruled.  Proceed.

3       MS. BROWN:  Thank you.

4   Q   (by Ms. Brown)  So you've talked a little bit about the

5   Joint Commission and if you can just give us the nutshell

6   version of what the Joint Commission is, who started it and

7   what is its mission?

8   A   In a nutshell the Joint Commission was started now

9   almost a 100 years ago and it was 1917 by the American

10  College of Surgeons.  It was--I would say for about the first

11  50 years or so of its existence it was a--it did survey and

12  inspect hospitals and did have--did have standards but it

13  was--I would say from a modern perspective a rather easy, one

14  over lightly process.

15          When the Medicare legislation was introduced by the

16  federal government it named the Joint Commission as a

17  requirement--its accreditation process as a requirement for--

18  as a condition of participation in Medicare and that gave it

19  of course a whole--a much greater stake and importance in

20  standards of care.

21          So I would say since--since the 1970s certainly and

22  for sure since the 1980s the Joint Commission Standards have

23  expanded vastly.  They are--I think although they're not

24  officially the standard of care of America they're certainly

25  widely recognized as the closest thing to that.

1              The Joint Commission inspects every hospital that

2    it accredits, which is about 5,000 hospitals in America, once

3    every three years regularly.  And if there are reports of

4    difficulty or--or adverse--adverse events it will sometimes

5    do an unannounced surprise inspection which I participated in

6    quite a few times.

7              So I think it's--although it's not a governmental

8    agency it's recognized by the government, required by most

9    states as part of the hospital's license.  And I think widely

10   recognized as the closest thing to a standard of care in

11   America.

12   Q    What is the relationship between the VA, the Veterans

13   Administration Hospital System and the Joint Commission?

14   A    Well, I don't think there's a formal relationship.  The

15   VA is the--I believe is the largest hospital system in

16   America, I think three to 400 hospitals.  And so of course

17   the Joint Commission and the VA work together a lot.

18             I know personally since I've accredited, inspected,

19   and consulted to--to--oh, I would say probably 30 or 40 VA

20   hospitals over the years I know the VA is very focused on the

21   Joint Commission and tries to adapt its practices to the

22   Joint Commission and feels very strongly that each of its

23   hospitals need to be accredited by the Joint Commission and

24   to do well in the accreditation process.

25   Q    And are you familiar with the standard of care for

1    accreditation--or excuse me for credentialing and privileging

2    physicians in hospitals in general in the United States and

3    VA hospitals in particular?

4    A    Well, again, the standard--there is no official standard

5    of care.  I think the Joint Commission Standards comes close

6    to it.  The V&A--the V--the Veterans Administration has its

7    own handbook.  Other states and hospital systems and

8    certainly HCFA--the CMC it's now called has standards also

9    for Medicare so they are other standards but I think the

10   Joint Commission probably comes closest to standard of care.

11         Most of the standards as I read the VA--the

12   Veterans Administration handbook, as I read the CMC

13   Standards, they're very close to the Joint Commission.  They

14   --they differ only in small technicalities.

15   Q    So what I hear you saying is that there's a lot of rules

16   and regulations whether by the VA itself or the Joint

17   Commission, right?

18   A    (No audible response.)

19   Q    And then all of those taken together establish what a

20   reasonable hospital should do in terms of credentialing and

21   privileging physicians?

22   A    I would say so.  And I would also add to that as someone

23   who has been in hundreds of hospitals over the past 25 years

24   there's common national practice which I would refer to too--

25   there are certain things that hospitals in America--just

1   everybody does it.  And I--I think that is--that also has a

2   role in establishing in my mind the standard that others

3   should live by.

4   Q    All right.  So just so we're clear when we're--we're--

5   because I don't want to--I want to make sure we're not mixing

6   our terms between you and me--so when I use standard of care

7   in terms of credentialing and privileging I'm going to be

8   talking about what a reasonable hospital would do at the time

9   frame we're talking about.

10  A    Yes.

11  Q    As opposed to referring to a particular JCAHO standard

12  as the standard of care.

13  A    Yes, that is correct.  Although I think the JCAHO

14  standard is one of our touchstones.  I think the standard of

15  care throughout America is--is--should be consistent.

16  Q    Now, does the VA have it's own documents that mandate

17  what should be done at the hospital level in terms of

18  credentialing and privileging specific physicians?

19       A    Yes, I've seen various documents over now two to

20  three decades at the--at the VA.  Currently the document that

21  you supplied me the--the manual seems to be the current

22  statement of the Veterans Administration, which as I read it

23  reaffirms in broad outline most of the Joint Commission

24  Standards.

25            MS. BROWN:  And, Your Honor, VHA handbook on

1   credentialing and privileging has been marked as Plaintiff's

2   Exhibit 46.  It was also marked by the defense as an exhibit

3   and I believe it is a stipulated exhibit.

4        THE COURT:  Agreed?

5        MR. WU:  No objection, Your Honor.

6        THE COURT:  All right.  46 received.

7        (Plaintiff's Exhibit 46 was received in evidence.)

8   Q    (by Ms. Brown)  All right.  Dr. Shershow, now the

9   credentialing and privileging handbook, Exhibit 46, and I

10  think it--the clerk will help you with that.

11  A    Okay.  It's just numbered here, okay.

12  Q    And that--that is a document with which you are

13  familiar?

14  A    Yes, I've seen this document before.

15  Q    All right.  And if we would look at Exhibit 46 page 4

16  please.

17       MS. BROWN:  Your Honor, do you have a copy of that?

18       THE WITNESS:  Yes, I am.

19       THE COURT:  I'm looking for it.  Yes, I do.

20  Q    (b Ms. Brown)  All right.  On the 46 page 4, under

21  number two it says scope 2a, "All VHA healthcare

22  professionals who are permitted by law in the facility to

23  provide patient care services independently must be

24  credentialed and privileged as defined in this handbook."

25  Does that then apply to Dr. Kindt for the time frame that

1  we're talking about in say 2008 through 2011?

2  A    I would say definitely yes.

3  Q    All right.  When it says that they must be credentialed

4  and privileged as defined in this handbook does must imply

5  this is a nondiscretionary function?

6  A    No.  To--to me there is nothing discretionary about

7  credentialing and privileging.  It is an absolute requirement

8  and certainly from a Joint Commission's perspective when we

9  see it not done properly we are quite severe on the hospital.

10 Q    Okay.  And in terms of following the outline of the VHA

11 handbook why is it important that this is not discretionary?

12 A    Well, if it was discretionary a chief of service or a

13 medical director or a governing board of a hospital could--

14 could chose to allow a physician to practice without similar

15 credentials and would allow privileges without a similar

16 investigation.  And I think--I just can't imagine anybody who

17 would advocate that.

18 Q    All right.  I want to look at Exhibit 46 page 5 because

19 I want to look at a couple of definitions that we're going to

20 be talking about.  The first one is credentialing, what is

21 the definition of credentialing as applies in this case?

22 A    We usually, just to make it understandable, we usually

23 separate credentialing and privileging as kind of two aspects

24 of qualifying a physician to practice in a hospital.  The

25 credentialing is their--their--their formal background, their

1    medical school graduation, the state license, things like

2    that.

3          The--but all people in one specialty don't do the

4    same thing in the hospital, some--in the surgical fields for

5    example some surgeons might do certain types of procedures

6    because they've had training in that procedure and they're

7    experienced and others with a similar specialty might not do

8    those procedures.

9          So privileging--credentialing is establishing the

10   doctor's--his or her basic privilege--basic credentials to be

11   on the medical staff and in that department.

12         Privileging is what the--what the doctor will

13   actually do in the hospital.

14   Q    Okay.

15         THE COURT:  Excuse me, what page?

16         MS. BROWN:  I'm sorry, page 5 of Exhibit 46.

17         THE COURT:  I don't have--that doesn't match the--

18         MS. BROWN:  There should be right in the center at the

19   bottom there's a small number it will be 46-0005.

20         THE COURT:  All right.

21         MS. BROWN:  On the left page, so that's the bates

22   numbered on it.

23         THE COURT:  All right.  Let's get clear, you said page

24   5, there's also pagination on the right corner so--

25         MS. BROWN:  I apologize there's actually pagination--you

1    know, the even numbers are paginated on the document on the

2    left and the--

3          THE COURT:  Well, we'll deal with the bates--

4          MS. BROWN:  Yes.

5          THE COURT:  --stamp numbers.  All right.

6          MS. BROWN:  Yes.  I apologize, Your Honor.

7    Q    (by Ms. Brown)  So credentialing according to VHA

8    handbook is defined here--it includes a systematic process of

9    screening and evaluating qualifications and then it also

10   talks about health status, do you see that on page 5?

11   A    I do see that, yes.

12   Q    Why is the--looking at a physician's health status

13   important as far part of this credentialing process?

14   A    Well, because--and this is also a Joint Commission

15   Standards, it's obvious that--that a physician that had a

16   physical or emotional or cognitive deficit might not be able

17   to perform certain privileges.

18          Just take an obvious example, the surgeon had

19   limited eyesight that might be an issue; he might be--he or

20   she might be completely competent and experienced and have

21   the training but because of their health status they couldn't

22   perform certain types of privileges.

23          So health status, both physical and mental, are

24   considered to be something that needs to be evaluated and

25   established for every physician.

1  Q    And then similarly right below credentialing under the

2  definition of clinical privileging it also includes

3  evaluating health status?

4  A    Yes, a health status would be something that would

5  overlap both areas.

6  Q    All right.  And if we look at Exhibit 46 page 6 for the

7  definition of competency, "Competency is documented

8  demonstration of an individual having the requisite or

9  adequate abilities or qualities capable to perform up to a

10  defined expectation."

11        When they say documented demonstration what are

12  they talking about?

13  A    A competency is a word that the Joint Commission uses a

14  lot to competency is--is a--is a--is a combination of not

15  only training and experience but the current ability.  We

16  usually--we often use the phrase current competence because a

17  physician might have been competent five years ago but might

18  not be today and that has to be evaluated.

19        And I think the--what the--that's what this is

20  referring to, the current competence of the physician who is

21  capable physically and mentally in terms of his cognitive

22  abilities to perform the privileges that he's going to be

23  given.

24  Q    And then number J is one standard of care.  Now, is that

25  something that's found not only in the VHA handbook but also

1    within the Joint Commission rules and regs?

2        MR. WU:  Objection.  Your Honor, I would objection--

3    object to any testimony regarding the substance of what the

4    Joint Commission Standards say.  It's not only not in

5    evidence but--

6        THE COURT:  Overruled, proceed.

7    Q    (by Ms. Brown)  The--

8    A    Yes.

9    Q    --idea of one standard of care does that--is that

10   commonly considered within the hospital administration and

11   credentialing and privileging arena?

12   A    Yes.  The Joint Commission has a very famous standard

13   which has to do with a single level of care, the Joint

14   Commission calls it a one standard of care; that is it's a

15   strongly felt value I think for all of us in administration

16   and in regulatory affairs that--that a patient should have

17   the expectation that wherever they go in a hospital, whatever

18   physician they see, whatever department that there is a

19   single standard of care and--and it's not a pot luck.  And I

20   think that's I would say particularly important in a--in a

21   system like the VA where there is less choice of--of your

22   actual--you're not coming in with a private physician, but

23   you're kind of assigned to a physician.

24            And so that's--it's important that all physicians

25   be up to a level--a desirable level of quality of care so

1    that the quality and the safety of the treatment is uniform

2    throughout the hospital.

3    Q    What is the importance of this process of credentialing

4    and privileging physicians?

5    A    The importance of it is to establish the competency,

6    competency defined as everything I've talked about, of the

7    physician to perform the privileges that they're given.

8    Q    Now, then look a little bit--referring to the process

9    now, historically how did peer review--one physician

10   commenting on another physician's abilities--factor into the

11   credentialing and privileging process?

12   A    Okay.  Very briefly.  You know, I could give a seminar

13   on this, but I'll make it as brief as possible.  I would say

14   in the 1980s, '70s and '80s about the time I came into the

15   Joint Commission what was considered to be cutting edge

16   quality assessment was what we would now call individual peer

17   review, that is a peer, another doctor with similar training

18   and background, reading a doctor's chart or looking at the

19   way a case was handled either surgically or medically or both

20   and making comments about any quality issues that seem to be

21   apparent.  Individual case review was what we really did and

22   certainly in the '80s when I first became a Joint Commission

23   surveyor.

24             In the 1990s this changed rapidly.  And by the late

25   1990s although individual case review was certainly still

1    considered to be important and necessary we had much more

2    move to aggregate data, rate base data, physician specific,

3    infection rate, complication rate, the way certain

4    medications are used, a death rate, a length of stay issues,

5    all--all the kinds of quality and safety issues as aggregate

6    data physician specific is now known to be a much more

7    powerful way of assessing the quality and the safety of a

8    physician's practice patterns.

9    Q    Now, in this case--because you just mentioned about peer

10   reviews, somebody sitting down and reading--another physician

11   is actually pulling their charts and looking at them, is

12   there any evidence based upon what the United States has

13   produced in this case related to Dr. Kindt that anyone did

14   that with any of Dr. Kindt's charts?

15   A    No.  As I said in my report what I was astounded by

16   because I've seen a lot of VA hospitals is--at least what I

17   was provided with on--on several occasions as the documents

18   kept coming I didn't see any evidence that even the older

19   individual case review we--we know call that peer review,

20   individual peer review, I didn't see any documentation that

21   that was done ever on Dr. Kindt in what I was shown.

22   Q    So the peer review file that you were--or excuse me the

23   credentialing file that was given to you how many different

24   iterations of that did you receive?

25   A    When you first contacted me you gave me a large file, I

1    --I looked through it carefully and didn't see anything to do

2    with peer review and as I--as I said to you at that time.

3    Later you sent me--I guess you had been provided with more

4    documents and I did an addendum to my report.  Again, I

5    didn't see any evidence of peer review much less aggregate

6    data or any more modern performance monitoring.

7              And very recently just in the last few weeks you

8    sent me I guess some further material that had been sent.

9    And again there was no actual data, either individual or

10   aggregate on Dr. Kindt.

11   Q    How did--so we talked about peer review, is that

12   different than peer recommendations?

13   A    Yes, it's--it's somewhat confusing.  I--I liked--for

14   peer recommendations I liked to use the term letters of

15   reference because I think people understand that much better.

16   But in the Joint Commission language for some reason they use

17   the term peer recommendation; that's not peer review that's a

18   peer, typically a department or section chairperson,

19   assessing the quality data and making a--making some summary

20   comments about it.

21   Q    And again in terms of peer recommendations is the idea

22   that the peer who is making the recommendations--in this case

23   say Dr. Brega recommending Dr. Kindt is the idea that they're

24   actually looking at charts or a specific patient review?

25   A    That--that's absolutely the Joint Commission

1   expectation.

2   Q    Is that also VA?

3   A    And the VA and the VA expectation.  We call it in our

4   kind of lingo a substantive peer recommendation.  And what we

5   mean by the word substantive is it's not just what is often

6   referred to as a good guy or good gal.  You know, he's okay,

7   she's okay, she's a good physician, everyone likes her;

8   that's not what we see as a peer recommendation from a

9   department or section chairperson.  We want it to be what we

10  say data based.

11         And we want them to refer to the quality track

12  record so that it's clear that this doctor is providing

13  quality care and safe care for patients.

14  Q    All right.  You had mentioned a little earlier the

15  concept of aggregated data or data--I'm from Montana, it's

16  data there--what is aggregate data?

17  A    Okay.  Aggregate data is--is all--let's see if I can say

18  it in a way that's--that's not too technical.  It's all the

19  data on--on a particular--particular field of interest.

20         Let's take infection and control because that's

21  kind of an easy one to conceptualize.  The--the surgical

22  infection rate or sub-surgical infection rate and one

23  surgical subspecialty or the hospital post-surgical infection

24  rate might be 10 percent say, now, that might move national

25  standards but if you look at that data physician specific you

1    might find that a few physicians, their infection rate

2    surgeons, let's say, post-operative infection rate is 15

3    percent or higher whereas some physicians is 5 percent.

4            Well, that's very valuable data we think because

5    those physicians with the very high infection rate we ought

6    to take a look at them carefully and look--and maybe some

7    individual case review at that point to look at their cases,

8    why is there infection rate so high.  Are there some quality

9    issues; is there something we should be concerned about.

10           So that's just an illustration of how powerful

11   aggregate data is.  And I think that's been known in the

12   field now I would say since--as I said the 19--late 1990s and

13   it's been actively taught by the Joint Commission.

14           And you see it everywhere.  It's no longer

15   something that is unusual to see as it might have been in the

16   1980s.

17   Q    When did the VA hospital system start collecting

18   aggregate data?

19   A    Well, I can't tell you that of course for sure because

20   I'm not an expert on, you know, the history of the VA quality

21   improvement, but I can tell you that the VA has always been

22   in the forefront of Joint Commission Standards and--and--and

23   --and surveys and has always taken it very seriously.

24           And I can remember specifically in the late 1990s

25   in consulting and inspecting VA hospitals wonderful aggregate

1    data at many hospitals, absolutely.  They had--in some cases

2    better computer capability than private hospitals did.  So I

3    was surprised in this case to see the absence of it.

4    Q    So can you--can you state that more likely than not that

5    at least by say 2000, the turn of the century, that the VA

6    hospital system had the capability to not only, you know, not

7    only generate aggregate data but to make it available for

8    review?

9    A    Well, you know, I can't say that with definite--I mean

10   I'm not an expert in every aspect, in every VA hospital in

11   the country, but I--I would say that the VA hospitals that I

12   saw around the turn of the century were well on their way to

13   being effective accumulators of aggregate data in every

14   department--

15   Q    In your--

16   A    --not just surgery.

17   Q    --opinion starting at least in 2000, maybe earlier,

18   should a reasonable hospital been not only collecting but

19   also using aggregate data, physician specific performance, as

20   part of its credentialing and privileging process?

21   A    I would say, yes, definitely.

22   Q    Why the trend away from peer recommendation or chart

23   review to aggregate data?

24   A    Well, that's a long story but I think the bottom line is

25   people began to feel in the 1990s--and I certainly felt this

1    personally based on my survey and experience very acutely

2    that individual peer review was frequently very subjective;

3    that it was--it was your colleagues checking you and, you

4    know, often they were your best friends.  And it was

5    difficult for doctors--if you only did individual case review

6    to really make what would be considered an accurate

7    statement.

8              And most importantly we didn't see--we didn't see a

9    lot of quality activities taking place as a result of the

10   monitoring.  We saw everything is fine, case is okay, case is

11   okay, case is okay, we felt there had to be a more objective

12   way to measure it.  And I think that's why there was the move

13   to aggregate data in the 1990s.

14   Q    And in prior credentialing and privileging these peer

15   recommendations are not anonymous, right?

16   A    No, and--and they--and they go back quite a ways, at

17   least to the 1980s or probably even before my time in the

18   Joint Commission.  No, they're not anonymous.  Peer

19   recommendations--certainly the chairperson's peer

20   recommendation is not anonymous.  And sometimes other peer

21   recommendations are from other doctors either inside or

22   outside the hospital are not anonymous and they're not

23   secret, they're seen by everybody including the candidate,

24   the applicant.

25   Q    And then in this case--at least in the 2006, 2008, 2009

1    time frame one of the two people doing peer recommendations

2    for Dr. Kindt was Dr. Brega?

3    A    That's correct.

4    Q    And they worked together day in and day out at the VA?

5    A    Yes.

6    Q    Okay.  What--what documents have you reviewed to--as

7    part of your evaluation in this case?

8    A    Okay.  I thought you had asked me that so I made--I mean

9    I can refer to a few notes, I just jotted down what I've--

10   Q    You may.

11   A    --actually seen.  You sent me a number of documents.

12   You sent me three depositions, Dr. Kindt's, Dr. Whitehill's,

13   and Dr. Brega's depositions; I've read all of those.  You

14   sent me the complaint in the case; you sent me the VA, the

15   bylaws, the medical staff bylaws of the VA at this hospital.

16             As I said earlier on several occasions I received--

17   I guess they were pieces of Dr. Kindt's credential file.  You

18   also sent me the contract for neurological services which I

19   believe was between the medical school, the University of

20   Colorado Medical School and--and the VA.  And you sent me one

21   additional--the VMA handbook and then recently you gave me an

22   updated version of that.

23   Q    The VHA handbook?

24   A    The V--I think it's called the Veteran--VHA handbook,

25   excuse me, not the VMA, VHA handbook.

1    Q    Okay.

2    A    I think those are--that--I think that's the totality of

3    the documents I reviewed.

4    Q    Based upon your review of those documents, based upon

5    your education, experience, and training, do you have an

6    opinion whether the Denver VA met the standard of care in

7    terms of its evaluation of Dr. Kindt during the credentialing

8    and privileging process in 2009?

9    A    Yes, I do have an opinion.

10   Q    And what is your opinion?

11   A    My opinion is that the credentialing--the credentialing

12   and privileging--or I would say the re-credentialing and

13   privileging activities in 2009 did not meet--did not meet the

14   standard of care.

15   Q    Okay.  I'm going to talk first about their use or nonuse

16   of aggregate data and then we'll talk about their actual

17   actions in 2009 and 2011.  What aggregate data based upon

18   your review of the depositions in this case was available to

19   Dr. Whitehill in 2009 for use as part of the privileging and

20   credentialing process?

21   A    Well, I don't think any way.  I mean I read his

22   deposition several times.  He does refer sort of vaguely to

23   some aggregate data but I--but I--I didn't get a clear sense

24   of whether there was any that he--that was available to him.

25   Q    Was--

1  A    Certainly none of it was physician specific.  I think

2  that was pretty clear.

3  Q    Well, when you say it wasn't available, do you mean it

4  didn't exist or no one sought it ought?

5  A    I can't be sure of that.  I don't know was the answer I

6  think to that.  I--I hope it existed, but if it did he didn't

7  seem to be very aware of it.

8  Q    Was it the standard of care in 2009 to not only have

9  aggregate data but to actually use it to look at physician

10 specific performance?

11 A    Most assuredly, yes, that's correct.

12 Q    We have heard--you weren't here for opening statements

13 but heard Mr.--one of the U.S. Attorneys say that every six

14 months five or six cases of physicians including Dr. Kindt

15 was being reviewed as part of ongoing physician evaluation.

16 Was there any evidence of that at all in the credentialing

17 and privileging file?

18 A    I haven't been shown anything that would allow me to

19 substantiate that.

20 Q    In light of the failure of the VA, the Denver VA to

21 utilize aggregate data, either because they didn't have it or

22 because they had it and didn't look at it, in light of that

23 failure was Dr. Kindt in your opinion properly credentialed

24 and privileged--privileged in 2009?

25 A    No, I don't believe he was.

1  Q    Should Dr. Kindt have been operating or supervising

2  residents if his ability to continue the practice of

3  neurosurgery was not adequately investigated during the

4  credentialing and privileging process?

5  A    Well, my view would be--and I think I would speak, you

6  know, for the Joint--certainly for the Joint Commission view,

7  but certainly my own personal view--and I think a few would

8  disagree with me--is a doctor shouldn't be practicing at all

9  in a hospital in any capacity unless he's properly

10  credentialed and privileged and that process is redone every

11  two years; that's the Joint Commission standard, that's the

12  VA standard, and that's the national practice virtually

13  everywhere you go.

14  Q    So not just your personal opinion but by industry

15  standards he should not be operating unless he's been

16  adequately investigated as part of the credentialing process?

17  A    That is correct.

18  Q    All right.  Let's talk specifically about 2009 and then

19  we'll look at some documents.  In 2009 was there anything

20  that should have triggered a more in-depth investigation of

21  Dr. Kindt and his physical and cognitive abilities?

22  A    Well, I--I think as I pointed out to you when you sent

23  them to me, Dr. Kindt had just relinquished, voluntarily

24  relinquished his--his--his privileges to do cranial surgery

25  and was applying for privilege to do spinal surgery.  I would

1    think that a credentials committee and a department would

2    want to look into that rather carefully.  For a surgeon not

3    to do cranial surgery is a pretty central move.

4    Q    In your review of the depositions of doctors Whitehill,

5    Brega, and Kindt, did there seem to be a lack of

6    understanding among them as to the reason for the reduction

7    of privileges in 2009?

8    A    I did--don't get the impression that they really

9    understood--at least from what they said in their depositions

10   of why he had given up his privileges and they didn't seem to

11   be curious as to why he had.  I would think they would have

12   been intimately involved and--and what to know the reason for

13   that and use that as potentially a red flag to investigate

14   that further.

15   Q    If there had been further investigation in 2009 such as

16   specific interviews with the head of the hospital or other

17   neurosurgeons, that sort of thing, should that have been

18   reflected in the credentialing and privileging file?

19   A    Absolutely.  I mean--

20   Q    And was there anything--any additional investigation

21   once there was the reduction of privileges into to why those

22   were reduced and conclusions made about fitness for practice?

23   A    There--there's certainly no statement in that regard in

24   their recommendation that I've seen.  And in--and in their

25   depositions I did not get any clear answer from them as to

1  why they didn't investigate it further.

2  Q    All right.  I'm going to talk about Exhibits 16 and 44.

3       MS. BROWN:  And, Your Honor, these are stipulated

4  exhibits.  These--this together is Dr. Kindt's credentialing

5  and privileging file that's been produced by the United

6  States.

7       THE COURT:  All right.

8       MR. WU:  No objection, Your Honor.

9       THE COURT:  16 and 44 are received.

10      (Plaintiff's Exhibits 16 and 44 were received in

11  evidence.)

12 Q    (by Ms. Brown)  So without going through--

13 A    I'm not sure what we're on right now.

14 Q    Just--

15 A    There's no 16 in here.

16      THE CLERK:  44 is in that notebook.

17      THE WITNESS:  Okay.  Thank you.

18 Q    (by Ms. Brown)  Okay.  I'm going to start with Exhibit

19 16 page 107.

20      MS. BROWN:  And again, Your Honor, these should be some

21 bates numbered at the bottom.

22      THE COURT:  Okay.

23 Q    (by Ms. Brown)  So this--let me know when you're there,

24 Doctor.

25 A    I'm--I'm here, yes.

```
 1   Q    So this is an application for neurosurgical procedures
 2   completed by Dr. Kindt back in 1985, do you recall seeing
 3   that as part of your review in this case?
 4   A    The one I have says 2006 so are you sure this is the
 5   right--
 6   Q    At the--
 7        MS. BROWN:  May I approach the witness, Your Honor?
 8        THE WITNESS:  I can look at--
 9        THE COURT:  What page?
10        MS. BROWN:  107.
11        THE COURT:  All right.  107.
12        THE WITNESS:  Is that the bates number or--
13        MS. BROWN:  It's the bates number.
14        (Pause.)
15        THE WITNESS:  Okay.  I'm there now.
16   Q    (by Ms. Brown)  Okay.  And I'm just using this as an
17   example.  Did you see these similar documents from at least
18   1985 up through 2009 for Dr. Kindt?
19   A    Well, I saw some of them, they--they weren't all there
20   every two years, but there were some there I saw, yes.
21   Q    So should there have been this type of document for
22   every two years that Dr. Kindt was practicing at the VA?
23   A    Yes, this is what we call a privileged list.  And the
24   idea is that the doctor every two years reapplies for the
25   privileges if he is--if he or she is going to.  And then
```

```
 1   they're either--each privilege is either given or not given

 2   depending on his or her quality and safety track record.

 3   Q    And was the--a similar document present in the file for

 4   each of the review of Dr. Kindt?  Each of the two year

 5   reviews?

 6   A    Yes, you would expect to see this every two years and--

 7   and see it either signed off on or certain privileges perhaps

 8   not agreed to by the department or--or service chief.

 9   Q    Okay.  I want to go then to Exhibit 16 page 362.  Is

10   this the request for privileges for Dr. Kindt from 2008?

11   A    Okay.  Yes, I'm there.

12   Q    Do you see that--

13   A    I do.

14   Q    --it's--and that's signed off on by Dr. Whitehill at the

15   bottom?

16   A    It looks like that to me, yes.

17   Q    Okay.  And then if we can go to Exhibit 16 page 351.

18   A    I'm there.

19   Q    And that's actually--that's a several--are these also

20   again his requests for privileges?

21   A    Yes, it looks to me like they have somewhat altered

22   their format which is not a problem.

23   Q    Right.

24   A    But they're--but they are all privileged list, yes.

25   Q    So down at the bottom there it says revised July of
```

```
 1   2009?

 2   A    Yes, I see that.

 3   Q    So they started using a different form?

 4   A    Yes.

 5   Q    Okay.  So--and so this is a, what, a five page document?

 6   A    About that, yes.

 7   Q    So if we go to page--

 8        MS. BROWN:  Your Honor, I don't have the page number

 9   written down may I approach the witness and just look real

10   quick to the last page?

11        (No audible response.)

12   Q    (by Ms. Brown)  Dr. Shershow, what's the last page of

13   that--

14   A    It's page--it looks to me like it's page 355.

15   Q    All right.  If we can look at page 355 please.  Well,

16   wait a minute before we do.  Page 351 what--what is Dr. Kindt

17   requesting for cranial surgery?

18   A    It--it looks like at that point he is not requesting any

19   privileges in cranial surgery.

20   Q    So based upon your review of the privileging and

21   credentialing files is this the first time since at least

22   1985 Dr. Kindt did not request privileges to do brain

23   surgery?

24   A    That's certainly my understanding, yes.

25   Q    All right.  And so let's look at page 355 please.  And
```

1    do you see that Dr. Kindt signed this on November 20th of

2    2009?

3    A     I see that, yes.

4    Q     And then if you look at the bottom of that it was signed

5    off by doctors Brega and Whitehill on December 18th of 2009?

6    A     Yes.

7    Q     Now, it says there constructed with Dr. Brega based upon

8    your review of the deposition of Dr. Whitehill what is that

9    referring to?

10   A     I think he--he means he was--he had done it for Dr.

11   Brega is what he said I believe in his deposition.

12   Q     You mean Dr. Kindt?

13   A     No, excuse me, Dr. Whitehill.

14   Q     Right.  Dr. Whitehill constructed this form--

15   A     For Dr. Brega.

16   Q     Okay.

17   A     I think he said she was busy or something.

18   Q     So the fact that on December 18th doctors Brega and

19   Whitehill--or at least Dr. Whitehill signed off on that, what

20   does it tell us about whether he knew that there was a change

21   in requested privileges at that point?

22   A     In the very document he's signing there is a change of

23   privileges so I have to assume he knew or at least should

24   have known that Dr. Kindt had relinquished his cranial

25   privileges.

1    Q    And if he was constructing this form with Dr. Brega as

2    it says there is it reasonable to conclude that Dr. Brega was

3    aware at least of December--as of December 18th of this

4    reduction in privileges?

5    A    Given the fact--I believe they are the only--Dr. Brega

6    and Dr. Kindt were the only two neurosurgeons in the hospital

7    it's hard to imagine that Dr. Brega wasn't aware of that.

8    Q    All right.  I want to go to Exhibit 44 bate stamp page

9    3.

10   A    I'm getting better at it.

11   Q    Now, this is a form we haven't looked at yet, but we

12   talked about there being these peer references, is this one

13   of the peer reference forms that were in use at the Denver

14   VA?

15   A    Yes.  This--this is a fairly standard.  One often sees

16   peer references similar to this.

17   Q    And this form is--let's see this is the one signed by

18   Kevin Lillehei, right?

19   A    Yes.

20   Q    And if we can go to page 4 I believe.  This is the same

21   year--the peer reference form signed by Dr. Brega?

22   A    Yes.

23   Q    On December 18th?

24   A    That's what it looks like.

25   Q    Cosigned by Dr. Whitehill?

1    A    Whitehill, yes.

2    Q    So let's look at question number three up above.

3         MS. BROWN:  If we can blow that up please, Kylie.

4    Q    (by Ms. Brown)  Dr. Brega had to answer the question

5    whether any action had been taken regarding this

6    practitioner's clinical privileges including but not limited

7    to denial, suspension, reduction, or revocation, and she

8    answered, no, right?

9    A    Correct.

10   Q    Was that true?

11   A    Well, it--it's certainly not true if Dr. Kindt is

12   relinquishing his privileges.  It's true that it wasn't--at

13   least as far as we know done under duress or as a--as a

14   disciplinary action, but it--it certainly was a reduction.

15   And--which they were acknowledging and presumably agreeing

16   to.

17   Q    Under the standard of care for privileging and

18   credentialing, first of all, should that have been a yes?

19   A     I should think it would have been a yes if she

20   understood the question.  There's--I mean the reduction is

21   quite clear.

22   Q    And certainly when Dr. Whitehill cosigned that document

23   on December 18th even if Dr. Brega was somehow confused what

24   should Dr. Whitehill have done if he was following the

25   standard of care for credentialing and privileging this

1    surgeon?

2    A    I think we--we--we--we should assume that anybody who

3    signs or cosigns such a document has read it and agrees with

4    it.

5    Q    And so when number three the answer is no and we know

6    that Dr. Whitehill knew that there had been a reduction in

7    privileges, a substantial reduction, what should have

8    happened here?

9    A    I--I think there should have been some comment

10   concerning it.

11   Q    So what we have in 2009 is a surgeon who for at least 25

12   years has been doing brain surgery, right?

13   A    Correct.

14   Q    And has--

15   A    That's my understanding.

16   Q    --a sudden reduction in privileges, correct?

17   A    That's my understanding, yes.

18   Q    And we have a peer reference questionnaire that isn't

19   accurately reflecting that?

20   A    I would agree with that.

21   Q    Should this information--and knowing that this surgeon

22   is 79 years old--should this information have prompted

23   someone to investigate further whether there were physical or

24   cognitive problems that led to that reduction?

25   A    I would say absolutely yes.  I--I would say when one is

1    credentialing and privileging an elderly physician in any

2    case, you know, cognitive ability has to be--has to be

3    something that everybody considers certainly as part of

4    health status.

5            But in this particular case all the more so since

6    the doctor is clearly giving up a major area of his

7    specialty.  It's hard to understand why that wasn't commented

8    on on these recommendations.

9    Q    Based upon your review of the depositions in this case,

10   specifically I think the deposition of Dr. Whitehill, did it

11   appear that the process for credentialing Dr. Kindt in 2009

12   was rushed?

13   A    Well, there's some implication of that in their--in

14   their depositions.  I would say just looking at the documents

15   themselves the most generous thing I could say is it wasn't

16   done very carefully.  It was done--it was done in a pretty

17   haphazard manner without any substance to it that one would

18   expect.

19   Q    Okay.  I want to talk about 2001--or excuse me, 2011.

20   And even though this was after Dr.--Mr. Lopez's surgery I

21   want to ask you about some of the facts that shed light on

22   the overall credentialing and privileging process at the VA

23   hospital, okay.

24   A    Okay.

25   Q    So if we look at Exhibit 44 page 1.

1     MR. WU:  Objection, the 2011 credentialing is not--

2     THE COURT:  Yes, what's your purpose?

3     MR. WU:  I'm sorry?

4     MS. BROWN:  It goes to the haphazard nature of the

5     credentialing process at the VA--

6     THE COURT:  Well, in what respect?

7     MS. BROWN:  Pardon me?

8     THE COURT:  In what respect?

9     MS. BROWN:  Dr. Kindt had another substantial reduction

10    in his privileges and again no investigation appears in the

11    credentialing file as to the reason for that, whether there

12    was a physical or cognitive--

13    THE COURT:  Yeah.

14    MS. BROWN:  --impairment.  Again--

15    THE COURT:  Objection sustained.

16    MS. BROWN:  All right.

17    (Pause.)

18 Q  (by Ms. Brown)  In 2009 when the first substantial

19    reduction in privileges occurred, should someone at the VA

20    hospital at least attempt--attempted to look for aggregate

21    data for Dr. Kindt in particular to assess what was going on

22    with his patients across the board in terms of complications,

23    readmission rates, infection rates, that sort of thing?

24 A    I think they should look at that on every physician,

25    but, yes, I would think that a neuro--a neurosurgeon such as

1   Dr. Kindt--and I have to say particularly an elderly one, an

2   aging one, who was giving up a large area of his privileges

3   one would have thought that that would have been certainly

4   something they would have done.

5        MS. BROWN:  May I have a moment, Your Honor?

6        THE COURT:  Yes.

7        (Pause.)

8   Q   (by Ms. Brown)  So, Dr. Shershow, the 2010 time frame,

9   which his the time frame when Mr. Lopez's surgery occurred,

10  would that be what was--part of what was being evaluated for

11  the credentialing in 2011?

12       MR. WU:  Objection, this opinion has not been

13  (inaudible) reported.

14       THE COURT:  Sustained.

15  Q   (by Ms. Brown)  In the absence, Dr. Shershow, of looking

16  at aggregate data or actually doing a physical or cognitive

17  examination of Dr. Kindt--well, strike that.  Have all of the

18  opinions you've given here today been expressed to a

19  reasonable degree of probability?

20  A   Yes, they have.

21  Q   And--

22       MS. BROWN:  All right.  I believe those are all my

23  questions.

24       THE COURT:  All right.

25       MS. BROWN:  Thank you.

1     THE COURT:  We'll take the mid-morning recess before

2  cross-examination.  So one of the things I'll ask you to do

3  is these exhibit lists--

4     MS. BROWN:  Yes.

5     THE COURT:  --if you'll mark those that are stipulated.

6     MS. BROWN:  Yes.

7     THE COURT:  You can do that during the noon hour.

8     MS. BROWN:  Okay.

9     THE COURT:  So it would be easier for us to follow if

10  you have those marked.

11     MS. BROWN:  Yes.

12     THE COURT:  Both sides.  All right.  Recess.  15

13  minutes.

14     (10:17 a.m. - Recess accordingly.)

15     (At 10:31 a.m. on December 15, 2014, with counsel for

16  the parties present, the following proceedings were had:)

17     THE COURT:  Be seated please.  All right.  Mr. Wu?

18                    CROSS-EXAMINATION

19  BY MR. WU:

20  Q    Good morning, Dr. Shershow.

21  A    Good morning.

22  Q    So I heard you talk about the interaction between the

23  Joint Commission Standards and the--and the VA handbook,

24  correct?

25  A    I don't believe I said the VA handbook, I said I was

1    aware over the years of collaboration on committees and

2    conferences and things like that I would hear about it at the

3    Joint Commission.

4    Q    And you reviewed the VA handbook as to credentialing and

5    privileging as part of your written report; is that correct?

6    A    I--I did, yes.  At least I--particularly the sections

7    that dealt on--to the issues in this case.

8    Q    And it was your testimony that those standards are

9    fairly similar to those and--and to those of the Joint

10   Commission, right?

11   A    They seem to me--the time frames involved to be quite

12   similar, yes.

13   Q    So in terms of the VA handbook, which I believe the

14   number is 1100.19, you have no qualms with the written

15   version of the handbook specifically, correct?

16   A    I'm not sure I know what you mean by no qualms.

17   Q    You don't think anything in the handbook is--is

18   deficient or in any way out of order when you reviewed it?

19   A    I--I wouldn't say that.  I--and I certainly don't pose

20   as an expert on the VA handbook, but I was shown it on this

21   case by the plaintiff's attorney because she thought that

22   that paralleled the Joint Commission in certain--the sections

23   that I was talking about and I agreed with her.  But I

24   certainly am not an expert in the entire handbook, no.

25   Q    But the sections you reviewed are parallel or very

1    similar to the Joint Commission Standards, correct?

2    A    I was specifically looking at the sections that had to

3    do with the use of physician specific aggregate data.  And

4    those seem to be--to be very similar to the Joint Commission

5    requirements, yes.

6    Q    Is that the only section of the handbook that you

7    reviewed?

8    A    Pretty much.  I flipped through the rest of it but

9    that's the one I--I really read carefully, in both the 2008

10   edition and I was subsequently shown the 2011 edition of the

11   handbook and they--they looked--the section on aggregate data

12   looked identical to me.

13   Q    So your testimony is that you didn't review the entire

14   VA credentialing and privileging handbook?

15   A    No, I did not.

16   Q    So--

17   A    Not in detail; I looked through it but not in detail.

18   Q    --so if you were told that the VA handbook was the

19   standard by which the VA judges its credentialing and

20   privileging process you would have no opinion on that,

21   correct?

22   A    I would have an opinion on that.

23   Q    But you just said you didn't review the whole handbook?

24   A    The credentialing and privileging process is a--is a

25   condition for their Joint Commission accreditation of each

1   hospital.  The hospital is not accredited based on the

2   handbook, they're credited based on Joint Commission

3   Standards.  So I would think that the Joint--that the

4   Veterans--the Veterans Administration would have wanted the

5   handbook to further the goal of the Joint Commission

6   accreditation that would be my assumption.

7   Q    But you also stated that the Joint Commission handbook

8   is not a standard of care, correct?

9   A    Excuse me what are you referring when you say a Joint

10  Commission handbook?

11  Q    I'm sorry the Joint Commission Standards do not set the

12  standard of care, correct?

13  A    There--there is no official standard of care document in

14  America to my knowledge.  I said that the Joint Commission

15  Standards, I think for most people, come the closest to that,

16  but they are not in any way the official standard of care.

17  No such document exists.

18  Q    So they're not legally binding upon the VA?

19  A    Well, that's a legal question.  I'm not an attorney, you

20  can't--I can't answer that question.

21  Q    But you've been involved in Joint Commission activities,

22  correct?

23  A    Yes, I have.

24  Q    And you've visited hospitals as part of the

25  accreditation process?

1  A    Correct.

2  Q    And it's not true that as part of that process a

3  hospital can't be accredited if they don't meet every single

4  Joint Commission standard; isn't that right?

5  A    Well, the answer--I can't answer that with a simple yes

6  or no, can I explain--

7       THE COURT:  We're getting far field.  Do you have any

8  criticism with the parts of the VA handbook that you

9  reviewed?

10      THE WITNESS:  The parts that I reviewed, Your Honor, I

11  had no criticism of.

12      THE COURT:  Thank you.

13      MR. WU:  Thank you, Your Honor.

14 Q    (by Mr. Wu)  Would you--would you agree with the idea

15 that over the past say decade or so the field of

16 credentialing and privileging has been in sort of a constant

17 state of change and improvement?

18 A    I--I think the field of credentialing has improved

19 tremendously over the past I would say 30 years.  In the last

20 decade I don't think there's been tremendous change in it, I

21 think much of it came in the early part of the 21st Century

22 and the late 1990s and it has continued.

23      (Pause.)

24 Q    (by Mr. Wu)  You testified earlier that you believed

25 that the--based on your review of the materials you were

```
 1   given the process for credentialing was rushed; is that--is
 2   that a correct summary of your testimony?
 3   A    I said I had that impression both from the deposition
 4   testimony and also from the documents themselves.
 5   Q    And that opinion though--I don't see that in your
 6   written report--it's not in your written report, is it?
 7   A    I--I don't think I expressed an opinion about that in my
 8   written report, no, but I was expressing it today when asked.
 9   Q    Do you know how Dr.--how old Dr. Kindt was at the time
10   he was re-credentialed?
11   A    Which credentialing are you speaking about?
12   Q    I'm sorry, the 2009 period in which he was
13   re-credentialed that covers the period of Mr. Lopez's
14   surgery.
15   A    If memory serves me I believe he was 79 at that point or
16   pretty close to that.
17   Q    I believe you testified earlier that he was 81, but
18   you're saying now he's 79?
19   A    I--I don't remember testifying that he was 81 today
20   but--
21   Q    So your testimony is that he was 79?
22   A    It's my--it's my memory.  Without double checking, yes.
23   Q    You're not a neurosurgeon, right?
24   A    That is correct.
25   Q    And you've never practiced neurosurgery?
```

1   A     That is correct.

2   Q     Never trained in neurosurgery?

3   A     I never was--I obviously had neurosurgical clerkships in

4   medical school and in internship but I--I've never practiced

5   as a neurosurgeon.

6   Q     And you don't hold yourself out as an expert in

7   neurosurgery?

8         THE COURT:  Well, why are you--these are rhetorical

9   questions.  Let's get to the case.

10        MR. WU:  Yes, Your Honor.

11  Q     (by Mr. Wu)  You never reviewed any aggregate data for

12  Dr. Kindt, correct?

13  A     I was never presented any to review.

14  Q     So you don't know what Dr. Kindt's--an analysis of Dr.

15  Kindt's aggregate data might show, correct?

16  A     I can't make any comment about data I haven't seen of

17  course not.

18  Q     And it's possible that Dr. Kindt's error rates if--

19        THE COURT:  Counsel, is it possible--come on.  Get to

20  the case, get to his testimony.  If you've got

21  cross-examination about it use it, otherwise sit down,

22        MR. WU:  All right.

23  Q     (by Mr. Wu)  Let's look at--hold on just a second.

24        (Pause.)

25  Q     (by Mr. Wu)  This is Exhibit 44.  We looked at--if you

1    could look at Exhibit 44 and that's C & P number 4.  And that

2    was the peer reference questionnaire for--that was signed by

3    Dr. Brega and Dr. Whitehill, do you see that?

4    A    That's page 4, yes, I think I see that.

5    Q    Okay.

6    A    Sign in 2009, that's the date?

7    Q    That's correct.

8    A    Okay.

9    Q    And you were asked some questions about question number

10   three of that form that's highlighted in the screen there.

11   A    Yes.

12   Q    So isn't it true that this question would refer to an

13   involuntary reduction in privileges due to substandard care?

14   A    I--I--I believe it certainly does refer at least in part

15   to that, but it could also refer to any action being taken to

16   decrease his privileges voluntarily or involuntarily--at

17   least that's the way I would read it.

18   Q    Isn't it true that there's--that being incompetent or

19   having a substandard standard of care is not the only reason

20   why a physician may reduce their privileges?

21   A    I would say that that's correct, yes.

22   Q    And for--for instance if there was a new piece of

23   technology that came out and--

24        THE COURT:  Counsel, get to his testimony.

25        MR. WU:  Yes, Your Honor.

```
 1  Q    (by Mr. Wu)  So it's possible this question--
 2       THE COURT:  Is it possible--I will not--
 3       MR. WU:  All right.
 4       THE COURT:  --come on.
 5       (Pause.)
 6       THE COURT:  Do you have a question?
 7       MR. WU:  I'm sorry, yes, yes.
 8       THE COURT:  Well, ask it.
 9  Q    (by Mr. Wu)  I'm going to have you look at Exhibit 16
10  and it's near the--near the very back.  It's U.S. 2895.
11  A    I think it must be this book.
12       THE CLERK:  I'm sorry what was the--
13       THE WITNESS:  15.
14       MR. WU:  16.
15       THE WITNESS:  This is 16.
16       MS. BROWN:  I didn't hear the bate number.
17       THE COURT:  There hasn't been one.
18       MS. BROWN:  Okay.
19       MR. WU:  I'm sorry, it's page 16-365.
20       THE WITNESS:  It's 15?
21       THE CLERK:  16.
22       THE WITNESS:  16, so it's the bates number 365.  You
23  wouldn't think I would know what a bates number is, would
24  you?
25       MR. WU:  It's number 16--
```

1      THE COURT:  Look at the screen to save time.

2    Q    (by Mr. Wu)  16-366.

3    A    366, there we go.  Okay.  I'm there.

4    Q    All right.  So this appears to be a--at the top it says

5    declaration of health, do you see that?

6    A    Yes.

7    Q    So it appears to be a declaration of health form.  And

8    the name on it is Glenn Kindt?

9    A    Yes.

10   Q    And next to Dr. Kindt's signature it's dated 10/20/2009?

11   A    Yes.

12   Q    And then underneath there's a confirmation of applicants

13   declaration, do you see that?

14   A    Yes.

15   Q    And it's signed by--it says Kerry Brega?

16   A    I see that, yes.

17   Q    And it's dated 10/21/2009, correct?

18   A    Yes.

19   Q    And you had raised in your reports that a physical

20   health declaration was one of the requirements of

21   credentialing and privileging, correct?

22   A    I did raise that, yes, because it is a requirement.

23   Q    And this appears to be the form that certifies that for

24   Dr. Kindt's 2009 re-credentialing, correct?

25   A    This does appear to be such a form, yes.

1       (Pause.)

2   Q    (by Mr. Wu)  And you testified about the--the peer

3   review process wherein sample cases are reviewed for

4   physicians, do you remember that?

5   A    When I testified about the peer review process--I didn't

6   hear the rest of it.

7   Q    Wherein--I'm sorry, wherein sample cases are reviewed

8   for particular physicians?

9   A    Selected cases are reviewed, yes.  Usually based on

10  criteria.

11  Q    And that's a--that's a standard procedure for review of

12  quality of care or quality improvement in hospitals across

13  the country, right?

14  A    Yes.  It--that's the--that was the initial method of--of

15  performance review and that has continued to be a requirement

16  when indicated to do individual case review based on certain

17  clinical criteria.

18  Q    But in 2009 and 2009 that was still a standard practice

19  at hospitals across the country and it was in the Joint

20  Commission Standards, correct?

21  A    I would say that that is correct.  It is still certainly

22  a requirement and it's still actively carried out by

23  hospitals.  It's not all they do but it's certainly one of

24  the things that they do.

25  Q    And it's an important part of quality review of a

1   physician, correct?

2   A    I--I would say on certain situations, yes, it is

3   important typically if there's indication of quality issues.

4   Q    And based on that data you can certainly get a fair

5   indication of a physician's quality of care, correct?

6   A    Well, there's a lot of dispute about that, a lot--as

7   I've--as I've testified earlier today there's a widespread

8   feeling that that's a very subjective method of quality.

9        Monitoring, some people thing that it has its

10  place, it has its role.  It can give ideas, it can give

11  hints, it can--it can bring up areas that can be pursued

12  further with more objective aggregate data.  But certainly

13  if--if--in certain situations it's still done, it's still a

14  requirement, and I--my personal belief is that it can be

15  helpful.

16  Q    If aggregate data is collected on an entire practice,

17  say an entire neurosurgery practice, that--that doesn't give

18  you information about one specific surgeon, right?

19  A    Correct.  Not necessarily, although in a very small

20  department like neurosurgery there might be some hints, but

21  in order to--to drill down we say--that's the term we use--to

22  the individual physician, particularly for re-credentialing

23  and re-privileging, it's important to--to aggregate--to

24  sub-aggregate the data by physician.

25  Q    Are there sampling problems with aggregate data for

1   example if you're comparing an aggregate data of 1,000

2   different specific surgeries but the physician that you're

3   re-credentialing only performed five such surgeries and maybe

4   one of them was indicated, isn't the sample size in that case

5   too small to give you an accurate picture?

6   A    Indeed that's correct.  There are some statistical

7   issues which have to be dealt with in a small department or

8   with any data about--we call that at the Joint Commission the

9   inactive physician problem.  That is if you have aggregate

10  data can you apply it to a physician that doesn't do very

11  much at the hospital and that is an issue of course.  It--it

12  is a technical issue with analyzing the data.

13  Q    So even aggregate data isn't a silver bullet, it doesn't

14  guarantee a better standard of care, right?

15  A    Well, I--I don't--I don't think anything guarantees a

16  standard of care.  If we could guarantee standard of care we

17  would do it, but it certainly goes a long ways towards

18  helping us to evaluate the competency of a physician at the

19  time of re-credentialing.

20  Q    You have no knowledge of the Denver VA's quality

21  improvement or evaluation of quality of care issues other

22  than what you reviewed in the depositions, correct?

23  A    That is correct.

24       MR. WU:  That's all I have, Your Honor.

25       THE COURT:  Any redirect?

Shershow - Redirect                                    86

1        MS. BROWN:  Just briefly, Your Honor.

2                      REDIRECT EXAMINATION

3  BY MS. BROWN:

4  Q    Dr. Shershow, you mentioned sub-aggregate data, what is

5  that?

6  A    Well, there are many ways to aggregate data, we could

7  aggregate data by surgical--

8        THE COURT:  We're just talking about individual doctors,

9  right?

10       THE WITNESS:  That's one way to aggregate it.

11       THE COURT:  Well--

12       THE WITNESS:  We could aggregate it many other ways by--

13  by--by--

14       MS. BROWN:  Okay.

15       THE COURT:  As I understand it you had no aggregate data

16  to deal with in this case.  All right.

17       THE WITNESS:  Okay.

18  Q    (by Ms. Brown)  And then with regard to the inactive

19  physician problem, based upon the application for privileges

20  in 2009 is it fair to say that Dr. Kindt represented he had

21  done hundreds of procedures?

22  A    Absolutely.  I think there were two neurosurgeons in the

23  department.  I think they were both--to put it mildly very

24  active.

25  Q    Thank you.

1       MS. BROWN:  No further questions.

2       THE COURT:  We are now excusing the witness I take it?

3       MS. BROWN:  Yes, Your Honor.

4       THE COURT:  Mr. Wu?

5       MR. WU:  No objection.

6       THE COURT:  You may step down.  You are excused.  Thank

7  you.

8            Next witness?

9       MS. BROWN:  My next witness will be Helen Woodard.

10      (Pause.)

11      MS. BROWN:  Your Honor--okay.

12                        HELEN WOODARD,

13  called as a witness on behalf of the Plaintiff, having been

14  first duly sworn, was examined and testified as follows:

15      THE CLERK:  Please be seated.  Please state your full

16  name and spell your last name?

17      THE WITNESS:  Helen M. Woodard, W-O-O-D-A-R-D.

18                   DIRECT EXAMINATION

19  BY MS. BROWN:

20  Q    Ms. Woodard, I think your CV has been marked as Exhibit

21  26.

22      MS. BROWN:  And, Your Honor, that's a stipulated

23  exhibit.  We stipulated to all CVs.

24      THE COURT:  Yes.

25  Q    (by Ms. Brown)  I would just like you to just very

 1    briefly for the Court to state your education, background,

 2    and training in rehabilitation and life care planning.

 3    A    Yes.  I have a master's degree from the University of

 4    Northern Colorado in rehabilitation counseling.  I got that

 5    degree in 1970.  And I've worked in rehabilitation counseling

 6    ever since doing rehabilitation counseling and placement with

 7    various people.

 8         I started in 1975 or so to do what now is called

 9    life care planning and have training in that by getting

10    seminars from the places that offered those courses back in

11    the '80s and early '90s.

12         I've done a lot of life care plans in various

13    places.

14    Q    Thank you.  Now, in this case I asked you to evaluate

15    three things, Mr. Lopez's employability, right?

16    A    Yes.

17    Q    I asked you to prepare a life care plan for him?

18    A    Yes.

19    Q    And I asked your opinion regarding his need for home

20    services.

21    A    That's correct.

22    Q    Okay.  I wanted to first talk about what you reviewed in

23    order to form opinions in those categories.

24    A    All right.

25    Q    What did you review?

1    A    I looked at all of the medical records and employment

2    records that were available.  We also did some labor market

3    research to look at that; met with Dr. Barolat and got

4    information about the problems and difficulties associated

5    with the injury that Mr. Lopez had.

6    Q    Why would you meet personally--oh, did I cut you off?

7    A    No.

8    Q    Why would you meet personally with Dr. Barolat?

9    A    To--to understand what the future needs were for the

10   pain stimulator that he has for the implanted pain

11   stimulator.  And also to understand that he was still needing

12   medication at a pretty high level in spite of the pain

13   stimulator.

14   Q    Okay.

15        MS. BROWN:  Your Honor, at this time I'd ask that Ms.

16   Woodard be recognized as an expert in rehabilitation and life

17   care planning.

18        MR. WU:  No objection, Your Honor.

19        THE COURT:  Yes, I've heard from this witness before.

20        MS. BROWN:  Thank you, Your Honor.

21   Q    (by Ms. Brown)  Let's talk first about Mr. Lopez's

22   employability.  Do you have an opinion whether Mr. Lopez is

23   employable?

24   A    Yes.

25   Q    What is your opinion?

1   A     I don't think he is employable.  I think that he's so

2   disabled and his symptoms--

3        MR. WU:  Objection, Your Honor, this is beyond the

4   scope.

5        THE COURT:  Overruled.  Go on.

6        THE WITNESS:  --and the symptoms are so severe and

7   variable that he would not be reliable in the labor force.

8   Q    (by Ms. Brown)  What is it about the variability of the

9   symptoms that makes someone an unreliable employee?

10  A     It means that when they're having a very bad day they

11  can't function, they can't do even their daily household

12  activities much less go out and be able to perform work.  And

13  because occur variably they can't predict when they're going

14  to feel a little better and when they're going to feel a

15  little worse or a lot worse or a lot better.  And so it makes

16  it virtually impossible to work in any kind of routine

17  gainful employment.

18  Q    Now, in this case Mr. Lopez did work or continued to

19  work from the--after he recovered from his surgery until late

20  in 2012, if he was able to do it then why can't he do it now?

21  A     He had a lot of support in the workplace.  And his

22  coworkers and even his supervisor were being supportive and

23  doing part of his work.  He reached a point where he realized

24  he was dangerous there and it was not a safe situation for

25  anyone.  And he wanted to leave before he was fired.

1  Q    Were you able to do a job site evaluation of the Pueblo

2  Chemical Depot?

3  A    No.  They wouldn't let us in.

4  Q    Is it a secure facility?

5  A    It's a secure facility.  It's not unusual to not be able

6  to go into those facilities.

7  Q    Okay.  Let's talk then about the life care plan that you

8  prepared in this case.

9       MS. BROWN:  Your Honor, that is Exhibit 27, it is not a

10  stipulated exhibit but I would move for the admission of

11  Exhibit 27.

12      THE COURT:  Well, let's have her--let's have her testify

13  about it first.

14      MS. BROWN:  All right.

15  Q    (by Ms. Brown)  Ms. Woodard, if you would look in that

16  book in front of you, Exhibit 27, is that the life care plan

17  that you prepared?

18  A    Yes.

19  Q    Would it assist you in your testimony to--to go through

20  the life care plan as written?

21  A    All right.

22      MS. BROWN:  Move for the admission of 27.

23      MR. WU:  No objection, Your Honor.

24      THE COURT:  All right.  It's received.

25      (Plaintiff's Exhibit 27 was received in evidence.)

1   Q    (by Ms. Brown)  All right.  And let's talk about the

2   elements of your life care plan, we'll put up Exhibit 27 page

3   1.  With regard to your opinions on the need for medical

4   care, primary care physician visit, the neurosurgeon, what is

5   the basis for that opinion?

6   A    Well, we used several things in this--for the basis for

7   the life care plan.  The meeting with Dr. Barolat, the review

8   of the records, and the frequency with which Mr. Trujillo

9   (sic) was being seen by various providers.

10  Q    Mr. Lopez.

11  A    Excuse me, I'm thinking about somebody else, Mr. Lopez--

12  and we concluded that he needed primary care physician

13  visits, those are his first line of defense when he has a

14  flare and some of his medications are prescribed there.

15           The primary care physician was--the cost was

16  determined in Pueblo and it was 50 to $75 per visit.  And he

17  should have one to two additional visits per year to life

18  related primarily to the Chronic Pain Disorder.

19  Q    And as part of that evaluation of medications?

20  A    Yes.

21  Q    Okay.

22  A    Well, and coordination.  He's had a lot of trouble with

23  side effects of various meds.

24  Q    Okay.  Let's talk about the stimulator implant

25  neurosurgeon, what is Mr. Lopez going to require in the

1   future related to--

2       THE COURT:  Well, you're asking this as assumptions,

3   right?

4       MS. BROWN:  Right.

5       THE COURT:  I mean ordinarily a witness appears after

6   all of this testimony is in.

7       MS. BROWN:  Correct.

8       THE COURT:  So this is out of sequence.  So you ask it

9   in terms of assumptions which will or not be supported by

10  other evidence in the case.

11      MS. BROWN:  Yes.

12      THE COURT:  All right.

13      MS. BROWN:  Yes.

14  Q    (by Ms. Brown)  So, Ms. Woodard, assuming that Dr.

15  Barolat testifies that Mr. Lopez is going to require

16  maintenance of this stimulator, how did you include that in

17  your life care plan?

18  A    I included that based on the information I had from Dr.

19  Barolat.  And Mr. Lopez is seen for the stimulator

20  reprogramming annually.  And the cost for that programming is

21  $573 for the programming and 137 for the office visit.

22  Q    And the annual total then?

23  A    The annual total is 710, and that's a lifetime cost.

24  Q    And assuming that Mr. Lopez needs laboratory testing how

25  did you account for that in your life care plan?

1  A    We included laboratory testing that was being done.

2  These are really related to the opioids that he's on.  So he

3  gets a testosterone level, a TSH, and a Vitamin D level and

4  then the CBC, liver or function test and urine drug screens

5  which are related to the chronic pain medications as well.

6  Q    We have heard that Mr. Lopez had pain that led him to

7  the surgery, based upon your interviews with the physicians

8  and review of the file why is the opioid therapy included?

9  A    Because he has--he is using opioids--has used opioids

10 pretty much since this occurred except when he was employed

11 and couldn't use them and maintain his employment.  And

12 they're used for the pain that is not managed by the

13 stimulator.

14 Q    Was he using any sort of narcotic or opioid prior to the

15 surgery?

16 A    Not really.

17 Q    Okay.  Let's look at page 2 of Exhibit 27.  And I want

18 you to assume that Dr. Barolat will testify that the IPG, the

19 battery for the stimulator, requires replacement, how did you

20 factor that into your life care plan?

21 A    Yes.  We used the physician cost of $2,200, the facility

22 cost, which is the hospital cost of 94,924 to 145,952, and

23 the anesthesia cost of 3,150 to $4,200.  The total cost for

24 the replacement is 100,274 to 152,352.

25 Q    And that's through his life expectancy?

1    A    Yes, every five to seven years.

2    Q    What life expectancy tables did you use when looking at

3    this?

4    A    I really didn't look at life expectancy tables in this

5    case.

6    Q    Okay.  Did you--who did you rely on for that?

7    A    The economist.

8    Q    All right.  Let's talk about medications and supplies,

9    what is the basis for your decision to include medications

10   and supplies in your life care plan?

11   A    These were the medications that he was on at the time of

12   the--that the plan was written.  And they--they change

13   periodically, different things have been tried with him.  But

14   this was the cost at the time of the life care plan.

15   Q    What--

16   A    He was on--

17   Q    Go ahead.

18   A    --Pregablin, that's $3,880 to $4,910, Oxycodone, 370 to

19   510, and Methadone 170 to $225.

20   Q    Do you have an understanding what the Pregablin is for?

21   A    Yes, it's for nerve pain.  It's other name I think is

22   Lyrica.

23   Q    Where did you get the dollar amounts for the

24   prescription medications?

25   A    We used pharmacies in the community where he's living

1   and those are the costs for a private pay on these

2   prescriptions.

3   Q    Let's talk about the over-the-counter medications, why

4   did you include those in the life care plan?

5   A    These are the medications he needs as a result of his

6   treatment.  He has quite a bit of difficulty with

7   constipation which is a complication of the narcotic

8   medications.  And so the Docusate and the Polyethylene glycol

9   are listed there.  And then the Vitamin D because Vitamin D

10  becomes a big problem for people taking these medications.

11  Q    And the cost for those where did that come from?

12  A    Those are again costs in the community at the

13  pharmacies.  Do you want to know the names of the actual

14  pharmacies?

15  Q    That's all right.  So this life care plan was prepared

16  in April of 2013 have there been increases in the cost of

17  these medications in that almost two year period?

18  A    There are been--there--there is slightly different cost

19  of the medications.  The different issue is that he's on

20  slightly different medications now.  And although he's still

21  taking these three as well.  But he's also on some others.

22  Q    Your life care plan as far as what we've gone through at

23  this point, does it overstate or understate his probable

24  losses or the cost of the life care plan?

25  A    Oh, I think these are realistic.  They probably don't

1   take into account everything he needs in some ways.  And if

2   there's new medication that he might benefit from it doesn't

3   include any possibility of that being funded in this plan.

4   Q    Why not?

5   A    It's impossible to know for sure what's out there in the

6   pipeline and how much it will cost.

7   Q    Is the same is true for future surgeries or other type

8   of interventional procedures that might come up in the future

9   that might help chronic nerve pain?

10  A    Yes, we don't know what those might be and we haven't

11  included anything for medical advances.  Sometimes we've been

12  asked to do that but doing it is--you have to have some basis

13  even then.

14  Q    In your experience as a life care planner and

15  rehabilitation counselor when did you first start seeing

16  spinal cord stimulators being regularly used?

17  A    I think I saw the first one about 25 years ago.

18  Regularly used probably in the last 10 or 15 years.

19  Q    All right.  Have I covered all of your opinions in terms

20  of the need for medications and medical interventions in the

21  life care plan?

22  A    Yes.  We didn't include his treatment for depression

23  because he had depression before and it was hard to sort out,

24  but he's got significant medications related to his increased

25  depression at this point.

1  Q    Based upon your evaluation of Mr. Lopez's medical

2  records and your interviews with him, have those medications

3  increased as a result of his chronic pain?

4  A    Yes.

5  Q    All right.  Let's talk about your opinions with regard

6  to assistance that Mr. Lopez requires.  At the time of your

7  life care plan what assumption did you make as to the

8  services that were being provided by his wife?

9  A    I knew that she was managing his medications, was

10  functioning essentially as his case manager, making sure he

11  got where he needed to go and doing the things related to the

12  follow-up for the medical care.

13          And she was--she had assumed a lot of the household

14  responsibilities.  And she was his basic support system for

15  all of the severe problem he was having due to the severe

16  pain.

17  Q    When you expressed your opinions back in April of 2013

18  were you considering that Mrs. Lopez would more likely than

19  not remain in that role?

20  A    I did.  I thought that she would be still able to do

21  that indefinitely.

22  Q    Did you then--okay.  So let's talk about your opinions

23  back in April of 2013 as to the amount and type of assistance

24  Mr. Lopez would require even with Mrs. Lopez doing what--you

25  know, all the things that she was doing.  What is your

1    opinion as to the--we're on 27 page 3--to the amount of

2    assistance that Mr. Lopez requires as a result of his chronic

3    pain?

4    A    We included five to ten hours a week of assistance for

5    him as replacement of part of the things that Mrs. Lopez was

6    doing at the time and to support Mr. Lopez in his daily life;

7    that was 16 to $17 per hour.  So the annual total was 4,160

8    to 8,840.

9    Q    Where did you get the 16 to $17 per hour?

10   A    That's a home health personal care provider, not a--not

11   an aide, but a personal care provider in the Pueblo area.  We

12   surveyed the placed in Pueblo that would provide that

13   assistance.

14   Q    Okay.

15   A    It's an agency cost.

16   Q    And then you have case management services.  What is

17   your opinion as to--well, tell me why he needs case

18   management services in your opinion?

19   A    I think he needs case management assistance for

20   coordination between the physicians and for follow through.

21   And since Mrs. Lopez was doing much of that I included four

22   to six hours per year in the life care plan.  And that was

23   480 to $750 a year.

24   Q    And then going to home care costs you are limiting that

25   appears to snow removal and yard work, why is that?

1   A     While Mr. Lopez was able to do that before the surgery,

2   he has not been able to do it really since.  He tries but

3   he's not really able to do it.  And it--I included cost for

4   that through his age 72, 1,800 to $2,400.

5   Q     Why only through age 72?

6   A     Because as people age--especially if they have an

7   underlying condition like the back surgery that he had, the

8   heavier work needs to sort of be diminished over time.

9   Q     Did you issue then a supplemental letter when you got

10  new information concerning Mrs. Lopez?

11  A     Yes.

12  Q     And what else did you cover in the supplemental letter?

13  A     I covered a little about Mrs. Lopez's health condition

14  because the circumstances are significantly different

15  upcoming.  And so I wanted to provide information to people

16  that the circumstances at home are changing.

17  Q     Now, what's your understanding of when Mrs. Lopez's

18  cancer recurrence was diagnosed?

19  A     She had just had that information when I--when I saw

20  them.  And so she had just gotten that information just prior

21  to November 10th.

22  Q     Okay.  Now, in--in your opinion if Mrs. Lopez isn't

23  available to Mr. Lopez to provide the services that she had

24  been providing how would that affect your opinion in terms of

25  Mr. Lopez's future needs?

```
 1   A     It would affect them significantly.  Mr. Lopez has a lot

 2   of difficulty functioning on a day-to-day business in the

 3   household.  And without the support of someone there most of

 4   the time I don't think he'll be able to stay living

 5   independently; part of it is that he just needs someone there

 6   to notice and--and pay attention.  And the other is he really

 7   needs supervision in the use of his medications because he's

 8   now so forgetful.

 9   Q     If Mrs. Lopez is not available to provide the services

10   that she had been providing what factor of increase in your

11   life care plan would there be?

12   A     Oh, at least four or five times in the--in the

13   assistance section.

14   Q     Have the opinions that you've expressed all been to a

15   reasonable degree of probability?

16   A     Yes.

17         MS. BROWN:  May I have a moment, Your Honor.

18         THE COURT:  Yes.

19         (Pause.)

20         MS. BROWN:  All right.  Thank you.  Those are all my

21   questions.

22         THE COURT:  All right.  Mr. Wu?

23                        CROSS-EXAMINATION

24   BY MR. WU:

25   Q     Good morning, Ms. Woodard.
```

1   A      Good morning.

2   Q      Do you know the name of the nerve stimulator device that

3   Mr. Lopez had implanted?

4   A      I'm sorry I didn't hear you.

5   Q      Sorry, do you know the name of the nerve stimulator

6   device that Mr. Lopez had implanted?

7   A      I--the--the brand?

8   Q      Yes.  Or the company, the manufacturer.

9   A      Yes, I think I do, hang on.  It was in my notes with Dr.

10  Barolat.  It's a Medtronic.

11  Q      Okay.  Did Dr. Barolat--in your conversations with Dr.

12  Barolat did he tell you when it would be medically necessary

13  to replace that device?

14  A      He said usually between five and ten years.  The battery

15  lasts longer than that but sometimes fails before that.

16  Q      So you wrote five to seven years on your report,

17  correct?

18  A      Yes.

19  Q      But it could be as many as ten?

20  A      Actually he said as many as nine.

21  Q      Okay.  And then in the section of your report--I believe

22  it's page 2 of Exhibit 27 regarding prescription medications,

23  did you know before Mr. Lopez had the nerve stimulator device

24  implanted how much prescription pain medication, Lyrica or

25  Oxycodone he was taking?

1   A    We looked at that generally but we didn't look at it

2   with regard to he specific doses.

3   Q    So you don't know whether he was taking a larger dose or

4   a smaller dose before and after the nerve implantation device

5   was--

6   A    A larger or smaller dose of which?

7   Q    Of--Of Lyrica for example which I understand you said is

8   a nerve pain medication.

9   A    I don't.  Usually that--I can--I can tell you--

10        THE COURT:  Well, you said you don't, that's it.

11  Q    (by Mr. Wu)  And what is the dosage that you have

12  assumed Mr. Lopez to be taking to come up with the annual

13  total of Lyrica or Pregablin as you listed here of 3800 to

14  about 4900 per year?

15  A    Of the Lyrica?

16  Q    That's right.

17  A    200 milligrams twice a day.

18  Q    And what about the Oxycodone?

19  A    The Oxycodone is 5 milligrams three to four times a day.

20  Q    And I'm looking at the over-the-counter medication now,

21  you have Docusate sodium and--I can't really pronounce this--

22  Polyethylene glycol--those are both stool softeners, correct?

23  A    Say that again?

24  Q    Those are both stool softeners, correct?

25  A    Yes, they are.

```
 1   Q    Why does Mr. Lopez need two different types of stool
 2   softeners?
 3   A    Because with these two medications he has a very
 4   significant problem with constipation.  And the treatment is
 5   usually the Docusate by mouth and the Polyethylene glycol
 6   twice as day as well.  So he takes both of those twice a day.
 7   Q    At the same time?
 8   A    I'm not sure he takes them at the same time.  He may
 9   take them at alternating times.  But he uses them both twice
10   a day.
11   Q    But he uses them concurrently that's--is that right?
12   A    Yes, that's very common in my experience with people who
13   are taking chronic narcotic medication.
14   Q    All right.
15        MR. WU:  That's all I have.  Thank you.
16        THE COURT:  All right.  Any direct, Ms. Brown?
17        MS. BROWN:  No, Your Honor.
18        THE COURT:  Witness excused?
19        MS. BROWN:  Yes, Your Honor.
20        THE COURT:  All right.  You may step down; you're
21   excused, Ms. Woodard.
22             Next witness?
23        MS. BROWN:  Next witness will be Mrs. Lopez.
24        THE COURT:  All right.
25        (Pause.)
```

E. Lopez - Direct                                105

1        MS. BROWN:  Your Honor?

2        THE COURT:  Yes.

3        MS. BROWN:  I would like to excuse Mr. Lopez for Mrs.

4   Lopez's--

5        THE COURT:  Sure.  You may come and go as necessary.

6        MS. BROWN:  Is she there.

7            Ms. LaCrue went to look for her out front.

8        THE COURT:  Okay.

9        (Pause.)

10        MS. BROWN:  I apologize, Your Honor.  Things have moved

11   faster than I had anticipated.

12        THE COURT:  Well, that's good.

13        MS. BROWN:  Yes.  There she is.

14        THE CLERK:  Please turn, face me and raise your right

15   hand.

16                            EVA LOPEZ

17   Called as a witness on behalf of the plaintiff, having been

18   first duly sworn, was examined and testified as follows:

19        THE CLERK:  Please be seated.  Please state your full

20   name and spell your last name.

21        THE WITNESS:  May name is Eva--

22        THE COURT:  Well, face the--face the--

23        THE WITNESS:  I'm sorry.

24        THE COURT:  --microphone.  Thank you.

25        THE WITNESS:  My name is Eva May Lopez, L-O-P-E-Z.

1     THE COURT:  Thank you.

2                        EXAMINATION

3  BY MS. BROWN:

4  Q    Mrs. Lopez, I want to first ask you some questions about

5  your marriage to Leonard Lopez, okay?

6  A    Okay.

7  Q    And you're soft-spoken, so you might have to lean

8  forward a little bit.  When were you and Leonard Lopez

9  married?

10  A    We were married on July 13, 1989.

11  Q    How long had you known him before you were married?

12  A    I had known him about a year.

13  Q    You had--you had only--

14  A    Oh, no, I had known him before that because we were from

15  San Luis, but together about a year.

16  Q    Right.  You had dated for about a year?

17  A    Uh-huh.

18  Q    But how old were you when you and Mr. Lopez met?  Can

19  you even remember not knowing him?

20  A    No, my sister is married to his brother, so we've always

21  known each other.

22  Q    What was it about Mr. Lopez that led you to date and

23  then ultimately accept his marriage proposal?

24  A    He was a very nice person.  He was very--he was so

25  happy.  He was always--he made me happy; that's why I married

E. Lopez - Direct                           107

1   him.

2   Q    Physically, can you describe him?

3   A    He's a very muscular man.  He was very hard working.

4   He's been working since he was 12 years old.  He was one of

5   12 children and they were always competing for each other's

6   attention.  But as far as his--his--he was--how can I say?

7   If anybody needed him to help move furniture or do anything,

8   he was always there because he was so strong.  He is--he was

9   so strong, and he still is strong, but this happened.

10  Q    So I'm going to ask that--that the--let's see.  I'm

11  going to show you some photographs of Mr. Lopez.

12       MS. BROWN:  And I'm not sure if these are stipulated or

13  not.  Exhibit 18?

14       MR. PESTAL:  Not yet, Your Honor.

15       MS. BROWN:  All right.  So I guess we'll just put up for

16  the witness Exhibit 18, page 3.

17  Q    (by Ms. Brown)  It will be on the screen in front of

18  you.

19  A    Okay.

20  Q    And there will also be a book.

21       MS. BROWN:  Just for the witness, Kylie.  Well, I guess,

22  well, it doesn't matter.  Oh, well, let's do this.  Let's

23  take that down--

24       THE COURT:  Well--

25       MS. BROWN:  I understand, Your Honor.

1    THE COURT:  All right.

2  Q    (by Ms. Brown)  Do you recognize the people in that

3  photograph?

4  A    That's--those are his brothers and his sisters and his

5  mother.  There's one sister--there's one, two, three, four,

6  five--one sister missing, because there are 12 all together.

7    MS. BROWN:  I move for the admission of Exhibit 18, page

8  3.

9    MR. PESTAL:  I'm not sure of the relevance, Your Honor.

10    THE COURT:  If that's an objection, it's overruled.

11  Let's just get them in and go through them.

12    MS. BROWN:  Do you want me to tell you all the ones I'm

13  going to look at or--

14    THE COURT:  Well, I don't know.  You've got a bunch of

15  them here.  Do we have to go through every one of them?

16    MS. BROWN:  We are not going to go through every one,

17  but we're probably going to go through about ten.

18    THE COURT:  All right.  Let's do it.

19    MS. BROWN:  All right.

20  Q    (by Ms. Brown)  So you said that Mr. Lopez came from a

21  large family, a family of 12.  Where in the mix did he fall?

22  A    Pardon?

23  Q    Where in the mix of age did Mr. Lopez fall?

24  A    He was the fourth from the top.

25  Q    The fourth from the oldest?

E. Lopez - Direct                                    109

1   A     From the oldest.

2   Q     Now, when--when you--when Mr. Lopez announced that he

3   was going to get married--first of all, how old was he when

4   he married?

5   A     He was 30--36.

6   Q     And how did his family react to the news that you and he

7   were to be married?

8   A     They weren't very happy.  They were jealous.

9   Q     Okay.

10  A     Because he was a very giving person.  So when he worked

11  and they needed money, he was there for them.  And then his

12  father died when they were--when he was--the father was 42,

13  so the oldest brother went to the--to the Army.  The second

14  oldest got married.  So he kind of became the man of the

15  house, so he was the one that really took--helped his mother

16  take care of especially the girls.

17  Q     His younger sisters?

18  A     Yes.

19  Q     Now, in this picture, Exhibit 18, page 3, which one is

20  Leonard?

21  A     The one--the one from my--on the right side the way I'm

22  looking at it.

23  Q     Okay.  Now, after you were married, did you work outside

24  the home?

25  A     No.  Yes.  No.  Yes, I did.  I was working at Harloff.

1   And then that was in Colorado Springs.  We moved to Pueblo

2   and I had our daughter and we decided that I would stay home

3   because we were going to--because I was taking care of my

4   mother.  My mother was very sick, and I took care of her

5   until she passed away.  And then at that time, it was time

6   for my daughter to start school, and we put her in Catholic

7   school.  And Leonard said just stay home and that way you can

8   drive her and we can make due with what I make.

9   Q    Okay.  And where was Leonard working?

10  A    He was working at the Pueblo Chemical Depot.

11  Q    Do you have an understanding what--well, never mind.

12  Did he enjoy working at the Pueblo Chemical Depot?

13  A    Yes, he did.  He advanced and he was motivated to

14  advance.

15  Q    Now, you mentioned that you have a daughter.

16  A    I have three children.

17  Q    Right.  And you--did you have children from a prior

18  marriage?

19  A    Yes, I did.

20  Q    How many?

21  A    Two.

22  Q    And then your daughter, Felina?

23  A    Felina.

24  Q    When was she born?

25  A    She was born in September of 1989.

E. Lopez - Direct                              111

1   Q    Now, prior to this back surgery, would you describe Mr.

2   Lopez's relationship with Felina?

3   A    They were close, very close.  I mean she still loves her

4   father, but she was always with him.  I mean she would call

5   him.  It was him that she would call for anything she needed.

6   Q    I want to look at just a few pictures to illustrate some

7   of the things that Mr. Lopez and Felina used to do together.

8   If we can look at Exhibit 18, page 34.

9        MS. BROWN:  Move for the admission of 18-34.

10       THE COURT:  I'll receive all these pictures that you're

11  going to offer, so--

12       MS. BROWN:  Okay.  Thank you.

13       (Plaintiff's Exhibit 18 was received in evidence.)

14  Q    (by Ms. Brown)  So Exhibit 18, page 34, who is this?

15  A    That was my husband and Felina.

16  Q    And horseback riding?

17  A    Yes.

18  Q    And is that something that they did together?

19  A    Yes.

20  Q    Let's look at Exhibit 18, page 29.

21  A    That's my husband and Felina and our dog Juedo

22  (phonetic), and we were in St. Isabel.  We used to hike a

23  lot.

24  Q    When you say "a lot," how often would you and Felina and

25  Mr. Lopez go hiking?

1   A    Any time he got a day off or something we would just get

2   in the truck and go.

3   Q    All right.  Let's look at Exhibit 18, page 25.  What is

4   this--first of all, is your husband and daughter in this

5   picture?

6   A    Yes.  My daughter is the little girl pulling the rope,

7   and my husband is right behind her.  And they're getting

8   cattle--the calves ready to brand.

9   Q    And how often did this activity take place?

10  A    Once a year, because he would help his brother and his

11  cousin.

12  Q    Were you there?  Were you the one taking this picture?

13  A    Yes.

14  Q    Okay.  What's--how did Mr. Lopez participate in the calf

15  branding physically?  What was his job?

16  A    Well, he was--he's so strong.  He would get the calf and

17  he would just put it on its side and somebody hold one leg

18  and somebody would hold the other leg and then the guy that

19  branded, but he was the one that actually used to thrown them

20  down.

21  Q    Now, this picture is obviously from a long time ago

22  because--

23  A    Yes.

24  Q    --Felina is grown?

25  A    Yes.

1   Q    But did Mr. Lopez participate in branding at his

2   brother's ranch all the way up until the time of his back

3   surgery?

4   A    Right.

5   Q    Yes?

6   A    Yes.

7   Q    And if--let's see, I want to look at Exhibit 18, page

8   22.  What is this picture?

9   A    This is my daughter when she--for her senior prom.

10  Q    How close were--well, what year was this?

11  A    2008.

12  Q    And how close were they at that time?

13  A    Like two peas in a pod.

14  Q    Okay.  I want to talk about then some of the activities

15  that you and Mr. Lopez enjoyed before his back surgery, or

16  the things that you did together.  If we can look at Exhibit

17  18, page 1.  And--

18  A    He's bucking bails, because he--we do that.  I mean

19  that's how we were raised.  I did that with my dad and he did

20  it with his dad and now he was doing it with his brother and

21  with his cousin, bucking bails, cutting and all that.

22  Q    Did he do that before--right up until the time of the

23  back surgery?

24  A    Yes.

25  Q    So since the back surgery, does he participate, at least

1    attend, the branding and the gathering of the hay, that sort

2    of thing?

3    A    Yes, but usually he's the driver now.  And he says, "My

4    --my brothers think that I can't do anything."  It's hard on

5    him.

6    Q    In what way?

7    A    Well, he feels that they don't include him like they

8    used to.

9    Q    Have you observed that?

10   A    Yes.

11   Q    What have you observed?

12   A    I observe how unhappy he is when we're over there.  And

13   they always used to get together after this was done and they

14   used to have fun and drink a few beers.  Well, he's on

15   medication so he doesn't do those.  And so he's not part of

16   the--the--but--their activities like that.

17   Q    Out of these 12 children, how many men?

18   A    Six--well, five and him.  Six.

19   Q    And what was their relationship?  I mean how did they

20   interact with each other before the surgery?

21   A    They were good brothers.

22   Q    Were they competitive with each other?

23   A    Oh, gosh, they were competitive, and you can't blame

24   them because they were 12, and their mother and father didn't

25   have a lot of money, and then their father died when he was

1    42.  So they were so competitive.  They always want to be

2    number one, and they--they--and they wanted--always wanted to

3    outdo each other.

4    Q    So, for example, bucking bails, what would the

5    competition be?

6    A    To see who could throw it higher.

7    Q    Okay.

8    A    Who could get the most from the field faster.

9    Q    And did that carry over into fishing or hiking?

10   A    Yes.  Anything they did they were competitive.

11   Q    Okay.  Let's look at Exhibit 18, page 4.  Now, this is

12   you and Felina and Leonard?

13   A    Yes.

14   Q    And where was this?  What was the event?

15   A    I believe it was a wedding.

16   Q    Now, and did you have a large family?

17   A    Yes, I had nine brothers and--well, we were nine, and

18   then my oldest sister passed away when she was 25, so she had

19   three children--3, 2, and 8 months--and my mother took them

20   in because the husband didn't want them, so we had--we were

21   12 all together also.

22   Q    So it was 12 on his side, 12 on your side, marriages,

23   children, are there a lot of occasions where there's dancing?

24   A    Yes.

25   Q    And tell me about Leonard as a dancer?

1    A    I love to dance, and he always took me dancing.

2    Q    Did he love it as much as you?

3    A    I don't think he loved it as much as I did, but he did

4    it for me.

5    Q    How has that changed since he had this back surgery?

6    A    Well, we've been to a few occasions where he'll get up

7    and he--and I tell him no, and he says come on and we'll do

8    two or three dances.  But he's in pain, so we don't do it

9    like we used to do it.

10   Q    All right.  I'm going to switch gears a bit and talk

11   about your typical days at home before Mr. Lopez retired,

12   okay.  So you were used to being home by yourself?

13   A    Yes.

14   Q    And how did you spend your time?

15   A    Well, I used to cook, I used to sew, I used to--the

16   laundry, all the basic things that you do.  And I used to

17   love to listen to music, so I had my music on all the time.

18   And I used to love to dance, so I used to go around the house

19   dancing and stuff.

20   Q    And once Mr. Lopez retired, how did that change your

21   routine?

22        THE COURT:  Can we have a time here?

23        MS. BROWN:  Oh, I'm sorry.

24   Q    (by Ms. Brown)  When did Mr. Lopez retire?

25   A    October 2012.

```
 1  Q     Okay.  And that was about a year and a half after the

 2  back surgery?

 3  A     Yeah.

 4  Q     Let me just kind of fill in that timeframe.  While he

 5  was still working but after the back surgery, what did you

 6  observe about changes in him?

 7  A     He was--he had a lot of anxiety because he was having to

 8  go to work, and he says I can't do the job that--

 9        MR. PESTAL:  Objection, Your Honor, hearsay.

10        THE COURT:  Overruled.  Go ahead.

11  Q     (by Ms. Brown)  Go ahead.

12  A     --that I did before.  I says I'm sore and they have to

13  do exercises on the computers.  He says I can't do them like

14  I used to.  I used to finish them right away and now I--it's

15  --I'm not--and I'm really worried that I don't want to get

16  fired after I've worked so hard to get to this point in my

17  life.  And he wants to retire.  And he says can we make it.

18  I says we've made it before; we'll make it.

19  Q     So how did his relationship with Felina change during

20  this timeframe?

21  A     He was such an angry man, so He slowly pushed her away.

22  And I would tell him, "Don't be so mean."  I, as his wife,

23  could take it because I--I'm--I'm older; I can understand.

24  But she didn't.  She said, "Mother, he's so mean to me.  I

25  can't talk to him.  I used to call him."  And she stopped
```

1   really calling him, so she changed from calling him to

2   calling me.  And then--then she went to school and she got a

3   degree and then she--she's always worked since she was 16 and

4   then she found Tino--that's her--her partner, and they had a

5   baby.  And now the baby is eight months old and it's brought

6   a little bit of life back into Leonard's life because he has

7   something to look forward to.  He loves his grandson.

8   Q    Has it brought him and Felina back together?

9   A    A little bit, yes, but she still only calls me.

10  Q    So how did the way--did the way he treated you change

11  after the surgery?

12  A    Yes.

13  Q    Tell us how.

14  A    I would--he was in our--like he would be in the bedroom,

15  and it's like a computer room/bedroom, and I would walk in.

16  And he says, "I don't want you in here.  Get out."  And he--

17  that wasn't--that wasn't him.  And then he would get a lot of

18  anxiety.  And when--when--even when he was in bed and he

19  says, "Eva, Eva, hurry, hurry, I don't know what's happened

20  to me.  It seems like my body is leaving my--I'm leaving my

21  body.  Hold on to me."  He was--he was serious.  He was very

22  serious.  And then he had anxiety where it seemed like he was

23  having a heart attack.  Finally I told him, "Go and have

24  yourself checked."  And it wasn't.  He wasn't having a heart

25  attack; he's got a good heart.  It's just that all these meds

1    and everything that happened to him has really taken their

2    toll.  And then he's a very proud man, so when he--his--

3    sexually, he became dysfunctional, it has really bothered

4    him.  And I tell him, "It's not that important.  You're what

5    is important in my life."  And then this is something that he

6    didn't want me to tell anybody--anybody that he would have so

7    much--he felt so bad and everything that he used to wet the

8    bed, and that is so awful for me to say.

9    Q    Do you need a break?

10   A    I'll be fine.

11   Q    All right.  Let's--let me talk about the timeframe just

12   leading up to the surgery, okay.  In late 2009 and early

13   2010, did you notice that your husband seemed to be having

14   more problems with his back?

15   A    Yes, we would go to the mall or even hiking, he would

16   have to sit down, even if it was just on the floor at the

17   mall and then it would pass.  And then he decided that he

18   should go in and see someone, and I encouraged him.  And so I

19   have a little bit of guilt about that.

20   Q    Did you go with him when he met Dr. Kindt?

21   A    Yes, I did.

22   Q    And do you remember when you first met Dr. Kindt?

23   A    I remember when we spoke to him and he assured him that

24   he had done surgeries and everything had gone well, that it

25   was a simple surgery.  He was just going to go in and shave

1   the discs, because he had pinched discs.  And we thought that

2   it would just be a simple surgery and he would come out of it

3   okay.

4   Q    Okay.  Let's talk about the day of the surgery.  Did you

5   see Dr. Kindt before the surgery?

6   A    I don't believe so.

7   Q    Did you see any physician before the surgery?

8   A    (No audible response.)

9   Q    No?

10  A    No.

11  Q    Where were you waiting during the surgery?

12  A    In the waiting room.

13  Q    Who was with you?

14  A    A lot of people.  A lot of his family and a lot of my

15  family.

16  Q    Okay.  I won't have you go through everybody.

17  A    Okay.

18  Q    What was your understanding of how long the surgery was

19  going to last?

20  A    It was going to be a short surgery, maybe an hour and a

21  half, two hours.  And I got worried because it was--the hours

22  just kept passing and passing.  And I would go and ask and no

23  one was giving me any information.

24  Q    And at some point did someone come out and talk to the

25  family?

E. Lopez - Direct                    121

1   A    Yes, Dr. Kindt and Dr. Waller came in.

2   Q    What did they tell you?

3   A    That the surgery hadn't gone well; that there was a

4   little nerve that they had removed because it really was--

5   they didn't feel it was serving any purpose.

6   Q    And this is what they told you?

7   A    Yes.  And then they came in twice and said the same

8   thing.

9   Q    What was your impression of them when they were giving

10  you this information?

11  A    Well, they weren't--it's not like when you go and have

12  surgery, because I've had surgery and the doctors come in and

13  they're--they're in a good mood, everything went well.  The

14  minute they came in, I knew, his mom knew, his sisters knew,

15  his brothers, everyone knew that the surgery had not gone

16  well.

17  Q    How did you know that?

18  A    Just by the way they told us--

19  Q    Okay.

20  A    --what was happening.  And then--and then they took him

21  to his room and it was so sad to see him.  He was in such

22  pain.  He was in such pain.

23  Q    When did you see your husband after the surgery?  Where

24  was he when you first saw him?

25  A    When they were taking him on the gurney to the room.

E. Lopez - Direct                              122

1   Q    What did you see?

2   A    That you could tell--you can tell in people's faces how

3   --that he was in pain.  And then they had to move him.  And I

4   went into the room and they asked me to leave.  And I said,

5   "I'm not leaving.  He's my husband.  I have a right to be

6   here."

7   Q    Could you tell from looking at Mr. Lopez where his pain

8   was?

9   A    Yes.  In his foot, because you couldn't touch it.  I

10  went to touch it and--touch him and it was like--

11  Q    Be--

12  A    --crucial--I mean devastating to him, was extraordinary

13  pain.

14  Q    What did Mr. Lopez do when you touched his foot?

15  A    He--he--I mean he jumped.  You know, when you touch his

16  --he--he like jumps.

17  Q    Had this ever happened before the surgery?

18  A    No.  No.

19  Q    Now, there--there was a note in the medical records from

20  a resident that Mr. Lopez was essentially pain free at the

21  time of discharge.  Was that--was he pain free when he left

22  that hospital?

23  A    No.  If he was pain free, why did they give him so many

24  medications to go home with?  And also, he wanted to get out.

25  So they told him he could get out if he could go use the

E. Lopez - Direct                        123

1    bathroom.  So he told his brother and his nephew, which are

2    big men, "You help me get over there and help me get back so

3    I can get out of here," and that's what they did.

4    Q    I'm going to have you look, if you would, at the book at

5    Exhibits 3, I think, through 7.  I think we need the other

6    book.

7         THE COURT:  What is the reference?

8         MS. BROWN:  Exhibits 3 through 7.  They're the medical

9    bills and the medical bill summary.

10        THE COURT:  Well, are these disputed?

11        MS. BROWN:  I believe they are disputed, Your Honor.

12   Maybe I'm--

13        MR. PESTAL:  Just as to foundation, Your Honor.  I don't

14   know where the numbers came from.  We haven't been provided

15   the underlying calculations.

16   Q    (by Ms. Brown)  Mrs. Lopez, if you would look at Exhibit

17   3, which is the summary.  And then right behind that is the

18   payment ledger from Blue Cross, Blue Shield.  First of all,

19   are you familiar with Mr. Lopez's--are you the person who

20   handles all the finances?

21   A    I handle all the finances.

22   Q    All right.  And are these the bills that he has incurred

23   as a result of the injury suffered during the surgery, this

24   Blue Cross, Blue Shield summary?

25   A    Yeah, Blue Cross is our--is our insurance, and I believe

1    these are all accurate.

2    Q    And if you would look at Exhibit 3; it's the summary

3    broken down by medical care provider.

4    A    Okay.  It's--

5         MS. BROWN:  I would move for the admission, Your Honor,

6    of Exhibits 3, 4, 5--may I approach?  I think it might be 6

7    as well.

8         THE COURT:  You said 3 through 7 first.

9         MS. BROWN:  Okay.  I'm doing the end of it by memory.

10   May I approach the witness?

11        THE COURT:  Well, I'm--why is this a problem?

12        MS. BROWN:  Pardon me?

13        THE COURT:  I'm asking Mr. Pestal why is this a problem.

14   I would have expected this to have been agreed to before we

15   ever started today.

16        MR. PESTAL:  Well, Your Honor, just--so with respect to

17   this, I expect the doctors to testify about these medical

18   records.  I don't know that this witness has any knowledge

19   about them.  That's my objection coming in at this point.

20   Typically a doctor testifies about them.

21        THE COURT:  Yes, I understand that.

22        MR. PESTAL:  So I mean if she has knowledge, if the

23   witness has knowledge, I have no objection.

24        THE COURT:  Well, how is she going to have knowledge of

25   what each--these are the bills that were paid; is that it?

1     THE WITNESS:  Right.

2     THE COURT:  All right.

3     MR. PESTAL:  And that's my point, Your Honor.  At this

4  point--

5     THE COURT:  I'll receive it as the bills paid.  Whether

6  this is reasonable and necessary can be addressed in the

7  doctors.

8     MS. BROWN:  Thank you, Your Honor.

9     THE COURT:  All right.

10    (Plaintiff's Exhibits 3 through 7 were received in

11 evidence.)

12    MS. BROWN:  Excuse me just a moment.

13    (Pause.)

14    MS. BROWN:  I just want to make sure we're clear and I'm

15 not overdoing the exhibits.  So it's Exhibit 3 through 7.

16    THE COURT:  That's my understanding.

17    MS. BROWN:  Yes.  All right.

18    THE COURT:  One of them is the summary.

19    MS. BROWN:  Correct.

20    THE COURT:  The others are the bills?

21    MS. BROWN:  Yes.

22    THE COURT:  All right.

23 Q   (by Ms. Brown)  Mrs. Lopez, I want to talk to you about

24 attempts made to see Dr. Kindt after the surgery and after

25 Mr. Lopez left the hospital, okay?

```
 1  A    Yes.
 2  Q    Have you and Mr. Lopez seen either Dr. Kindt or Dr.
 3  Waller since he left the hospital?
 4  A    No.
 5  Q    What efforts did you make to see Dr. Kindt?
 6  A    We made appointments.  In fact we made one especially to
 7  see Dr. Kindt.  My husband just wanted to talk to him.  He--
 8  and we specifically said we wanted to see Dr. Kindt.  When we
 9  got there, we saw someone else.  And we asked the doctor that
10  we were seeing, "Isn't Mr.--Dr. Kindt going to be here?"  And
11  he says, "Well, let me check."  And he went and he looked and
12  he said, "He's here, but he's unable to come and talk to
13  you."  That's it.
14  Q    Okay.  All right.  The next topic I want to cover is the
15  medications that Mr. Lopez takes, okay.  Who's in charge of
16  his medications?
17  A    I'm the one who fills his daily containers, the little--
18  Q    The little seven-day prescription?
19  A    Yeah.  Yeah.
20  Q    Why?  Why do you do it?
21  A    Because he doesn't remember what he's taking.
22  Q    Have you observed him to have any adverse reactions or
23  problems with any of his medications?
24  A    Yes.  At the beginning when he was taking Neurontin, the
25  dosage was too high.  My son is a pharmacist, and he told me,
```

1    "Mother, they started him too high.  At 600 milligrams, three

2    times a day, that's 1800 milligrams."  So he's--

3         MR. PESTAL:  Objection, Your Honor.

4         THE COURT:  Sustained.  Stricken.

5    Q    (by Ms. Brown)  Did you observe him having difficulty

6    with his Neurontin?

7    A    Yes.

8    Q    Okay.

9    A    He started having like--like zoning out, but he started

10   getting like Parkinson's tremors.  So I spoke to the doctors

11   and I asked them to please change his medication.  Then they

12   gave him Ritalin because he was falling asleep at work.  And

13   they gave him Ritalin to wake up.  Well, the Ritalin was

14   reacting with other medications.  I don't know, I'm not the

15   doctor, but he was passing out.  So--and I asked him to

16   change that.  And if it wouldn't be that I'm so vigilant

17   about taking care of my husband, I don't know where he would

18   be, because nobody else seemed to care.

19   Q    Did you have to manage his medications before the

20   surgery?

21   A    Oh, no.

22   Q    Now, I just want to ask about this briefly because it is

23   a factor here.  Are you having your own health issues now?

24   A    Yes, I am having--I will be having a double mastectomy

25   the 23rd of December.  This is the second time I have cancer

1    for the breast, and I've had cancer--uterine cancer.

2    Q    Is there anyone to take care of your husband if for some

3    reason you're not able?

4    A    Well, my youngest daughter insists that she can take

5    care of him, but she has a job, her partner has a job, she's

6    taking care of an eight-month old baby.  There's no way that

7    she could give up her job to take care of him, and it really

8    worries me because he was really, really, really, really

9    forgetful.

10        MS. BROWN:  May I have a moment, Your Honor?

11        THE COURT:  Yes.

12        (Pause.)

13        MS. BROWN:  Those are all my questions.

14        THE COURT:  All right.

15        MS. BROWN:  Thank you, Mrs. Lopez.

16        THE WITNESS:  Thank you.

17        THE COURT:  Mr. Pestal?

18                         CROSS-EXAMINATION

19   BY MR. PESTAL:

20   Q    Good morning, Ms. Lopez.

21   A    Good morning.

22   Q    My name is Mark Pestal.  And--

23   A    I remember you.

24   Q    --do you remember meeting me before--

25   A    Yes.

1  Q    --when you gave your deposition?

2  A    Yes.

3  Q    So good to see you again.

4  A    Good to see you.

5  Q    So let's talk a little bit about the timeframe leading

6  up to your husband's back surgery.  He had been complaining

7  of back problems since getting--leaving the surgery, the Army

8  I believe it was?

9  A    Right.  Yes.  He was in the National Guard.

10 Q    And every since that accident in Iraq, his back was

11 giving him a problem?

12 A    A lot of problems, yes.

13 Q    A lot of pain?

14 A    Yes.

15 Q    So back pain all along his back?

16 A    I don't know exactly where.

17 Q    Okay.  Did he also experience leg pain?

18 A    Yes.

19 Q    Okay.  In both or--

20 A    One.

21 Q    His left leg?

22 A    As far as I know, yes.

23 Q    Okay.  In both legs or just on one side?

24 A    The left side.  The one that he limps on now.  I don't

25 know.

1    Q    Okay.  So he had pain in that left leg prior to the

2    discectomy; is that correct?

3    A    Yes, that's why he went for that procedure.

4    Q    And in fact in the months or maybe even years leading up

5    to that surgery, his--his back and his leg pain, they were--

6    they were--that was increasing; is that fair to say?

7    A    I suppose it is fair to say that.

8    Q    In other words, it got so--to a point that he--

9    A    A point to where he had to go see somebody to take care

10   of it.

11   Q    Right.  In other words, it got to a point it was so bad

12   that he wanted to go see a neurosurgeon to take care of it?

13   A    Right.

14   Q    And now since that surgery, have you noticed that your

15   husband's back pain is improved, or do you know?

16   A    He always complains about his back, so evidently it

17   didn't improve that much.

18   Q    Okay.

19   A    And he--and he definitely complains about his foot pain.

20   That's where it settled.  That's the problem.

21   Q    Right.  And so really his--his main problem, his only

22   problem is the foot pain you said?

23   A    It's not the only problem.

24   Q    Well, he's got some other medical conditions that he's

25   had before the surgery, right, and even psychological

1   problems, true?

2   A    As far as the PTSD from the service.

3   Q    Right, so he--so Mr. Lopez suffered from Post Traumatic

4   Stress Syndrome prior to his discectomy, true?

5   A    True.

6   Q    Okay.  And he had some other ailments as well, correct,

7   before the surgery?

8   A    What ailments are you talking about?

9   Q    Respiratory, for instance.

10  A    Yes, that was probably from the--the--the--whatever they

11  burned in Iraq.

12  Q    Some chemical agent over in Iraq--

13  A    Yes.

14  Q    --has caused him respiratory problems?

15  A    Yes.  He got bronchiectasis, and they took care of that

16  at the VA also.

17  Q    Okay.  And your husband is receiving a certain amount of

18  disability payments as a result of those other medical

19  problems that he--were caused from his service; is that true?

20       MS. BROWN:  Objection, Your Honor, relevance.

21       THE COURT:  Overruled.

22       THE WITNESS:  Yes, he's receiving disability payments

23  from the VA.

24  Q    (by Mr. Pestal)  And is that about $1,600 a month?

25  A    No, it has increased.

E. Lopez - Cross                               132

1  Q    And how much is it today?

2  A    $3,300.

3  Q    $3,300?

4  A    Yes.  It increased because he had to go before the

5  boards, and they decided that he was unemployable.

6  Q    And then he also receives $773 a month, approximately,

7  in retirement income, or is it more today?

8  A    It's--from--from his first--at work it's 800, I believe,

9  $39.

10 Q    And then you both receive Social Security of about $700

11 a month?

12 A    I get about--it just went up and it's going to be a

13 little bit--about $902, I believe that's what mine is.  And

14 I'm not exactly--what his is going to be.

15 Q    And since Mr. Lopez's discectomy, all of his medical

16 care costs have been paid for by--with the exception of Dr.

17 Barolat, the VA--he goes to the VA for medical care, true?

18 A    He goes to the VA for medical care, but he also went to

19 pain management.  Dr. Kedlaya and the nurse practitioner,

20 Rose Wertz, they--he want--he wants to get better, so he went

21 so they could see if they could manage the pain.  Okay, they

22 helped him for maybe about a year.  They couldn't do

23 anything.  He just called--recently he talked to somebody

24 named Dr. Chris Mason, and she--she--he sent her all the

25 records, and she says there's nothing that--

1   Q    So, Ms. Lopez--

2   A    --I can do for him.

3        THE COURT:   Yeah.

4   Q    (by Mr. Pestal)  --let me get back to my question.   So

5   my question is, your husband currently goes to the VA to get

6   medical care?

7   A    Yes, he does.

8   Q    Okay.   And the only private doctor at this point is Dr.

9   Barolat; is that correct?

10  A    At this point, yes.

11  Q    And does he have another appointment scheduled with Dr.

12  Barolat, do you know?

13  A    Well, he just went to one now in October.

14  Q    And--

15  A    And he--

16  Q    So currently he doesn't have any other doctor

17  appointments scheduled at this point in time, if you know?

18  A    No, he doesn't.   Well, except for the VA he does.

19  Q    And I think you mentioned in your deposition, you were

20  asked about whether or not--you know, how much your life has

21  changed.   And you indicated in your deposition that "I mean

22  my life hasn't changed."   So you're still doing your daily

23  activities, is that true, after this discectomy?

24  A    I still do my regular work plus what he used to help me

25  with, yes.

1   Q    Okay.  And so with some of--with respect to some of the

2   activities that you all have done after the discectomy,

3   you've done some traveling; isn't that true?

4   A    Yes, we have.

5   Q    Gone to San Antonio?

6   A    Yes.

7   Q    And Mr. Lopez obviously went with you?

8   A    Yes.

9   Q    And you were able to see the Alamo; is that true?

10  A    Yes.

11  Q    And you were able to walk on the boardwalk down there?

12  A    Yes.

13  Q    Okay.

14  A    Well, he also used his cane when he walks, and he does

15  walk in a lot of pain.  And the only reason he goes is

16  because I want to do it and he wants to please me.

17  Q    And so when you go out to some of these activities that

18  you want to go to, your husband uses a cane to help him walk;

19  is that--you'll have to say yes, ma'am.

20  A    Yes.

21  Q    Thank you, ma'am.

22  Q    And in terms of driving, Mr. Lopez still drives; is that

23  true?

24  A    Yes, he does.

25  Q    And you drive--are you a passenger when he's driving?

E. Lopez - Cross                    135

1   A    I'm a passenger and I'm also a driver if he feels that

2   he doesn't want to drive.  I'll give you an example.  We went

3   to a funeral last Tuesday, and he went in to turn into the

4   parking lot and he missed where you go in and he hit the curb

5   with our brand-new car.  And then he's talking to his cousins

6   and she has a cake and he says, "Oh, I like that."  She gives

7   it to him, he puts it on the driver's seat and he doesn't

8   remember and he sits on the cake.  That's how soon he

9   forgets.

10  Q    Okay.  And what I'm trying to--and I appreciate that,

11  ma'am.  With respect to his driving, you also own a 5th

12  wheel?

13  A    Yes.

14  Q    And that's like a camper trailer?

15  A    Right.

16  Q    And he drives the truck when you go to visit your

17  brother's ranch--or his brother's ranch?

18  A    Yes, he--he--or my son has been helping us now lately

19  because--in fact, we gave him the 5th wheel that we had, my

20  son.

21  Q    Okay.  At the time of your deposition, I think you told

22  us that you were--

23  A    Yes.

24  Q    --driving and taking vacations with that 5th wheeler?

25  A    We weren't taking vacations.  We only take it to one

1  place, to San Luis and then we park it.  And we use it when

2  we go to San Luis because that's where we were born.  And

3  then we bring it back home.  That's the only time we drive

4  it.

5  Q    And that's like a 24-foot trailer; is that right?

6  A    Yes.  Can I make a comment?

7       THE COURT:  No.

8  Q    (by Mr. Pestal)  And, Ms. Lopez, I'm not sure I quite

9  heard you as to whether you said when Dr. Kindt and Dr.

10 Waller came into the waiting room whether you said that they-

11 -they said that the surgery had gone well or had not gone

12 well?

13 A    Had not gone well.

14 Q    They said that the surgery had not gone well?

15 A    Right.

16      MR. PESTAL:  No further questions, Your Honor.  Thank

17 you.

18      THE COURT:  Any redirect?

19      MS. BROWN:  Briefly.

20                      REDIRECT EXAMINATION

21 BY MS. BROWN:

22 Q    Mrs. Lopez, you were asked about driving and driving

23 with a 5th wheel.  Do you have concerns about Mr. Lopez's

24 driving?

25 A    Yes, I do.  In fact, Dr. Woods from the VA told him, "If

1   you get caught, you're under narcotics.  You will get a DUI."

2   And I am so stressed out and I tried to do most of the

3   driving when I can.  And when we come to Denver, I drive all

4   the way to Castle Pines and he'll take it from there because

5   I hate to drive in Denver, so it's changed my life in that

6   respect.  That I am so stressed out when we go anywhere.  And

7   he tells me, "You are going to just have to start driving

8   everywhere we go."  And I don't really like to drive.

9   Q    Do you think that he's an unsafe driver?

10       (Pause.)

11       THE COURT:  Perhaps the question could be whether she

12   feels safe with him driving.

13       MS. BROWN:  Thank you, Your Honor.

14   Q    (by Ms. Brown)  Do you feel safe with Mr. Lopez Driving?

15   A    No.

16   Q    Thank you.

17       MS. BROWN:  No further questions.

18       THE COURT:  All right.  And I take it she may be

19   excused?

20       MS. BROWN:  Yes, Your Honor, and she can--we will not be

21   recalling her, so she can remain in the courtroom.

22       THE COURT:  Yeah.

23       MR. PESTAL:  Thank you, Your Honor.  No objection.

24       THE COURT:  All right.  You may step down?

25       THE WITNESS:  Thank you.  Thank you, Your Honor.

```
 1        THE COURT:  After lunch you can come back and be in the
 2   courtroom also.
 3        THE WITNESS:  Thank you.
 4        THE COURT:  All right.  You're excused.
 5           We'll take our recess.  And so what do you have
 6   scheduled?
 7        MS. BROWN:  So, Your Honor, we're actually moving very
 8   quickly.  This afternoon we have two short witnesses.  We
 9   have Mr. Scott Maldonado, who was a co-workers at the Pueblo
10   Chemical Depot.
11        THE COURT:  All right.
12        MS. BROWN:  And I think we'll call Mr. Lopez this
13   afternoon.
14        THE COURT:  All right.
15        MS. BROWN:  And then tomorrow we have our expert
16   neurosurgeon and our economist.  And I think at that point
17   we're going to rest.
18        THE COURT:  So what time do you have this Dr.
19   Poffenbarger?
20        MS. BROWN:  Yeah, subject--we'll rest subject to Dr.
21   Barolat, but Dr. Poffenbarger can be here at any time.  He's
22   coming in tonight from Cody, Wyoming.
23        THE COURT:  All right.  Well, on the subject of driving,
24   we may have to shorten the day.  I usually carpool, but the
25   person I do carpool with is not--is on vacation.
```

1      MS. BROWN:  Okay.

2      THE COURT:  The meaning--the significance of that is I

3   can't use the HOV lane.

4      MS. BROWN:  Okay.

5      THE COURT:  And I have to go Highway 36 and it would be

6   better if I could at recess here at 4 o'clock.

7      MS. BROWN:  I don't think we're going to get anywhere

8   near 4 o'clock with the testimony honestly.  I think that

9   there's a good chance we could finish before--or finish at

10  lunch tomorrow.

11     THE COURT:  Well, I'm talking about today.

12     MS. BROWN:  Oh, today.  That's fine today too.  I think

13  we're going to finish early today.

14     THE COURT:  Yeah, and I'm not sure what time I can start

15  in the morning.  This morning was good; it was cloud cover

16  and hardly any traffic.  When there's bright sun, as you may

17  be aware, Highway 36 is very difficult.

18     MS. BROWN:  Yes.  I think we can start late and plan on

19  finishing early tomorrow as well.  And I think that today

20  we'll probably finish by the afternoon break.

21     THE COURT:  Yes.  And it has been agreed that Dr.

22  Barolat will testify.  I don't know if we've got a date for

23  that, but--

24     MS. BROWN:  January 9th.

25     THE COURT:  Yeah, so your case is still open until he

```
 1  testifies.

 2        MS. BROWN:  Yes.  Yes.

 3        THE COURT:  That's all agreed to at the pretrial.

 4            All right.  Well, we'll recess until 1:30 then.

 5        MS. BROWN:  Thank you.

 6            (12:06 p.m. - Whereupon, a lunch recess was taken.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               AFTERNOON SESSION

2       (At 1:29 p.m. on December 15, 2014, with counsel for the

3  parties present, the following proceedings were had:)

4       THE COURT:  Please be seated.  Next witness?

5       MR. LEVENTHAL:  Your Honor, there is one matter that I

6  would request just an opportunity to bring up.

7       THE COURT:  All right.

8       MR. LEVENTHAL:  Your Honor, this afternoon I intend to

9  call Mr. Lopez to testify.  I anticipate part of the cross-

10  examination will be the use of the informed consent document.

11  As I've indicated and the Court is well aware, we're not

12  making an informed consent claim.  It's our position, the

13  reason I'm bringing this to your attention is that would be

14  inappropriate and a waste of time.  The consent document

15  lists things that can happen, but it doesn't attempt to

16  distinguish whether those can happen with or without improper

17  care.  And so the fact that the person can suffer a nerve

18  injury clearly can happen with substandard care or

19  appropriate care, maybe, I don't know, but there's no attempt

20  to distinguish that.  So it's our position that it would be

21  irrelevant for the U.S. to try to cross-examine on the fact

22  that it has this laundry list of things on it that can

23  happen.

24       THE COURT:  Well, they can simply put in that he signed

25  it and we can receive it but not what his understanding is.

```
1         MR. LEVENTHAL:  Sure.  And there was one thing that I
2    just wanted to bring to the Court's attention.  They added to
3    that list on the informed consent document that they--a
4    patient understand that the procedure could be done at the
5    wrong level, which clearly is always something that can
6    happen with substandard care.  So there's an attempt by the
7    VA to try to even put that in, but it's not a release and
8    it's not, you know--
9         THE COURT:  Yeah, I understand that, but--
10        MR. LEVENTHAL:  --assumption of risk.  All right.
11        THE COURT:  --are you saying they modified the informed
12   consent after the surgery?
13        MR. LEVENTHAL:  No, not--
14        THE COURT:  No.
15        MR. LEVENTHAL:  --after the surgery, but I think it was
16   done after a procedure at the VA that was done at the wrong
17   level--
18        THE COURT:  Yeah.
19        MR. LEVENTHAL:  --and maybe one of Dr. Kindt's
20   procedures.
21        THE COURT:  Well, I don't know.
22        MR. LEVENTHAL:  All right.  Thank you.
23        MR. PESTAL:  Your Honor, I would just that I object to
24   foundation.  I know Mr. Leventhal has had a lot of VA cases,
25   but I don't intend to get too far into depth on the consent
```

1   form with Mr. Lopez anyway.

2       THE COURT:  All right.  Well, who is the next witness?

3       MS. BROWN:  My next witness is Scott Maldonado.

4       THE COURT:  All right.

5       MS. BROWN:  And, Your Honor, it's come to my attention

6   that I neglected to offer Exhibit 26, Ms. Woodard's CV.

7       THE COURT:  Oh, all right.

8       MS. BROWN:  So I'm offering it.

9       MR. PESTAL:  No objection.

10      THE COURT:  It's received, yes.

11      MS. BROWN:  Thank you.

12      (Plaintiff's Exhibit 26 was received in evidence.)

13      (Pause.)

14      THE CLERK:  Please raise your right hand.

15                        SCOTT MALDONADO

16  Called as a witness on behalf of the plaintiff, having been

17  first duly sworn, was examined and testified as follows:

18      THE CLERK:  Please be seated.  Please state your full

19  name and spell your last name for the record.

20      THE WITNESS:  Scott Maldonado, M-A-L-D-O-N-A-D-O.

21                      DIRECT EXAMINATION

22  BY MS. BROWN:

23  Q    And, Mr. Maldonado, it's going to be important that

24  you're fairly close to that microphone so we can hear you,

25  okay?

1   A     Okay.

2   Q     What do you do for a living?

3   A     I'm a retired government employee.

4   Q     Government employee?

5   A     Yes, I'm retired.

6   Q     Where did you work?

7   A     Pueblo Chemical Depot.

8   Q     What is the Pueblo Chemical Depot?

9   A     Well, the name has changed over the years to different

10  missions that went on there.  It turned out to be Pueblo

11  Chemical Depot because of the chemical munitions stored there

12  of mass destruction.

13  Q     And obviously that's a secured facility?

14  A     Yes, ma'am.

15  Q     When you were employed for the federal government at the

16  Chemical Depot, what was your job?

17  A     I started off in security.  I stayed there for 32--30

18  years and was transferred over to the emergency operations

19  center.

20  Q     When you were working security, did you have an

21  opportunity to work with Mr. Lopez?

22  A     Yes, ma'am.

23  Q     And can you tell us just approximately what timeframe

24  that was where you first worked with him in security?

25  A     In the '80s through the '90s.

Maldonado - Direct                        145

1   Q     And--

2   A     I'm not very good with dates, so--

3   Q     Okay.   That's okay.   What were--did you and Mr. Lopez

4   have the same job responsibilities at that time in security?

5   A     At that time, I believe we did.

6   Q     Okay.

7   A     We did have the same job responsibilities.

8   Q     Did you work alongside Mr. Lopez at that time?

9   A     Yes, ma'am.

10  Q     And tell us, please, what type of worker Mr. Lopez was?

11  A     What kind of worker?

12  Q     Yeah.

13  A     Oh, he was a powerful working, person that was--had

14  self-esteem, was motivated and well--handled himself very

15  well.

16  Q     Was he well respected with--among his peers?

17  A     Yes, he was.

18  Q     Did--was--did you and Mr. Lopez socialize together

19  outside of work?

20  A     No, ma'am.

21  Q     Have you ever?

22  A     No, ma'am.

23  Q     Now, so we have kind of a remote timeframe here, the

24  late '80s and early '90s where you and Mr. Lopez worked

25  security together.   At some point did--was Mr. Lopez

1   promoted?

2   A    He was--he went--it was a promotion,  He went to a--he

3   applied for a different job, which was in the Emergency

4   Operation Center, which was a higher grade.

5   Q    Okay.  At some point did you yourself move to the

6   Emergency Operation Center at the depot?

7   A    Yes, I was transferred there in August of 2010.

8   Q    Now, between the early '90s, when you had worked with

9   Mr. Lopez in security, and August of 2010, when you went to

10  the Emergency Operation Center, had you seen him from time to

11  time during that?

12  A    Periodically.  When I was a security supervisor, we

13  would have joint exercises with the county and state along

14  with the security units to safely and security safeguard the

15  chemical weapons at the Depot.

16  Q    From the early '90s up through the end of 2009, when you

17  saw Mr. Lopez on these occasions, did you notice anything

18  different about him?

19  A    No.  No, there was nothing different about him.  He was

20  well rounded.

21  Q    Now, in August of 2010, when you moved to the Emergency

22  Operation Center, did you notice anything different about Mr.

23  Lopez?

24  A    Strangely, oddly, yes I did.

25  Q    What did you observe?

Maldonado - Direct                    147

1   A    I observed that he was hobbling and had a limp to him.

2   I can't--I'm not a medical doctor, so I can't say he was in--

3   he looked to be in pain, I would say.

4   Q    And why--describe what you saw that made you conclude he

5   was having pain?

6   A    The way he was walking, the way he would sometimes make

7   gestures of his eyes and his face and just some voice things

8   that would say uh, or something like that.  He would be

9   constantly be doing that, constantly uh, ow, you know.  I

10  never really asked him--it took me a couple weeks before I

11  asked him.

12  Q    Why did it take you a couple weeks before you asked him

13  what was going on?

14  A    Mr. Lopez is a pretty--how do you say--personal person

15  and you just don't approach him and ask him questions about

16  his health or how he's feeling or what he feels.  You just

17  don't.

18  Q    Okay.  You mentioned there was something about how he

19  was walking.  Would you just describe what you observed about

20  his gait?

21  A    The way he walked?

22  Q    Yes.

23  A    He--he had a limp and his leg--his foot hit the ground

24  quite solidly, like a thump noise all the time.

25  Q    Did it appear he could control that foot?

1    A    Sometimes yes, sometimes no.  You know, I don't--I can't

2    say yes because you don't watch a person when they walk like

3    that or you don't let them observe you watching them do that,

4    especially a proud person like Mr. Lopez, you just don't.

5    Q    Okay.  What else did you notice about Mr. Lopez?  Did

6    you notice anything about his level of alertness?

7    A    His alertness was somewhat impaired.  At times when we

8    had joint exercises, he was more vibrant, and after that he

9    would go into a self--into himself because of his pain.  I

10   think it was because of his pain.

11   Q    Okay.  Did you see him falling asleep?

12   A    Periodically I've--I've nudged him and woke him up, yes,

13   ma'am.

14   Q    What would you and your co-workers do when you noticed

15   that maybe he was dozing off?

16   A    We would bring him aware of what was going on.

17   Q    Did Mr. Lopez have any physical problems, other than

18   what you've described with his foot?

19   A    Sometimes he had problems concentrating on the computer.

20   Sometimes on some of the exercises that we would practice

21   with each other in training--within our training programs, he

22   would lose concentration.  He would get frustrated because he

23   could not do things like he used to before.

24   Q    Did you ever see him fall?

25   A    I've seen him have muscle spasms and fall, yes, ma'am.

1    Q    And when he fell on the job, what would you and his co-
2    workers do?
3    A    We would go ask him if he was okay.  We would not touch
4    him.  He would be up and you don't do that to Leonard; he's
5    too proud of a man to let somebody help him up.
6    Q    Okay.  I wanted to ask you about whether you--you saw
7    him driving.
8    A    I've witnessed him driving quite often and followed him
9    home.
10   Q    Why would you follow him home?
11   A    To make sure he got home safe.
12   Q    Why did you feel like you needed to follow him to make
13   sure?
14   A    Because I think the medicines that he was taking was
15   making him not coherent.
16   Q    Did you have an opportunity to see Mr. Lopez's left foot
17   in this 2010 timeframe?
18   A    It took me about maybe two weeks to ask him to let me
19   see it, to see his leg, and it was on a weekend when nobody
20   was around and he showed me his--his leg that was--didn't
21   seem to be quite normal.  It was dark in color and I actually
22   asked him, "Is it living?"  And he says, "Yes, it's living.
23   It's there."  I says, "Does it hurt or what?"  He says, "Yes,
24   all the time."  I says, "How do you handle that pain?"  And
25   of course, you know, he just shrugged me off.

```
1        MR. PESTAL:  Objection, Your Honor.  Calls for hearsay.
2        THE COURT:  Overruled.
3        MR. PESTAL:  And I would have an objection what Mr.
4   Maldonado says.
5        THE COURT:  Well, you mean what Mr. Lopez said?
6        MR. PESTAL:  We do have objection to that.  We do--we
7   don't have an objection to what Mr. Maldonado observed, but
8   otherwise what Mr. Lopez said is hearsay.
9        THE COURT:  Overruled.
10        THE WITNESS:  Oh, okay.
11   Q    (by Ms. Brown)  Were you finished with your answer, Mr.
12   Maldonado?
13   A    Yes, I'm finished.
14        THE COURT:  So you understand the question I think is
15   what did Mr. Lopez say to you about his pain?
16            Right?
17        MS. BROWN:  Yes.
18        THE WITNESS:  Oh, he just said that he's in constant
19   pain.  I mean I would--
20        THE COURT:  Okay.
21        THE WITNESS:  --see--I would say yes he is because what
22   I saw it just didn't make my stomach feel right or my heart.
23   My heart really felt bad.  You know, I've known Leonard as a
24   man when he was whole and he just was not a whole man, you
25   know, when I saw what I saw.  It was just not--it was just
```

Maldonado - Direct                              151

1   not him.

2   Q    What type of footwear was Mr. Lopez wearing when you

3   started at the Emergency Operation Center in August of 2010?

4   A    He wore a tennie on his right foot and I think it's his

5   left he wore a slipper because he couldn't get a regular shoe

6   on.

7   Q    Did he--were there days where he took off the slipper

8   and put the tennis shoe on the left foot as well?

9   A    When we had joint exercises with I would say the

10  directors of the Chemical Depot, they would all merge into

11  that place and, yes, he put on tennies and he--he walked in

12  those tennies and yes he hurt in those tennies.  When it was

13  all over, he took--he took it off and put his slipper back

14  on.

15  Q    How big is the depot itself, like the whole thing?

16  A    The whole thing is about 2300--23,000 square miles--I

17  mean square acres.

18  Q    Okay.  And how big is the Emergency Operation Center?

19  A    Emergency Operation Center is maybe about three-quarters

20  of this room.

21  Q    Based upon your observation, was Mr. Lopez well

22  respected among his co-workers?

23  A    Very.  Very respected.

24  Q    Did you use the word with me big shot?

25  A    Big shot.

```
 1   Q    Okay.

 2   A    He was a driver for the organization during exercises.

 3        MS. BROWN:  May I have a moment, Your Honor?

 4        THE COURT:  Yes.

 5        (Pause.)

 6   Q    (by Ms. Brown)  Thank you, Mr. Maldonado.  Those are all

 7   my questions.

 8   A    Thank you.

 9        THE COURT:  Any cross-examination?

10        MR. PESTAL:  No, thank you, Your Honor.

11        THE COURT:  All right.  So I take it the witness is

12   excused?

13        MS. BROWN:  Yes, Your Honor.

14        THE COURT:  All right.

15        MR. PESTAL:  Yes, Your Honor.

16        THE COURT:  Mr. Maldonado, you may step down.  You're

17   excused, thank you.

18           All right.  Mr. Leventhal?

19        MR. LEVENTHAL:  Your Honor, at this time we would call

20   Mr. Leonard Lopez.  And, Your Honor, I would ask the Court to

21   observe the way he walks as he walks to the witness stand.

22        THE COURT:  All right.  Mr. Lopez, if you'll come up to

23   the witness stand, please.

24        THE CLERK:  Please raise your right hand.

25                          LEONARD LOPEZ,
```

1    called as a witness on behalf of the Plaintiff, having been

2    first duly sworn, was examined and testified as follows:

3         THE CLERK:  Please be seated.  Please state your full

4    name and spell your last name for the record.

5         THE WITNESS:  Leonard Lopez, L-O-P-E-Z.

6                         DIRECT EXAMINATION

7    BY MR. LEVENTHAL:

8    Q    Good afternoon, sir.

9    A    Good afternoon.

10   Q    Could you tell the Court your date of birth?

11   A    July 27, 1952.

12   Q    How are you feeling right now?

13   A    Not well.  My foot hurts pretty good, but I have my--my

14   stimulator going pretty good.

15   Q    Is your stimulator going?

16   A    Yes, I do.

17   Q    Okay.  We'll get into that a minute.  When you walked up

18   to sit down in the witness stand, you were walking on the

19   edge of your left foot.  Is that the way you always walk?

20        MR. PESTAL:  Objection, Your Honor.  Leading.

21        THE COURT:  Overruled.

22        THE WITNESS:  I did after--after the surgery I've always

23   walked like that.

24   Q    (by Mr. Leventhal)  Why?

25   A    Because I have like a ball under my--the sole of my foot

     1    and anytime I put pressure on it, it causes pain throughout

     2    my leg.

     3    Q    I want to go a little bit into your background.   Where

     4    were you born?

     5    A    I was born in San Luis, Colorado.

     6    Q    And how far did you go in school?  Did you graduate high

     7    school?

     8    A    I did.

     9    Q    And then did you attend college?

    10    A    I did.  I attended two years of college and then I

    11    joined the Air Force.

    12    Q    So where did you go to college for two years?

    13    A    Colorado State University, Fort Collins.

    14    Q    And then you said you went into the Air Force?

    15    A    Yes.

    16    Q    What year was that, approximately?

    17    A    It was in the early '70s.

    18    Q    About 1972?

    19    A    Yes.  Yes.

    20    Q    How long were you in the Air Force?

    21    A    A little over three years.

    22    Q    And then after getting out of the Air Force, you had a

    23    variety of jobs until you re-enlisted in the National Guard?

    24    A    Correct.  Yes.

    25    Q    Okay.  And tell the Court what those--generally what

1   those jobs were and what you were doing?

2   A    Well, before I got to the depot?

3   Q    Right, between the time that you got out of the Air

4   Force and then you went back in the National Guard.

5   A    Well, I was working as a warehouse supervisor for Clover

6   Club Foods.  And after that, I did a little bit of work in

7   the packing houses and then I left there and went to work for

8   California Devices Incorporated; they used to make computer

9   chips from scratch from the wafer up.

10  Q    Okay.  I'm going to ask you to speak up just a little

11  bit or move a little closer to the microphone.

12  A    All right.

13  Q    Have you worked most of your life since you were 13

14  years old?

15  A    Yes, I have.

16  Q    Has that been important to you?

17  A    Yes, sir.  My father always taught us to work hard.

18  Q    You re-enlisted in the National Guard in what year?

19  A    I think it was in 89 when I started working at the

20  depot.

21  Q    Okay.  And then at some point did you get deployed as a

22  military policeman to Iraq?

23  A    Yes, I did.

24  Q    And do you remember what year that was?

25  A    That was in 1991, when we went to Desert Storm.

L. Lopez - Direct                                    156

1  Q    You were married?

2  A    Yes, I was.

3  Q    And your wife's name?

4  A    My wife's name is Eva Lopez.

5  Q    And she testified.  You were not here when she

6  testified.  You have a child?

7  A    Yes, I do.  I have my daughter, Felina Lopez.

8  Q    And a grandchild?

9  A    I do.  I have an eight-month grandchild that we just

10 had.

11 Q    And do you and your wife help take care of the

12 grandchild?

13 A    Yes, we do.

14 Q    Okay.  Now, when you were in Iraq as a military

15 policeman, did you have an accident that caused an injury to

16 your back?

17 A    Yes, I did.

18 Q    Tell the Court about that, please.

19 A    Well, we were going to the desert to pick up some

20 prisons and I was driving in a pickup with my squad leader.

21 And we were going--and our lieutenant was lost, so we started

22 going through the desert pretty fast and all the sudden this

23 hole came up and we hit into it and I jammed my head into the

24 ceiling and then come back down onto the seat and just

25 started bouncing around in the truck.

1  Q    So you jammed your head into the ceiling and bounced

2  around the truck?

3  A    Yes, sir.  Because--the reason I hit so hard on the

4  ceiling was because we were in full gear.  I was wearing my

5  Catalar helmet and all my gear on--

6  Q    Okay.

7  A    --my LDE--LBE--

8  Q    Okay.  And what injury did you sustain as a result of

9  that impact?

10 A    Well, I felt that--my neck and my back was hurting, and

11 then I went to go see the medics there at the hospital that

12 they had there at the site where we were stationed.

13 Q    Other than the surgery, which is the subject of this

14 lawsuit, have you ever had a surgery before?

15 A    Yes, sir, I had a surgery for a--I can't remember what

16 it's called.

17 Q    When was that?

18 A    That was in '89.

19 Q    Was that related to your back?

20 A    No.  No.

21 Q    Okay.  And whatever the problem was, was it corrected in

22 the surgery?

23 A    Yes, it was.

24 Q    Physically how were you before you experienced this

25 injury in Iraq that you just described to the Court?

L. Lopez - Direct                        158

1    A     I was--well, I used to run a lot.  I was--when I was
2    deployed, I was in the special reactions team, which was the
3    swat team on the installation.  And we had to do pushups and
4    sit-ups and we had to run the two miles in a certain time, so
5    we were always training for--so we were in the gym quite a
6    bit after work and--
7    Q     Prior to the surgery on--in March of 2010, had you ever
8    had a significant problem--pain problem with your left foot?
9    A     No.
10   Q     So from the time of your injury until you had the
11   surgery, describe what you experienced with your back and any
12   problems that related to that injury for the Court.
13   A     Before I went--before I went to surgery?
14   Q     Before you had the surgery, leading right up to the
15   surgery.
16   A     Well--
17         THE COURT:  I would like to have the date of the injury
18   in Iraq.
19   Q     (by Mr. Leventhal)  Well, do you remember exactly when
20   the injury was when you were in Iraq?
21   A     No, I don't, because we were in the desert so much.
22   Q     We know you were in Iraq from 1989 to 1991.
23   A     Pardon?
24   Q     You were in Iraq from 1989 to 1991?
25   A     Yes, I was.

1  Q    And so it was--when was the injury in relation to when

2  you left at the end of 1991?

3  A    It was probably three months in when we were--when we

4  were on a theater.

5  Q    Pardon me?

6  A    It was probably three months, when we arrived at

7  theater.

8  Q    So close--sometime in 1989?

9  A    No, it was probably in '91.

10  Q    '91?

11  A    Yes.

12  Q    And can you get it any closer for the Court when in 1991

13  you had this injury?  Beginning of the year, mid-year?

14  A    It was probably in March.

15  Q    Okay.  And then from--were you able to complete your

16  stay in Iraq even with this injury?

17  A    I stayed.  When I went to go see the medics, they said

18  that I should go on light duty, but didn't because we were

19  short as it was because people were getting sick and they

20  were sending them home.

21  Q    Speak up just a little bit, please.

22  A    I said they told me to go on light duty, and I didn't go

23  on light duty because we had people that were getting sick

24  and they were sending them home.  So I stayed on duty so I

25  could help my fellow comrades that were there, because I

1   wanted to take my--I had to do my part.

2   Q    Okay.  And what--

3   A    I did it--

4   Q    Go ahead.

5   A    I did it for as long as I could until the pain started

6   getting to the point where I really couldn't--I didn't feel--

7   to the point where I couldn't help protect them, then I went

8   back to see the medics and they made me go on light duty.

9   Q    So part of the time you were in Iraq you were on light

10  duty?

11  A    Yes, it--it was--yes, it was.

12  Q    And when you came out of Iraq and you came back, did you

13  then get a job?

14  A    I had a job already at the Chemical Depot.  But when I

15  came back, they didn't take me off of active duty because I

16  was injured, so they put me on medical hold at Fort Carson.

17  Q    For how long?

18  A    I stayed on medical hold until probably September of

19  '91.

20  Q    And then what happened?

21  A    And then I went back to work.

22  Q    You said you had a job when you came back.  Where was

23  the job?

24  A    At the Pueblo Chemical Depot.

25  Q    Pueblo Chemical Depot?

1   A    Correct.

2   Q    And what was your job when you came back from Iraq at

3   Pueblo Chemical Depot?

4   A    I was still security guard.

5   Q    Were you a security guard when you--before you went to

6   Iraq at Pueblo Chemical Depot?

7   A    Yes, I was.

8   Q    All right.  So when you came back from Iraq, were you

9   experiencing problems with your low back because of this

10  crash--

11  A    Yes, I was.

12  Q    --in Iraq?

13  A    Yes.

14  Q    And describe for the Court exactly what those problems

15  were.

16  A    Well, I was having problems with the pain that--from my

17  buttocks down to my foot because I would get--it would be

18  intermittent.  Sometimes I would get the pain and sometimes I

19  wouldn't, but it would interfere with what I was doing most

20  of the time because when I got the pain I couldn't--I had to

21  sit down or stretch out my leg somewhere until the pain went

22  away.

23  Q    Well, was that what we commonly refer to as sciatic

24  pain?

25  A    Yes.

1  Q    And you said it was intermittent, meaning not all the

2  time?

3  A    Right.

4  Q    How often did you have the pain?  How often were you

5  without it?

6  A    Well, at first it just started maybe two or three times

7  a day and then all of the sudden it would--it would be--I--it

8  would be a lot longer when the pain lasted.  It wasn't the--

9  it was so many times a day.  Just that when I got it, the

10 pain lasted a whole lot longer and it was more intense, so I

11 just had to sit wherever I was no matter--no matter if I was

12 with my wife or wherever we were.  I would sit down until the

13 pain went away.

14 Q    Did you at some point seek--seek medical help after you

15 returned to Pueblo for an evaluation of your back?

16 A    Yes, I did.

17 Q    And do you remember who you saw and what you learned?

18 A    I don't remember who I saw, no.  I can't remember.

19 Q    Did you give consideration to having any type of

20 surgical procedure when you came back?

21 A    Yes, I did.  I--I talked to my--to my private--to my

22 physician, my family physician, and he set me up an

23 appointment with--with a neurosurgeon in Pueblo.

24 Q    And do you remember that doctor's name?

25 A    His name was Jan Davis.

L. Lopez - Direct                    163

1  Q    Jan Davis?

2  A    Jan Davis from--he worked at--at Parkview Hospital.

3  Q    And do you remember what year that was in?

4  A    No, I don't.  Sorry, I don't.

5  Q    Did you as a result of that appointment have a

6  neurosurgical procedure?

7  A    No, I didn't because--

8  Q    Why not?

9  A    Well, the surgeon told me that--he asked me where I

10 wanted to start, at my neck or at my back, he said because--

11 Q    Say that again.  He asked you where you wanted to start

12 and you said where?

13 A    He said where--he asked me where he wanted me to--him to

14 start the surgery, and he said did I want him to start on my

15 back up to my neck or my neck down to my back.  He said,

16 "Because either way I'm going to have to get to both places."

17 And I asked him, "Well, how would I come out?"  And he said,

18 "Well, I would give you a 50 percent chance of being well."

19 Q    Have you ever had a procedure on your neck?

20 A    No.

21 Q    How is your neck?

22 A    It's not well.  Well, I had an x-ray done just a few

23 days ago, and I called to see how it was and they told me

24 that I have a straight neck now.  And I asked them, well,

25 what does that mean.  And he said, well, that spinal cord has

1    a curve, most people have a curve at the top of their spinal

2    cord and now I don't have one.

3    Q    Okay.  Has anybody currently recommended you have

4    surgery on your neck?

5    A    No.

6    Q    And as far as you know, the problem with your neck is

7    not one that is subject to surgery?

8    A    Even if it is, I won't do it.

9    Q    If it weren't for your foot, the problem with your foot,

10   would you be able to work?

11   A    Yes, sir.

12   Q    Any question in your mind?

13   A    None.

14   Q    All right.  So this problem with your back and the

15   sciatic pain going down your leg, did that get progressively

16   worse up until the time you went to see Dr. Kindt?

17   A    Yes, it did.  It got--it got to the point where it was--

18   it was hurting so much all the time that I finally decided I

19   had to do something, so I went and saw my doctor and--well, I

20   went to the VA and saw my--saw the doctor there and--

21   Q    All right.  And before you go into that, between the

22   time you had the injury and the time you saw your doctor,

23   were you still working full-time?

24   A    Yes, I was.

25   Q    Did you miss sometime as a result of your back problems?

L. Lopez - Direct                    165

```
 1    A    Yes, sir, I would miss when I'd get out of bed and I
 2    just couldn't--couldn't get dressed and couldn't--
 3    Q    And how much time were you missing from work up to the
 4    time of the surgery?
 5    A    I don't know, it was off and on that I would call in
 6    sick.
 7    Q    More than a day or two a month or--
 8    A    Somewhere--somewhere around that area.
 9    Q    Okay.  So at some point this problem, pain in your back
10    going down your leg, got so bad that you went to see Dr.
11    Kindt?
12    A    Well, I went to go see my doctor first, and he set up an
13    appointment with--with Dr. Kindt, and then that's when I went
14    to see Dr. Kindt.
15    Q    Now, before doing that, were you able to hike?
16    A    Oh, yes.  I would--what happened is, I told my doctor
17    what was going on.  I told him I was limited and stuff.  And
18    he told me, well, my advice to you is when you feel well, he
19    said, go for broke, and when you don't, just take it easy.
20    So--
21    Q    When you feel well, what?  And again, I want you to
22    speak up, please.
23    A    He told me, when you feel well, he said, go for broke
24    and do what you need to do.  And when you don't feel well, he
25    said, just take it easy.
```

1  Q    So during this period of time, up until you saw Dr.--

2  your doctor and then Dr. Kindt, there were days you felt well

3  and would hike and do things like play golf, etcetera?

4  A    Yes, sir, I would.

5  Q    And other days where you just couldn't?

6  A    Yes, sir.  I would go fishing, I would hike with my wife

7  wherever she wanted to go and we would go on rides and I

8  played golf with my brothers.

9  Q    How was your disposition during that time?

10  A    It depends.  If I was feeling well, it was pretty good.

11  But when I was feeling bad, I was--I was quite the bear.

12  Q    So how was it that you ended up going to see Dr. Kindt

13  at the VA about your back?  How did that happen?

14  A    Well, like I said, my pain got to the point where it

15  was--it was really affecting the value of my life.  So I went

16  and saw the doctor and he set me up an appointment to see Dr.

17  Kindt in Denver, so I went to Denver and saw Dr. Kindt.

18  Q    And this pain was where?

19  A    It was in my--in my--in my back down to my foot, on the

20  left side of my leg.

21  Q    And the pain, did you have pain actually in your foot?

22  A    Yes, I did.

23  Q    Was it a different pain than you're experiencing now?

24  A    Not really.  It was--well, the pain that I'm

25  experiencing now is a hurt pain; the one before was--I was

1    having pins and needles and the pain was to the point where

2    it was just bothersome, always bothering me.  But it would

3    hurt--it was bothering me to the point where I couldn't walk

4    when it really got aggravated.

5    Q    We've looked at medication records.  Do you know whether

6    you were on any pain medication, not Ibuprofen, but pain

7    medication prior to the surgery with Dr. Kindt?

8    A    No.

9    Q    No, you were not?

10   A    I was--I was not on no pain medication.

11   Q    But occasionally took Ibuprofen?

12   A    Quite often.

13   Q    Okay.  So at some point you went to see Dr. Kindt.  How

14   was it that you saw him as opposed to anybody else?

15   A    That's--that's what they sent me up an appointment to

16   see him.

17   Q    And they being the VA?

18   A    Yes, sir.

19   Q    All right.  Tell the Court about your meeting with Dr.

20   Kindt.  What happened and--

21   A    Well, I went and met with Dr. Kindt.  And he--he spoke

22   about, well, what injury I had.  And I asked him if he could

23   fix it and he said, "Yes, I can take care of that."  And he

24   told me that he had done 1,000s of the surgeries and he had

25   done athletes and other people, and he said he never had a

1   problem once.  So he--he pretty much--what he told me there

2   pretty much convinced me that he was pretty good since he

3   never had a problem and he had all these surgeries under his

4   belt that he would do a good job for me.

5   Q    One of the things you just said was Dr. Kindt said he

6   could fix it.  What did you understand that to mean?

7   A    That he would take away the pain that was in my leg.

8   Q    And did he explain--did he explain to you why you were

9   having pain and what the surgery was going to be?

10  A    Yes, he did.  He told me that I had a disc that was

11  pinching my nerve and that he would go in and shave a little

12  bit of that disc to relieve the pain from the--on the nerve

13  where it was getting pinched and he said that would be it.

14  Q    Now, the leg pain you were having, which leg?

15  A    It was my left leg.

16  Q    And how it been your left leg ever since this incident

17  in Iraq when you hit your head and hurt your back?

18  A    Yes.  Yes, it has.

19  Q    So at some point did you agree to have the surgery?

20  A    Yes, I did.  Can I have some water?

21  Q    Sure.  There's some right there.

22       THE COURT:  Can you help him get water?

23       (Pause.)

24       THE WITNESS:  Thank you.

25  Q    (by Mr. Leventhal)  Do you carry pain medication with

L. Lopez - Direct                                    169

```
 1   you?
 2   A    Yes, I do.
 3   Q    What medication do you carry with you?
 4   A    I--I carry Oxycodone.
 5   Q    Have you taken Oxycodone today?
 6   A    Yes.
 7   Q    All right.  How--are you able to explain how--what
 8   happened and to tell the Court what happened as a result of
 9   that surgery?
10   A    I took my Oxycodone today.  It's not time for it, but I
11   --I took it anyway.
12   Q    Okay.
13        THE COURT:  Excuse me, when did you take it?
14        THE WITNESS:  I took this morning, before we came in.
15        THE COURT:  Okay.
16   Q    (by Mr. Leventhal)  Now, you had the surgery, what's the
17   first thing you remember when you woke up from the surgery?
18   A    I was in so much pain.  I never experienced a pain like
19   that.  It just hurt so much.
20   Q    Where was the pain?
21   A    It was on my left foot.
22   Q    Where on your left foot?
23   A    Pretty much on top of my foot, but it felt like the
24   whole foot was hurting so bad.
25   Q    Were you asked at the time how you would rate your pain
```

1    on the scale of 1 to 10, with 10 out of 10 being the worst

2    pain of your life?

3    A     Yes, I was, and--

4    Q     What did you say?

5    A     I told him it was probably about 20.

6    Q     A 20?

7    A     Yes, sir, on a scale from 1 to 10.

8    Q     Did Dr. Kindt come in and evaluate you?

9    A     I saw him come in, but I--I can't say he evaluated me or

10   not, but he--

11   Q     Did anyone after that surgery before you left the

12   hospital tell you what happened?

13   A     No, not at all.  But I had asked if I could see the

14   surgeon so I can get with him and ask him what exactly

15   happened, but I--and I set up some appointments with--with

16   Dr. Kindt by himself, and they made me appointments.  And

17   then when I showed up to the appointments, he wouldn't--he

18   wasn't there.

19   Q     He wasn't there?

20   A     No, he was not.

21   Q     So the records--

22   A     He was in the building, because I saw him in the

23   building, but he didn't come to my appointment.

24   Q     The records reflect that you had this 10 out of 10 pain,

25   but before you left the hospital, the pain had resolved; is

1   that true?

2   A     No.  No, it didn't.

3   Q     Were you discharged with a prescription for narcotic

4   pain medication?

5   A     I don't know, you would have to ask my wife.  She--I

6   honestly don't know.  I know that they gave me some drugs,

7   but I don't know what it was.

8   Q     Do you remember the drive home?

9   A     No.

10  Q     Do you remember how you were after the hospital?

11  A     After--

12  Q     After getting out of the hospital how your foot was?

13  A     After I got home?

14  Q     When you got home and in the weeks and months that

15  followed.

16  A     I had that pain going on so badly that I had to go to

17  the doctors to see if they could give me something else for

18  it.

19  Q     We heard just a few minutes ago that you were wearing a

20  slipper on your foot.

21  A     Yes, sir.

22  Q     Why were you wearing a slipper?

23  A     I--I could not put on socks or shoe because the pain was

24  just too much when I'd try to put anything on.

25  Q     And how would you describe the pain?  I know you said it

1  was severe, but what was the pain like?  Was it a burning

2  pain?  Was it pins and needles?  What was it?

3  A    It was--it was both.  On the bottom of my feet, I could

4  feel the pins and needles, but the rest of my foot felt like

5  it was just--it was just in so much pain.

6  Q    And again, was that a burning pain?

7  A    Yes, it was.

8  Q    Was there anything, the narcotics, any type of therapy

9  that would relieve that pain?

10  A    No.  No.  It would--narcotics helped for a while, but

11  it--the pain wouldn't go away.

12  Q    And--and how much would you actually have to take--how

13  much narcotics would you have to take in order for that to

14  have any effect on the pain?

15  A    Again, you have to ask my wife, because she--she took

16  care of everything.  I just don't know.

17  Q    When you took that much, when you took whatever you

18  would take to get rid of the pain, how did it effect you

19  cognitively, your ability to think and function?

20  A    Well, I was kind of loony for a while.  I get loony when

21  I first took them, and then I did a little bit better, but I

22  stayed--

23  Q    Did you return to the VA or the VA system to try to seek

24  some treatment or help for that pain?

25  A    Yes, I did.

1   Q    And that's what you just described, when you tried to

2   see Dr. Kindt and even though he was in the building he

3   didn't see you?

4   A    Correct.

5   Q    Did you ever see Dr. Waller?

6   A    No.

7   Q    Did you even know Dr. Waller was involved in your care?

8   A    No.

9   Q    Did you go outside the VA to try to get some treatment

10  for your pain?

11  A    Yes, I did.  I went to--

12  Q    And tell the Court about that.  Where did you go?

13  A    I went--I went to go see a pain specialist in Pueblo,

14  and I saw them for quite a while.  I don't know exactly how

15  long or what, but they would--they also prescribed something

16  for me to take, and they would give me some--I don't know

17  what, some samples that they had for me to try and I--I

18  stayed there until the time that they told me that they

19  couldn't do anything else for me, so I didn't go back.

20  Q    When you said you stayed there, you're not talking about

21  one visit?  You're talking about seeing them over a period of

22  time?

23  A    Correct.  I--

24  Q    Over what period of time did you see these pain

25  specialists and were they in Pueblo?

1  A    Yes, they were.  They were in--

2  Q    Over what period of time did you see the pain specialist

3  until they said there's nothing else we can do for you?

4  A    I would go see them probably once a month.

5  Q    For how long?

6  A    I don't know.  I honestly don't know.

7  Q    When did you return to work after the surgery?

8  A    I returned to work after all my annual leave and my sick

9  leave ran out.

10  Q    So your--your records reflect--and this will come out

11  through the economist--but that your income remained the same

12  during that period of time; was that because you were taking

13  annual leave and sick time?

14  A    Yes.

15  Q    And do you remember how long you were out using your

16  annual leave and using your sick time to keep your wages at a

17  level that they were before surgery?

18  A    Probably maybe a couple of months.

19  Q    And then once you ran out of annual leave and sick time,

20  did you go back to work?

21  A    I did.  I had to support my family, so I had to work.

22  Q    Was the pain better by that time?

23  A    No, it wasn't.

24  Q    So how did you do it?

25  A    I just sucked it up and went to work and did as best as

L. Lopez - Direct                          175

1   I could, but it wasn't the same because--

2   Q   Were you able to function at the same level that you

3   were able to function before this injury?

4   A   No, I just got to the point where I--I was always--at

5   work they would--people would always come to me for answers

6   and for--to get stuff done they would come to me.  And then

7   after this happened, I would unfortunately go back to my

8   colleagues and ask them how to do stuff and to check my work

9   to make sure that I did all the forms and everything that I

10  had to do were correct.

11  Q   So were you doing things--were you relying on your

12  colleagues, your co-workers, to do things after the surgery

13  that you weren't relying on them to do before the surgery?

14  A   Unfortunately, yes.

15  Q   And were they actually covering for you?

16  A   Yes, they were.

17  Q   At some point, did you make the decision that you could

18  no longer work?

19  A   Yes, I did.

20  Q   And what year was that?

21      (Pause.)

22  Q   Was that before or after the nerve stimulator was put

23  in?

24  A   It was--it was before.  I think it was before.

25  Q   And tell the Court why you decided that you could no

1    longer work.  And I understand this is difficult for you

2    because clearly you're a very proud man, but tell the Court

3    why.

4    A    It got to the point where some of the guys that I was

5    working with started to retire and other people were coming

6    in that didn't know me, so I couldn't--I couldn't ask them to

7    help me out.  And then I got to the point where saying that--

8    I just couldn't do it anymore.

9    Q    At some point did you go see a Dr. Barolat?  You okay?

10        (Pause.)

11   Q    Is this embarrassing for you to talk about?

12   A    Yes, it is.

13        (Pause.)

14        THE COURT:  We'll take a five-minute break.

15        MR. LEVENTHAL:  Thank you.

16        THE COURT:  All right.  Recess.

17        (2:15 p.m. - Recess accordingly.)

18        (At 2:20 p.m. on December 15, 2014, with counsel for the

19   parties present, the following proceedings were had:)

20        THE COURT:  Thank you.  Be seated.  Proceed.

21        THE WITNESS:  I apologize for my breakdown.

22        THE COURT:  You don't have to apologize.

23        THE WITNESS:  Pardon?

24        THE COURT:  You do not have to apologize.

25        THE WITNESS:  Thank you.

```
 1   DIRECT EXAMINATION BY MR. LEVENTHAL RESUMES:
 2   Q    Mr. Lopez, the question that I was asking when we took a
 3   break was why is it that you decided that you simply couldn't
 4   work anymore?
 5   A    Oh, like I said, my friends started retiring.  I just
 6   couldn't do the work by myself anymore and I just--I just
 7   didn't want to get fired, so I just thought I would go out
 8   with a little dignity and get out before something happened.
 9   Q    Go out with dignity.  And again, speak up, please.
10   A    I said I thought I would want to go out with some
11   dignity before I got fired, because I have never been fired.
12   So I just thought I would leave because I couldn't do the
13   work anymore.
14   Q    Now, one of the things we know and will probably come up
15   in your cross-examination is that you had some disability
16   ratings before this surgery performed by Dr. Waller and Dr.
17   Kindt?
18   A    That's correct.
19   Q    Is it true you were working full-time in spite of those
20   disability ratings?
21   A    Yes, I was.
22   Q    Okay.  Now, at some point after you left your job did
23   you go see a private neurosurgeon whose name is Dr. Barolat?
24   A    I did.
25   Q    And was that outside the VA system?
```

1   A    Yes, it was.

2   Q    And how was it that you went to see Dr. Barolat?  Why

3   did you see him and what led you to him?

4   A    Well, I was talking to my cousin that lives in

5   California, and I was talking to him about how his wife was.

6   And he told me that she had put in a transmitter in her back

7   because she was always in pain and that it had helped her a

8   lot with her pain.  So he said, "Maybe you should try it."  I

9   said, "Well, maybe I should."  And he said, "Well, I'll send

10  you some literature on it."  And so he sent me some paperwork

11  and a CD and I looked at it.  My wife and I both looked at it

12  and said, "Well, it probably can't hurt," because I mean I

13  would look for anything to help because I was--I was living

14  in pain so much, so I just looked for anything that could

15  help.  And we started going through the--on the internet and

16  came up with his name and we saw--read everything about him,

17  and we thought we would go talk to him, so we did.

18  Q    So you went to see Dr. Barolat.  Was he at Presbyterian

19  St. Luke's Hospital in Denver?  Or do you remember where you

20  saw him?

21  A    I saw him in his office at a hospital but--

22  Q    Okay.  And as a result of that visit and him explaining

23  to you about this stimulator that could be implanted, did you

24  have that surgery?

25  A    Yes, I did.  He--because when I got to his office, we

1   talked about the pain that I had, and he asked me to show

2   him.  So I took off my shoe and he touched my foot and I

3   jumped back.  And he told me, "You have that"--whatever they

4   call it, that pain syndrome.

5   Q    Complex regional pain syndrome?

6   A    Yes.  Yes.  Yes.  He told me you have it.  And I asked

7   him, "Well, will that implant help me?"  And he said, "Yes,

8   it will."  He said it would take some of the pain away, so I

9   said, okay, well--

10  Q    So you said that he touched your foot and you jumped.

11  When you had just clothing slightly touch your foot, did that

12  bother it?

13  A    Yes, it did.

14  Q    Is your foot a different temperature than the other

15  foot?

16  A    Sometimes it's hot and sometimes it's cold.

17  Q    You had the surgery?

18  A    I did.

19  Q    And did the surgery help?

20  A    Yes, it did.  It did.

21  Q    And tell the Court how it helped and how much it helped?

22  A    It probably helped about 40 percent because they gave me

23  some programs that I could--I could use that would take away

24  the pain and I would--depending how high I put it and how

25  much--how much electricity went down to my foot to help.

1   Q    So is there a dial that you have that you can set the

2   electricity and how much will go to your foot?

3   A    No, I have a handheld that I put on the--on--I have a

4   handheld that I put on my implant and I could either put it

5   higher or put it lower, depends how much I want for the pain.

6   When I got out, I put it pretty high so I can be able to be

7   with my wife and my daughter.  That's the only place I go is

8   with my wife and my daughter.

9   Q    As a result of the implant, have you been able to stop

10  using narcotic drugs?

11  A    No, I haven't.

12  Q    Have you been able to stop using--you take Oxycodone; we

13  talked about that?

14  A    I take Oxycodone, yes.

15  Q    And Methadone?

16  A    Yes.

17  Q    Both of them?

18  A    Yes.

19  Q    Every day?

20  A    Yes.

21  Q    How many times a day?

22  A    I take Methadone three times a day and I take Oxycodone

23  whenever I have to relieve the pain.

24  Q    I asked the Court to watch you walk up to the witness

25  stand.  And when you walked up, you were walking on the edge

1   of your left foot.  But you have tennis shoes on now?

2   A    Yes.

3   Q    Is that different than you had before the implant was

4   put in?

5   A    Yes.  Before the implant, I could not wear nothing but

6   slippers.  And then now I got the implant and it wasn't--it

7   wasn't under my skin at that time.  He left everything on the

8   outside--he left everything on the outside to see if I was

9   going to be a good candidate for it or not.  And he sent me

10  home for, I don't know, I think it was a week or two with it,

11  and I used it.  And I put on a tennis shoe and it helped a

12  lot.  I could wear shoes and socks, and I hadn't worn them in

13  quite a long while.

14  Q    When you had the slipper, did you walk on the edge of

15  your foot?

16  A    Yes, I did.

17  Q    And you still walk on the edge of your foot?

18  A    Yes, I do.

19  Q    So to the extent the implant has helped and it was

20  eventually put in your body, not to be worn on the outside,

21  it hasn't allowed to you walk flat on your feet?

22  A    No, it doesn't.  I--I have that ball on the bottom of my

23  foot that just every time I put pressure on it, it just

24  shoots pain up my leg.

25       MR. LEVENTHAL:  Your Honor, with the Court's permission,

1    what I would like to do is just bring a chair up and have Mr.

2    Lopez sit right here and just pull up his left foot and his

3    right foot so the Court can see his muscle function?

4         THE COURT:  Sure.  Okay.

5         (Pause.)

6         THE WITNESS:  I'll put my shoe on.

7         THE COURT:  Mr. Pestal, you can move too, if you wish

8    to--

9         MR. PESTAL:  Thank you.

10        THE COURT:  --observe this.

11   Q    (by Mr. Leventhal)  Did you take your shoe off while you

12   were testifying?

13   A    Yes, I do.  I've had it off all morning.

14        (Pause.)

15   Q    (by Mr. Leventhal)  And I want you to start with your

16   right foot.

17        THE COURT:  I have to stand.

18        MR. LEVENTHAL:  I can move him back a little bit.

19        THE COURT:  Move back a little, yes.  Okay.

20   Q    (by Mr. Leventhal)  Now, I want you to pull your right

21   foot towards you and I want you to do the same thing with

22   your left foot.  Is that as far as you can get it?

23   A    Yes, sir.

24   Q    Has it been like that since the surgery?

25   A    Yes, it has.

1  Q    Have you ever been able to--and now put them both

2  together so the Court can see the doctor.  And maybe I'll--

3  hang on.  I'm going to turn you sideways so the judge can see

4  the difference.  All right.  If you can return to your seat.

5       (Pause.)

6  Q    (by Mr. Leventhal)  Tell me what the effect on your body

7  is from your perspective of having to walk on your left foot

8  on the edge of your foot and not being able to fully bring it

9  up.

10 A    Well, since I've been walking on that, not I'm

11 experiencing pain on my--on my right knee and on my right hip

12 due to the way--well, according to the therapist, it was

13 because of the way I walk.

14 Q    Why did you take your shoe off?  I mean I understand

15 that you were in slippers before, now you wear tennis shoes,

16 but why did you have your shoe off while you were testifying

17 just now?

18 A    I take it off every time I stop, sit down no matter

19 where I'm at, whether I'm at church or out.  I take it off

20 all the time.  I'm at somebody's house, I just take it off.

21 I take it off in public because it relieves some of the pain

22 that's in my foot.

23 Q    After you had the nerve stimulator put in, were you able

24 to go back to work?

25 A    I didn't go back to work, no.

L. Lopez - Direct                    184

1   Q    Were you able to?

2   A    No, I was not able because I wasn't able before.  I--I

3   wasn't able after.

4   Q    When you take the Oxycodone, does it affect your ability

5   to stay awake and to think?

6   A    Yes, it does.

7   Q    Your coordination?

8   A    Yes, it does.

9   Q    There is--in your deposition you were asked whether you

10  had actually played golf since your surgery in 2010.  Did you

11  actually play golf with your brothers?

12  A    Well, I went out there.  If you want to call it playing

13  golf, I--I would hit the ball, but it wasn't--I went out more

14  to be with my brothers than I did golf because I--I couldn't

15  play.

16  Q    Were you in a golf cart?

17  A    Yes, I was.

18  Q    Do you still do that?

19  A    No, I don't.  I gave up all together golf because I--I

20  have six brothers, and we were all growing up and we were

21  pretty competitive with each other all the time, and it got

22  to the point where I just couldn't compete with them anymore

23  and I just--it--it wasn't worth me going out there because

24  they were playing good golf and I was just out there just to

25  be out there.

1   Q     How is your back pain and your leg pain since the

2   surgery?

3   A     My back pain is somewhat better, but when I do

4   something, I get the pain on the small of my back.  Like when

5   I help my wife sweep the house or I use the vacuum or

6   something like that point and I'm making motions, my small of

7   my back starts to hurt so I have to stop until it goes away

8   and then I finish doing it.

9   Q     And your leg pain?  You went and had this surgery with

10  Dr. Kindt because the leg pain was so bad.  Did your leg pain

11  improve with the surgery?

12  A     It improved when I used the--the implant.

13  Q     The stimulator?

14  A     Yes, the stimulator.

15  Q     Tell the Court about what your typical day is like now.

16  A     My typical day is I get up, I get cleaned up, I start to

17  read the paper and I fall asleep.  And then I wake up and I

18  try to read the paper again and I fall asleep.  Then my

19  daughter brings the baby over and I stay entertained with the

20  baby.

21  Q     You what?

22  A     I stay entertained with the baby.  I just watch him that

23  he doesn't--doesn't break--hurt himself and break stuff,

24  because he's crawling all over the place, so I just sit

25  around and watch him that he doesn't get hurt.

1  Q    Is your wife with you when you're watching the baby?

2  A    Yes, she is.

3  Q    So you're not left alone with the baby?

4  A    No.

5  Q    When you use the narcotics, which you use every single

6  day, does this impact how you drive?

7  A    Yes, it does.

8  Q    In what way?

9  A    Well, I drive and then all of the sudden I just go into

10  a zone and I'm just driving.  I don't know where I'm going; I

11  get lost and my wife tells me to turn there and turn here and

12  where are you going.

13  Q    Why do you carry the Oxycodone with you?

14  A    So I can use it when I have pain.

15  Q    And do you do that?

16  A    Pardon?

17  Q    Do you take Oxycodone sometimes not as scheduled?

18  A    Yes, I do.  I--

19  Q    Do you use a cane sometimes?

20  A    Yes, I do.

21  Q    How often?

22  A    It depends where we go.  If I'm going to be walking for

23  a while or we're going to go someplace for a while, I take it

24  with me.

25  Q    How would you say how this has impacted your life?

1   A     I don't have a life.

2   Q     How has it impacted your marriage?

3   A     Well, before my wife and I had a very good marriage.  We

4   still have a good marriage, but we do a lot of arguing

5   because I--she tells me things and I tell her, "Well, how

6   come you didn't tell me?"  And she says, "I did tell you."

7   And I said, "No, you didn't."  And then she says, "Yes, I

8   did."  And she tells me, "Don't argue with me because I know

9   I told you."  And then it's--it just goes from there to an

10  argument.

11  Q     Are you still together?

12  A     Yes, we are.  It's just that it's--it's not the same.

13  We're just--

14  Q     Compare for the Court the types of things you did before

15  the surgery with Dr. Waller and Dr. Kindt and what you did

16  around the house after the surgery.

17  A     Before I had the surgery?

18  Q     Before you had the surgery and after, what functions you

19  did around the house and what functions you now do around the

20  house.

21  A     When I was feeling good, I would help my wife do

22  everything in the house except I wouldn't do bathrooms.

23  Q     You wouldn't do bathrooms?

24  A     No, I would not.  I told her, "I'll help you do

25  everything but I won't do bathrooms."  So I did help her with

1    everything inside.  And I used to do the yard work on the

2    lawn and I used to prune the trees and take care of the yard.

3    Q    And now?

4    A    Now, I try to vacuum and I try to sweep for her.  I

5    don't do laundry anymore.  I don't do dishes anymore.  I--

6    Q    How has this affected your relationship with your

7    daughter?

8    A    Well, my daughter and I had a great father-and-daughter

9    relationship.  We were--she was hooked to my side forever.

10   And then after I had my surgery, I would fight with her for I

11   don't know what reason, but I would fight with her.  And she

12   would start crying and walk away.  And she would tell me I

13   was mean.  And then it got to the point where she moved out.

14   And I thought that, well, she's just moving out, but I found

15   out from my wife that she moved out because of me.

16   Q    Mr. Lopez, did Dr. Kindt or Dr. Waller ever explain to

17   you what happened during that surgery and why it happened?

18   A    No, they didn't, and I still don't know.

19   Q    Did anybody at the VA ever explain to you, ever tell

20   you, well, gee, this is just one of those things or it

21   doesn't always work out or give you any explanation at all as

22   to why this happened?

23   A    No, I never saw--I never saw anyone unless my wife made

24   appointments for me.  They never called, they never made an

25   appointment; we had to do everything on--my wife did

1    everything on her own.

2    Q    Is it hard for you to talk about this?

3    A    Yes, it is, extremely hard.

4    Q    I know I've asked you some questions and you've looked

5    at your wife, and I know some of those questions revealed

6    some things she may not know; is that true?

7    A    Yes.  Yes, it's true.

8    Q    All right.

9         MR. LEVENTHAL:  Just one second, Your Honor.

10        THE COURT:  Yes.

11        (Pause.)

12   Q    (by Mr. Leventhal)  Thank you, sir.  And those are all

13   my questions right now.

14        THE COURT:  Mr. Pestal?

15                        CROSS-EXAMINATION

16   BY MR. PESTAL:

17   Q    Good afternoon, Mr. Lopez.

18   A    Good afternoon.

19   Q    And do your recall that we met at your deposition?

20   A    Pardon?

21   Q    Do you recall that we met at your deposition?

22   A    No, I don't.

23   Q    Okay.  Do you remember having your deposition taken a

24   year or two ago?

25   A    No, I don't.

1   Q    Okay.  Well, we've got a transcript of the deposition

2   that we can talk about.  So let's talk a little bit about

3   your walking.  So you were able to--where did you park today

4   to come to court?

5   A    I got a ride.

6   Q    Okay.  And where did they--where did you park?

7   A    Across the street in the garage.

8   Q    Okay.  And do you remember what floor you parked on?

9   A    First.

10  Q    Okay.  And so you walked over to the courthouse, walked

11  up the steps and walked into court today, true?

12  A    That's right.

13  Q    And did you go out for lunch today?

14  A    I did.

15  Q    And where did you walk to?

16  A    Across the street over--I don't know, just some building

17  over here.

18  Q    And I believe you've indicated that you're wearing

19  tennis shoes today.

20  A    I am.

21  Q    And are those tennis shoes that you just buy off the

22  shelf at a shoe store?

23  A    No, I don't.

24  Q    Who buys your shoes for you?

25  A    My daughter buys all my shoes.  She's a manager at a

1  shoe--at a shoe--at a Foot Locker, so she buys all my shoes

2  for me.

3  Q    And I believe those were just regular A6 running shoes;

4  is that right?

5  A    Yes.  They're pretty expensive regular shoes.

6  Q    So, Mr. Lopez, let's--let's talk a little bit about some

7  of your health issues before--before the surgery.  You came

8  back from serving in Iraq.  That would have been the Persian

9  Gulf War; is that correct?

10  A    Yes, it is.

11  Q    And you were in the National Guard, the Army at the

12  time?

13  A    Yes, I was.

14  Q    And you saw some pretty heavy action in Iraq; is that

15  fair to say?

16  A    Well, no it's not.

17  Q    You saw some things that gave you emotional distress; is

18  that fair?

19  A    Oh, I saw--yes, I saw quite a bit of that.

20  Q    Okay.  And so as--after you came back from the Gulf War,

21  you were diagnosed with post traumatic stress syndrome, true?

22  A    Yes.

23  Q    Okay.  And that was the result of what you saw in the

24  battle--on the battlefield; is that correct?

25  A    Yes, what we saw and what we did.  Yes.

1  Q    Okay.  And so tell the Court how that post traumatic

2  stress syndrome affected you in your daily activities and on

3  your job.

4  A    Well, it would--it would affect me when I--where I

5  worked.  We always had a television on that had to be on the

6  news, so if anything happened we could tell the commander

7  what was going on.  And they would talk about the war on

8  there quite a bit, so I would think about it and just--I--I

9  was sad about it because when we were--when we were at Desert

10  Storm, we could have ended everything that these young people

11  are in for now and they wouldn't have been getting killed and

12  maimed now if we would have ended it.  But they didn't let

13  us, so we had to come back.

14  Q    And so it's fair to say, Mr. Lopez, that--I mean so you

15  weren't suffering from any kind of mental or emotional

16  problems before you went to the Gulf War, true?

17  A    No, I was not.

18  Q    And so when you came back, the post traumatic stress

19  disorder, that caused you sleep disturbances; is that true?

20  A    Yes, it did.

21  Q    Social isolation?

22  A    Yes, I was.

23  Q    Your ability?

24  A    Yes.

25  Q    You suffered from angry outbursts?

1    A    Yes.

2    Q    You had nightmares?

3    A    Pardon?

4    Q    You had nightmares?

5    A    Yes, I did.

6    Q    You had--

7    A    Well, I told--I told--when they asked me if I had

8    nightmares, I told them I don't know if it was a nightmare

9    because I--I don't remember dreams.  I just remember I wake

10   up with sweats and--

11   Q    And you had problems with concentration?

12   A    I do now.  I didn't when I got back.

13   Q    I'm sorry, you did or did not?

14   A    Okay.  These things that you're telling me I have now,

15   some I did not have when I got back from Iraq.

16   Q    Okay.  And I'm just reading from a medical record dated

17   September 15, 2009.  And it indicates that you had problems

18   with concentration.  So sitting here today, do you remember

19   prior to your discectomy whether you had problems with

20   concentration?

21   A    No, I don't.

22        MR. PESTAL:  If I could have the ELMO turned on.

23        (Pause.)

24        THE COURT:  Are we going to an exhibit here?

25        MR. PESTAL:  Just to refresh his recollection, Your

L. Lopez - Cross                              194

```
 1   Honor.

 2          THE COURT:  Okay.

 3   Q    (by Mr. Pestal)  And, sir, do you see here--so here's

 4   this note dated September 15, 2009; do you see that?

 5   A    No.

 6   Q    Sorry.  Do you see that there, 2009?

 7   A    Yes, I do.

 8   Q    Okay.  Prior to your discectomy, do you see that in this

 9   record it reflects that you have problems with concentration,

10   problems with memory?  Do you see that?

11   A    Yes, I do.

12   Q    And, sir, does that refresh your recollection as to

13   whether you had problems with concentration and memory prior

14   to your discectomy?

15   A    No, it does not.

16   Q    Okay.  And so do you remember prior to your discectomy

17   that you were--well, we'll skip that since you've already

18   indicated you've got PTSD.  And the problems that you had

19   with family members, specifically your daughter, those were

20   ongoing prior to your discectomy; is that--is that correct?

21   A    They were, but they weren't--they weren't to the extent

22   until I got on these drugs and stuff.

23   Q    And so in terms of your pre-existing condition, you were

24   constantly in pain, is that true, with your back pain before

25   the discectomy?
```

1  a    Yes.

2  Q    And it interfered with your work, true?

3  A    When?

4  Q    Prior to the discectomy?

5  A    No.

6  Q    So let me hand you--let me show you this medical record

7  dated November 23, 2009, and it's US 210.  It says, "Injured

8  back with sciatic.  Is constantly in pain, has to change

9  positions often, interferes with work, more depressed, can't

10 concentrate, can't do things he enjoys."  Do you remember

11 that you suffered from those things prior to the discectomy?

12 A    Well, it was--it was way into it.  It wasn't just after

13 I got back.  It was way into it.

14 Q    Right.

15      THE COURT:  Yeah.

16 Q    (by Mr. Pestal)  So as of 2009, that's a true statement

17 in terms of what you were experiencing in terms of your--your

18 physical condition; isn't that fair?

19 A    Yes.  Yes, it is.

20 Q    Thank you, sir.  And so prior to the surgery, do you

21 remember a doctor discussing what surgery would be performed

22 on your back?

23 A    Before my surgery?

24 Q    Yes, before the discectomy.

25 A    The only one that I remember was Dr. Davis, when I went

1   and spoke with him.

2   Q    Okay.  And so do you remember Dr. Waller right before

3   you went into the operating room showing you some paperwork

4   and discussing what was going to be done in the surgery?

5   A    I remember somebody, but I don't know who it was.  I

6   remember somebody, but I don't remember who it was.

7   Q    Okay.  And you remember signing some paperwork that

8   okayed the surgeons to operate on you, true?

9   A    Well, the only reason I did all of this was because Dr.

10  Kindt assured me that everything--

11  Q    Well, sir--

12  A    --was going to be fine.

13  Q    Sir, hold on.  Let me just have you answer my specific

14  question.  Do you remember signing paperwork okaying the

15  surgeons to do the operation?

16  A    I signed quite a few pieces of paper.

17  Q    Okay.  And prior to you signing those pieces of paper, a

18  doctor went over and explained the surgery to you; isn't that

19  correct?

20  A    I don't know.

21  Q    Okay.  You don't have a memory of it as we sit here

22  today?

23  A    Well, I remember somebody was there, but I don't know if

24  he explained it to me or not.  Like I said, I--I was--I went

25  in pretty confident because Dr. Kindt assured me that

1  everything was going to be fine because he had done so many,

2  so--

3  Q    And, sir, at the time of the surgery you were about six

4  feet tall and weighed 250 pounds?

5  A    Yes.

6  Q    And I apologize for jumping around a little bit today.

7  We weren't expecting you to testify until tomorrow.  With

8  respect to the tennis shoes that you wear, those are just off

9  the shelf tennis shoes?  Those aren't special tennis shoes,

10 correct?  I mean they may be running shoes, but they're not

11 anything other than you can buy at Foot Locker, right?

12 A    That's correct.

13 Q    Okay.  And--and there's no orthotic in that tennis--that

14 running shoe, true?

15 A    No, there's not.

16 Q    Okay.

17 A    I went to get orthotics made, tried to get orthotics

18 made, but they couldn't make it because of the way I was

19 walking.

20 Q    And after the surgery, you don't recall Dr. Kindt or Dr.

21 Waller saying anything about what happened during the

22 surgery?

23 A    They didn't say anything to me.  I haven't seen them

24 since.

25 Q    So with respect to your employment, you indicated that

1   you had a concern of being laid off.  No one at your--at the

2   Pueblo Army Depot ever came to you and said, hey, I think you

3   ought to retire, Mr. Lopez; isn't that true?

4   A    Nobody was getting laid off.

5   Q    And nobody came to you and asked--and said to you, hey,

6   we don't think you're doing your job very good, you ought to

7   think about retiring?

8   A    No.

9   Q    And so with respect to the nerve stimulator and how long

10  that will last, you remember that Dr. Barolat told you that

11  it would last for nine years?

12  A    No, he told me it would last for quite a while and that

13  when it started to go down that--that to go see them and they

14  would put another one in.

15  Q    Okay.  And you don't remember whether he told you it was

16  going to be nine years?

17  A    No.

18       MR. PESTAL:  Okay.  If I could have the witness have his

19  deposition handed to him.

20       THE COURT:  All right.

21       (Pause.)

22       THE CLERK:  I hand the witness the transcript of his

23  deposition taken March 7, 2013.

24  Q    (by Mr. Pestal)  Mr. Lopez, do you remember now that you

25  have the transcript in front of you giving a deposition on

1   March 7, 2013?

2   A    I don't remember it.  I remember we did, but I don't

3   remember what I said.

4   Q    Okay.  And so let me just have you turn to page 32, if

5   you would.  And do you see, sir, down on line 17.  Let me

6   know when you get there?

7   A    I'm there.

8   Q    You were asked, "Has Dr. Barolat told you what to expect

9   in the future in terms of your symptoms and your stimulator?"

10  And your answer was, "He just said it will be there, it will

11  be fine 'till--for nine years and then I have to go replace

12  the battery."  Was that your testimony in your deposition?

13  A    Yes, it was.  It's here.

14  Q    Do you have any reason, sir, sitting here today to

15  believe that the battery won't last for nine years?

16  A    I don't know when it's going to go out.

17  Q    So let me--let's go back to talking about your physical

18  conditions, the pain and symptoms you were experiencing prior

19  to the discectomy.  You had low back pain, correct?

20  A    Yes.

21  Q    You had neck pain?

22  A    Yes.

23  Q    You had headaches?

24  A    Yes.

25  Q    You took Ibuprofen for the headaches?

```
 1   A    Yes.

 2   Q    800 milligrams a day?

 3   A    Yes.

 4   Q    You had pain in your buttocks?

 5   A    My what?

 6   Q    Pain through your buttocks?

 7   A    I used to have it, yes.

 8   Q    Prior to the surgery?

 9   A    Yes.

10   Q    Okay.  And your pain went down your leg to the sole of

11   your foot?

12   A    That's right.

13   Q    And I believe you've described that the pain down to

14   your foot was like pins and needles all the time, true?

15   A    Yes, it is.

16   Q    And it stayed there all the time no matter what?

17   A    That's right.

18   Q    And you were also having numbness in your foot as well,

19   true?  In your left foot?

20        MR. LEVENTHAL:  Your Honor, confusion as to whether he's

21   talking about before or after Dr. Kindt's surgery.

22        THE COURT:  Yes.  I take it the questions are before.

23        MR. PESTAL:  Thank you, Your Honor, they are.

24        THE COURT:  Before the surgery.

25   Q    (by Mr. Pestal)  So--so, Mr. Lopez, before your
```

1   discectomy, before the surgery that Dr. Kindt performed, the

2   numbness and pins and needles were down into your foot; is

3   that true?

4   A    That's true.

5   Q    Into your left foot?

6   A    Yes, it was.

7   Q    So I take it the pins and needles sensation was a

8   painful sensation; is that fair?

9   A    Oh, I had a painful sensation.  I don't know if it was

10  from the pins and needles or not, but I had a pain.

11  Q    And you were in such--that pain in your foot before the

12  surgery was becoming severe enough where you went to see a

13  neurosurgeon about surgery on your back; isn't that true?

14  A    That's true.

15  Q    And the pain that you had before the surgery with

16  respect to the numbness and the pins and needles, that was on

17  the same place in your leg as it is today, true?

18  A    Well, I had pins and needles on the bottom of my foot,

19  but I have a lot of pain.  Even with my stimulator and the

20  drugs I'm taking, I still have a lot of pain.

21  Q    So on page 45 of your deposition you--you were asked on

22  line 15, "Was that in the same distribution that you've

23  described, the numbness and the pins and needles?"  And your

24  answer was, "Yes, it was."

25  A    Okay.  It was then and still is.

1   Q    And, sir, you mentioned that now today, just walking

2   around, you've used a cane I believe you said?

3   A    Yes, I do.

4   Q    And at the time of your deposition you weren't using a

5   cane; is that correct?

6   A    I don't know.  I don't remember.

7   Q    So let me have you look at page 59 of your deposition on

8   page--on line 11.  And do you see you were asked on line 12,

9   "Do you use a cane or crutches or wheelchair at all presently

10  since your stimulator was put in?"  And your answer was,

11  "No."  Do you recall that testimony?

12  A    Yes, I do.  Well, I don't recall it, but I--it's here,

13  so I said it.

14  Q    And then with respect to when you decided to have

15  surgery, you were asked in your deposition, "When did you

16  decide to change your mind and look into surgery as an option

17  for treating your back?"  And your answer was, "When the pain

18  got so intense that it was interfering with the way I walked

19  and what I was doing."  Is that--

20  A    That's the reason I went for it, yes.

21  Q    Thank you, sir.  And so when--you experienced pain

22  immediately coming out of surgery in your left foot, true?

23  A    True.

24  Q    And it did--it did improve some before you left the

25  hospital, true?

L. Lopez - Cross                           203

1   A     True.

2   Q     When you retired, Mr. Lopez, do you recall that you were

3   making about $79,000 a year?

4   A     I don't know what I make.  My wife takes care of

5   everything.  I just go to work.

6   Q     On page 88 of your deposition, you were asked, "Your

7   2009 income on your tax return is $79,000.  Do you know why

8   it was actually a little higher in 2009 than it was in 2010?"

9   Does that--does that refresh your recollection as to what you

10  were making in 2009?

11  A     No.

12  Q     You were a GS-11 step 6 when you retired?

13  A     Yes, I was.

14  Q     And you got your high 3 when you retired?

15  A     Yes, I did.

16  Q     And you got excellent performance appraisals at the time

17  you left?

18  A     I did.

19  Q     And with respect to the headaches that you've

20  experienced previously, you've been told that that was due to

21  the injury in your neck?

22  A     Well, I was told that that's possibly the reason that I

23  had my headaches--not didn't have--that I still have my

24  headaches.

25  Q     Okay.  So do you have headaches today?

L. Lopez - Cross                                204

1   A    Yes, I do.

2   Q    Okay.  And so do you recall on page 105 of your

3   deposition you were asked, "Have you ever been told what the

4   cause of your headache pain is?"  Your answer, "I was told

5   that by one doctor that it was due to my injury in my neck."

6   Do you recall being told that?

7   A    That it was due to the injury in my neck?

8   Q    Yes.

9   A    Yes, they told me that I was having headaches probably

10  because of my neck.

11  Q    And so essentially in 2013, 100 percent of your medical

12  care was being provided by the VA; is that true?

13  A    Yes, it is.

14  Q    And--and you've made the choice to return--or to go to

15  the VA to receive medical care; is that fair?

16  A    Yes, it is.  They messed me up, so I figured they would

17  take care of me.

18       MR. PESTAL:  And I would move to strike as

19  nonresponsive, Your Honor.

20       THE COURT:  Yes, stricken.

21  Q    (by Mr. Pestal)  And you believe they're trying to

22  provide you good care; isn't that true, Mr. Lopez?

23  A    I didn't hear your question.

24  Q    So in your deposition on page 120 you were asked, "Did

25  you think and do you think the VA doctors that you're seeing

1   currently are trying to provide you good care?"  You answered

2   yes to that, true?

3   A    What--the doctors that did the surgery or the doctors I

4   see--

5   Q    No.

6   A    --in Pueblo?

7   Q    The VA doctors that you're seeing currently.

8   A    Oh, yes, they're taking care of me, especially the one I

9   just got.  I lost him.  I've got a doctor now that she's a

10  really good doctor.

11       THE COURT:  Is that in Pueblo?

12       THE WITNESS:  Yes, sir.

13       (Pause.)

14       THE WITNESS:  I'm starting to experience a lot of pain.

15  It's time for my medication.

16       MR. PESTAL:  Would you like to take a quick break?

17       THE WITNESS:  Just so I can take my meds.

18       THE COURT:  All right.  How much more do you have?

19       MR. PESTAL:  Probably not that much, Your Honor.

20       THE COURT:  Well, how much?

21       MR. PESTAL:  Well, I mean I'm just going through,

22  probably 10, 15 minutes, if that.

23       THE COURT:  All right.  Well, we'll take another five-

24  minute--

25       THE WITNESS:  That's all right.  I can go 10, 15

 1   minutes, Your Honor.

 2          THE COURT:  Okay.

 3          (Pause.)

 4   Q    (by Mr. Pestal)  With respect to your left leg, you

 5   were--the muscles in that left leg are basically the same as

 6   your right leg; is that true?

 7   A    They look to be the same.

 8   Q    They look to be the--they appear to be the same?

 9   A    They look to be the same, yes.

10   Q    And do you experience any numbness--do you experience

11   any numbness in the outside of your leg?

12   A    No, I don't.  Not the leg part, but when you went down

13   to the foot, I did at the foot--or I do at the foot.

14   Q    How about--how about on the backside of your left leg,

15   did you experience any numbness or pain on the backside of

16   your left leg?

17   A    I experience a little bit on the heel of it.

18   Q    So--

19   A    I get the pain and needle sensation on the heel of my

20   foot along with the bottom of it.

21   Q    And previously you had a torn Achilles tendon?

22   A    That's right.  When I was in the Air Force, I had a torn

23   Achilles tendon, yes.

24          (Pause.)

25   Q    So, sir, as you sit here today, do you recall all of the

1   disabilities for which you've been given an impairment rating

2   by the VA?

3   A    I don't recall them all because they--they started and

4   then they started increasing it and then they increased it

5   again and then they increased it and then they decreased it

6   and then they increased it.

7       MR. PESTAL:  Your Honor, I don't have any further

8   questions for the witness at this time.

9       THE COURT:  All right.  Thank you.

10          Do you have some redirect, Mr. Leventhal?

11      MR. LEVENTHAL:  I do, Your Honor.  I'll make it as quick

12   as I can.

13                     REDIRECT EXAMINATION

14   BY MR. LEVENTHAL:

15   Q    Is it okay to go forward, Mr. Lopez?

16   A    I can take it where I'm sitting.

17      THE COURT:  Yeah, you can take the medication right now,

18   if you want to.

19      THE WITNESS:  Yes, sir.

20      THE COURT:  Go ahead.  We'll just standby while you do

21   it.

22      THE WITNESS:  Some more water, please.

23      (Pause.)

24   Q    (by Mr. Leventhal)  Okay?

25   A    I'm done with them, yes.

1   Q    What did you just take?

2   A    I took some Oxycodone.  I don't know what the other ones

3   were.

4   Q    How many Oxycodone did you take?

5   A    Two.

6   Q    I want to follow up with a couple of things.  Mr. Pestal

7   asked you what your wages were at the time you retired and

8   talked about your wages in 2009.  But you retired in 2012,

9   right?

10  A    Yes.

11  Q    And when Mr. Pestal took your deposition, on page 85 of

12  your deposition you learned your wages were $95,000, not

13  $79,000 at the time you retired; is that correct?

14       MR. PESTAL:  Objection, leading, Your Honor.

15       THE COURT:  Overruled.  I assume we've got a record of

16  what his wages were at the time of retirement.

17       MR. LEVENTHAL:  We do, and it's--yeah.

18       THE COURT:  So we'll do it from there, okay?

19       MR. LEVENTHAL:  All right, sir.

20       THE WITNESS:  What was your question?

21  Q    (by Mr. Leventhal)  That's all right.  We're okay.  One

22  of the questions Mr. Pestal asked you was whether you had an

23  Achilles heel--or an Achilles tendon injury years ago?

24  A    Yes, I did.

25  Q    Did that problem resolve?

L. Lopez - Redirect                     209

1   A    It never resolved because it was torn, so I always had

2   that--when I would flex my leg, it looked like I get that--

3   like it was stretching.

4   Q    So it gives you a little stretching feeling?

5   A    Yes, it does.

6   Q    Is the reason you had the surgery because of an Achilles

7   tendon--

8   A    No.

9   Q    --problem?

10  A    No.  I--

11  Q    Is the reason you have the pain because of an Achilles

12  tendon problem?

13  A    No.  No.

14  Q    How long did you intend to work had you not retired?

15  A    I intended to work for sure until 65, but they were

16  going to destroy that--that mustard and they built all that

17  stuff that was there.  And I wanted to take a part in the job

18  that I was trained for because we weren't doing it yet

19  because they hadn't started the destruction of the agents, so

20  I wanted to be a part of that, but didn't get there.

21  Q    You were asked a question about whether you were now

22  receiving 100 percent of your care from the VA.  When was the

23  last time you saw Dr. Barolat?

24  A    About maybe a month ago, three weeks ago, something like

25  that.

L. Lopez - Redirect                    210

1   Q    So Dr. Barolat is not through the VA?

2   A    No.

3   Q    So to that extent you're not really receiving 100

4   percent of your care from the VA?

5   A    No.

6   Q    Correct?

7   A    Correct.

8   Q    And do you intend to continue with Dr. Barolat?

9   A    I do.  He's helped me, so I'm going to stay with him.

10  Q    One of the questions you were asked was whether it was

11  the pain in your foot--that was the way it was phrased,

12  whether it was the pain in your foot that led to the surgery?

13  A    No.  No, it was the pain that was from my buttocks

14  through my leg down to my foot.  The whole leg is what--the

15  whole leg is what sent me to do--go get surgery.

16  Q    So to the extent that you agreed with Mr. Pestal that it

17  was the pain in your foot that led to the surgery, what's the

18  truth?

19  A    Well, the truth is it was my whole--I don't know what he

20  said, but my whole leg hurt from my buttocks all the way down

21  to the sole of my foot all the time and so that's the reason.

22  And it got worse and worse, and so that's the reason I went

23  to go get surgery.

24  Q    And if you had just had the foot problem and not the leg

25  problem and your back problem, would you have had the

1  surgery?

2  A    If it was just my foot in pain?

3  Q    Prior to the surgery with Dr. Kindt, would you have had

4  that surgery if it was just the foot?

5  A    Probably not.

6  Q    You could walk on it, you could hike, you could do all

7  those things?

8  A    When I felt good, I felt good.  When I didn't, I didn't.

9  It was pretty bad.

10  Q    So we can be as clear as possible for the record and for

11  the Court, how would you compare the severity of your problem

12  now versus what you went in with prior to surgery?

13  A    Oh, it--it just changed my life completely.  I--it

14  completely changed my life to what I used to do.  Now I do

15  absolutely nothing, absolutely nothing except when my wife

16  wants to do some things I do it for her because it's not fair

17  for me to punish her.  So she shouldn't take the punishment

18  for my pain, so I go out and I try to do the best I can when

19  she asks for things.

20  Q    You were--told the court and testified about what you

21  expected the outcome to be from the surgery?

22  A    Yes.  Yes, I expected--

23  Q    And that was based on your conversations with Dr. Kindt?

24  A    Yes, it was.

25  Q    Did anyone ever explain to you why, even though Dr.

L. Lopez - Redirect                     212

```
 1    Kindt told you this would fix it--
 2    A    No.
 3    Q    --relieve your pain--
 4    A    No.
 5    Q    --why it has not done that?
 6    A    No.
 7         MR. PESTAL:  Objection, Your Honor, beyond the scope of
 8    cross.
 9         THE COURT:  Overruled.
10         THE WITNESS:  No, but I--I just told him I had the pain.
11    I didn't know what it was.  And then one doctor told me it
12    was from my sciatic, and I don't know what caused it.
13         THE COURT:  Excuse me.  I think the question goes after
14    the surgery.
15    Q    (by Mr. Leventhal)  After the surgery, did anybody ever
16    tell you why the surgery didn't fix the problem?
17    A    No.  No, sir.
18    Q    Did at any time prior to the surgery anyone tell you
19    that the surgery would not fix the problem?
20    A    No.
21    Q    Did anyone prior to the surgery tell you that there were
22    a certain percentage of people who the surgery wouldn't work?
23    A    No.  No, he told me everybody that he had done they had
24    --they had gone through with flying colors.  So he did--he
25    told me he did 1,000s of them, including athletes, so that's
```

L. Lopez - Redirect                              213

1    what caused me to go with Dr. Kindt.

2    Q    The problems you had before surgery, the PTSD, your

3    headaches, your neck problems, were you able to function,

4    work and live?

5    A    Yes, I was.

6    Q    Did you have a life then?

7    A    Yes, I did.

8    Q    And what you described what happened in that surgery has

9    done what you described to the Court today?

10   A    Well, after the surgery, it messed up my foot and now I

11   --I can't go fishing.  I can't play golf.  I can't play

12   sports with my nephews and my brothers and I can't go dancing

13   with my wife.  I can't do yard work.  I can't help my wife

14   out.

15   Q    But beyond that, the pain level you have now is what on

16   a scale of 1 to 10?

17        MR. PESTAL:  Objection, Your Honor, beyond the scope of

18   cross?

19        THE COURT:  Overruled.

20        THE WITNESS:  The pain I have right now?

21        THE COURT:  The question is--yeah.

22        THE WITNESS:  Is I have a pain right now of about a

23   seven or an eight.

24   Q    (by Mr. Leventhal)  And what is it generally?

25   A    Pardon?

```
 1   Q    What is it generally since the nerve stimulator was put
 2   in, what level?
 3   A    It was always ten plus.
 4   Q    No, since the stimulator.
 5   A    Oh, since the stimulator was put in, oh, it's--it helped
 6   it quite a bit.  About 40, 50 percent it helped the pain.
 7   Q    And the pain level 1 to 10 on average?
 8   A    After the surgery?
 9   Q    After the stimulator.
10   A    After the stimulator, I would say it's--it would
11   probably be between a five and a six.
12   Q    All right.  Thank you very much, sir.
13        MR. PESTAL:  Just a few questions.
14        THE COURT:  All right.
15                            RECROSS-EXAMINATION
16   BY MR. PESTAL:
17   Q    Sir, in your deposition you were asked prior to your
18   surgery in March of 2010 what were your plans for retirement
19   or how long would you work before you retired?
20        MR. LEVENTHAL:  Can I ask for a page number?
21        MR. PESTAL:  Page 20.
22   Q    (by Mr. Pestal)  And your answer was, "I had planned to
23   work until I was 65 and then retire."  Do you remember being
24   asked that deposition question?
25   A    I don't remember being asked that, but that's what my
```

L. Lopez - Recross                    215

1   plan was.

2   Q    And when you were under oath in--did you attempt to tell

3   the truth in your deposition?

4   A    Of course I did.

5   Q    Okay.  And so that's an answer that we can rely on, that

6   you planned to retire at age 65 prior to the surgery in March

7   2010?

8   A    Yes, that was my plan, but I also wanted to be part of

9   the destruction that was there if it was going.

10  Q    Okay.  But that's not what you said in your deposition,

11  is it, sir?

12  A    No.  At that time, no, because I was--my plan was to

13  retire at 65.

14  Q    Right.  "I had planned to work until I was 65 and then

15  retire"?

16  A    Correct.  Correct.

17  Q    Thank you, sir.

18       MR. PESTAL:  No other questions.

19       MR. PESTAL:  Your Honor, given that Mr. Lopez was sort

20  of called out of order, we had expected him later in the

21  case, we'll just reserve the right to recall him in

22  defendant's case, if necessary.  I don't anticipate a need,

23  but given that things--

24       THE COURT:  All right.

25       MR. PESTAL:  Thank you.

1       THE COURT:  You may step down, Mr. Lopez, and return to

2   counsel table.

3           Mr. Leventhal?

4       MR. LEVENTHAL:  We have no other witnesses.  I would ask

5   the Court to take judicial notice of the complainant answer

6   filed by the U.S.  And it goes to what I said in the opening,

7   that they've admitted that a nerve injury occurred.

8       THE COURT:  I don't remember, but I'll look.

9       MR. PESTAL:  And, Your Honor, of course under Rule 15,

10  evidence comes in at trial and the pleadings can be amended

11  in accordance with that evidence.  Our position really, Your

12  Honor, is twofold.  There's two possibilities in the case;

13  one, the pathology report says that there was no nerve, and

14  the other, as our expert will explain, the other is that

15  there was potentially a small nerve removed.  So there's two

16  possibilities, and we may need to amend in accordance with

17  the evidence.

18      THE COURT:  Well, we'll argue about that later.

19      MR. LEVENTHAL: I'm sorry, Your Honor?

20      THE COURT:  We'll argue about that later, but obviously

21  the pleadings are the pleadings and--

22      MR. LEVENTHAL:  All right.  Thank you, Your Honor.

23      THE COURT:  So what do you--I'm not clear as to whether

24  you're calling Dr. Kindt.

25      MR. LEVENTHAL:  The letter we received from Dr. Kindt's

```
1    attorney, Mr. Nixon, said that it would be painfully obvious
2    when he shows up that he won't be competent to testify.  Our
3    request is that he just show up.  I certainly don't want to
4    humiliate him or do anything of that sort.  I think that if
5    we can ask him a few questions and it's evident that he is
6    not cognitively able, then we're going to obviously not
7    request that.
8              THE COURT:  Well--
9              MR. LEVENTHAL:  In spite of that, I would request that
10   you do read the designations that we submitted to the Court--
11             THE COURT:  Yes.
12             MR. LEVENTHAL:  --because I think it's likely he's not
13   going to be able to testify.
14             THE COURT:  Well, I don't--Mr. Pestal, can you--do you
15   have enough information that you could stipulate to this?
16             MR. PESTAL:  Your Honor, I have had conversations with
17   plaintiff's counsel about just using the deposition--
18             THE COURT:  Right.
19             MR. PESTAL:  --but they've insisted on calling him.  So
20   at this point, I think we need to call Dr. Kindt, see how he
21   does, and then we'll make appropriate designations after
22   that.  And he was videotaped in his deposition, so we have
23   that, and we may provide that to the Court as well.
24             THE COURT:  Well, I think it's unfortunate to bring him
25   in to demonstrate his present capacity if you can stipulate
```

1    that he really doesn't have testimonial capacity at this

2    time.

3        MR. LEVENTHAL:  We'll do that, Your Honor.  We're--we're

4    willing to do that.  And based on the representation by Mr.

5    Nixon, who I have worked with for years, I think that's fine.

6    If Mr. Pestal is agreeable, then we won't bring him in.

7        MR. PESTAL:  Okay.  Thank you, Your Honor.  Now that's

8    the first that I've heard that they are willing to stipulate

9    it, so we are willing to stipulate to use--I think it would

10   be appropriate to use potentially his videotaped deposition

11   because this was just taken a year ago, and there's a lot

12   communicated through a person's mannerisms and--

13       THE COURT:  All right.  Well, one step at a time.  He's

14   stipulating that he doesn't have present testimonial

15   capacity.

16       MR. PESTAL:  We would stipulate to that, Your Honor.

17       THE COURT:  All right.  So that means you don't have to

18   call him here, agreed?

19       MR. LEVENTHAL:  Agreed.

20       THE COURT:  All right.  Now, then, the plaintiff has

21   handed me a deposition transcript with--you know, it's--it's

22   an incomplete transcript.  It's got the plaintiff's

23   designation.  Have you reviewed that?

24       MR. PESTAL:  No, I haven't, Your Honor.  I have reviewed

25   Mr.--Dr. Kindt's deposition, and we will get designations as

1    soon as we can.  And again, I think that--I would--

2         THE COURT:  You want to do the video?

3         MR. PESTAL:  I think we would prefer the video, Your

4    Honor.

5         THE COURT:  Well, could it be partial video, simply to

6    demonstrate his mannerisms, his demeanor and manner while on

7    the stand, so to speak, and then do the written one?

8         MR. PESTAL:  I think that's an appropriate compromise,

9    Your Honor.  I think--I think that's sufficient.

10        THE COURT:  All right with you?

11        MR. LEVENTHAL:  It is, Your Honor.  I mean the video is

12   seven hours long.  I wouldn't--

13        THE COURT:  Yes, that's why I assumed--

14        MR. LEVENTHAL:  --imagine you would sit here for seven

15   hours and watch it.

16        THE COURT:  No.

17        MR. LEVENTHAL:  Although I'm sure Ms. Brown was

18   spellbinding when she took the deposition, but it's a long

19   deposition.

20        THE COURT:  Let's do this.  We'll play enough of it,

21   perhaps just the beginning--I don't know what it is--to

22   demonstrate what I just referred to.  And then I will need

23   any additional designations from the defendant, because all I

24   have, as I understand it, is the plaintiff's designation.

25        MR. PESTAL:  And I have already gone through and made an

1    initial cut.  I haven't married the two together.  We'll get

2    the Court one combined.

3         THE COURT:  Yes, I would like to have one transcript.

4    And, you know, ordinarily I would have it yellow and blue,

5    but the way it's being done now it could just be the parts

6    that both sides are offering and the rest of it blank; it

7    would be easier.  Instead of the yellow/blue, like we usually

8    do if it's going to be played to a jury and had to be edited.

9         MR. PESTAL:  Sure.  The only question would be if

10   there's objections to any portions, how we would deal with

11   those.  We would just have to note those in our submission.

12        THE COURT:  Yeah, I don't know.  I'm trying to do it so

13   that we wouldn't take open-court time to review it.  So you

14   can mark the objections in red in the margin, like we would

15   otherwise.

16        MR. PESTAL:  Okay.  Thank you, Your Honor.  That would--

17        MR. LEVENTHAL:  Your Honor, I'm actually fine with the

18   Court simply reading whatever he designates and whatever we

19   designate and the Court determining whether there's some

20   objection that should be ruled or not.  It doesn't need to be

21   edited out.  But I think the Court can certainly make--

22        THE COURT:  Yeah, I'm just saying mark--you give me one

23   transcript, it includes everything that both sides are

24   offering.  If there are any objections, mark them in red on

25   the margin in that--in that single transcript.

1          MR. LEVENTHAL:  Perfect.

2          THE COURT:  Okay?

3          MR. LEVENTHAL:  May I ask the Court to impose a deadline

4    on the U.S. to do that so that I'm not faced with a

5    transcript that's handed to me and not expected to--

6          THE COURT:  Well, you have quite a bit of time left yet

7    today.

8          MR. LEVENTHAL:  Okay.

9          MR. PESTAL:  We'll do our best, Your Honor.  I think--

10         THE COURT:  Try to get it done today, yes.

11         MR. PESTAL:  Potentially we can do that, Your Honor.

12         THE COURT:  All right.

13         MR. PESTAL:  So we'll have it at least sometime tomorrow

14   morning.

15         THE COURT:  All right.  Well, we'll try to resume at

16   nine o'clock in the morning, depending upon the traffic that

17   I--you know, I apologize for this, but we have to do what we

18   have to do.

19         MR. LEVENTHAL:  Of course, Your Honor.

20         THE COURT:  Okay.

21         MR. LEVENTHAL:  Thank you.

22         THE COURT:  The Court's in recess.

23         (Whereupon, at 3:26 p.m., the hearing was adjourned, to

24   be resumed at 9:00 a.m. on December 16, 2014.)

25

1                    <u>TRANSCRIBER'S CERTIFICATE</u>

2           I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6           Dated at Aurora, Colorado, this 7th day of January,

7    2015.

8

9

10

11

12                         <u>/s/ Suzanne H. Ben Majed</u>

13                         Suzanne H. Ben Majed

14                         Federal Reporting Service, Inc.

15                         17454 East Asbury Place

16                         Aurora, Colorado   80013

17                         (303) 751-2777

18

19

20

21

22

23

24

25

223

1                           I N D E X

2

3                                DIRECT   CROSS   REDIRECT   RECROSS

4    WITNESSES:

5    Plaintiff's:

6    John C. Shershow          36       73       86

7    Helen Woodard             87       101

8    Eva Lopez                 106      128      136

9    Scott Maldonado           143

10   Leonard Lopez             153      189      207       214

11   EXHIBITS

12   NUMBER                         OFFERED      RECEIVED

13   Plaintiff's:

14   Exhibit 24                     36           36

15   Exhibit 46                     44           44

16   Exhibits 16 & 44               62           62

17   Exhibit 27                     91           91

18   Exhibit 18                     111          111

19   Exhibits 3 through 7           124          125

20   Exhibit 26                     143          143

21

22

23

24

25