1    briefly for the Court to state your education, background,

2    and training in rehabilitation and life care planning.

3    A    Yes.  I have a master's degree from the University of

4    Northern Colorado in rehabilitation counseling.  I got that

5    degree in 1970.  And I've worked in rehabilitation counseling

6    ever since doing rehabilitation counseling and placement with

7    various people.

8            I started in 1975 or so to do what now is called

9    life care planning and have training in that by getting

10   seminars from the places that offered those courses back in

11   the '80s and early '90s.

12           I've done a lot of life care plans in various

13   places.

14   Q    Thank you.  Now, in this case I asked you to evaluate

15   three things, Mr. Lopez's employability, right?

16   A    Yes.

17   Q    I asked you to prepare a life care plan for him?

18   A    Yes.

19   Q    And I asked your opinion regarding his need for home

20   services.

21   A    That's correct.

22   Q    Okay.  I wanted to first talk about what you reviewed in

23   order to form opinions in those categories.

24   A    All right.

25   Q    What did you review?



EXHIBIT
2
tabbies

1    A    I looked at all of the medical records and employment

2    records that were available.  We also did some labor market

3    research to look at that; met with Dr. Barolat and got

4    information about the problems and difficulties associated

5    with the injury that Mr. Lopez had.

6    Q    Why would you meet personally--oh, did I cut you off?

7    A    No.

8    Q    Why would you meet personally with Dr. Barolat?

9    A    To--to understand what the future needs were for the

10   pain stimulator that he has for the implanted pain

11   stimulator.  And also to understand that he was still needing

12   medication at a pretty high level in spite of the pain

13   stimulator.

14   Q    Okay.

15        MS. BROWN:  Your Honor, at this time I'd ask that Ms.

16   Woodard be recognized as an expert in rehabilitation and life

17   care planning.

18        MR. WU:  No objection, Your Honor.

19        THE COURT:  Yes, I've heard from this witness before.

20        MS. BROWN:  Thank you, Your Honor.

21   Q    (by Ms. Brown)  Let's talk first about Mr. Lopez's

22   employability.  Do you have an opinion whether Mr. Lopez is

23   employable?

24   A    Yes.

25   Q    What is your opinion?

1    Q    Based upon your evaluation of Mr. Lopez's medical

2    records and your interviews with him, have those medications

3    increased as a result of his chronic pain?

4    A    Yes.

5    Q    All right.  Let's talk about your opinions with regard

6    to assistance that Mr. Lopez requires.  At the time of your

7    life care plan what assumption did you make as to the

8    services that were being provided by his wife?

9    A    I knew that she was managing his medications, was

10   functioning essentially as his case manager, making sure he

11   got where he needed to go and doing the things related to the

12   follow-up for the medical care.

13          And she was--she had assumed a lot of the household

14   responsibilities.  And she was his basic support system for

15   all of the severe problem he was having due to the severe

16   pain.

17   Q    When you expressed your opinions back in April of 2013

18   were you considering that Mrs. Lopez would more likely than

19   not remain in that role?

20   A    I did.  I thought that she would be still able to do

21   that indefinitely.

22   Q    Did you then--okay.  So let's talk about your opinions

23   back in April of 2013 as to the amount and type of assistance

24   Mr. Lopez would require even with Mrs. Lopez doing what--you

25   know, all the things that she was doing.  What is your

1  A    While Mr. Lopez was able to do that before the surgery,

2  he has not been able to do it really since.  He tries but

3  he's not really able to do it.  And it--I included cost for

4  that through his age 72, 1,800 to $2,400.

5  Q    Why only through age 72?

6  A    Because as people age--especially if they have an

7  underlying condition like the back surgery that he had, the

8  heavier work needs to sort of be diminished over time.

9  Q    Did you issue then a supplemental letter when you got

10 new information concerning Mrs. Lopez?

11 A    Yes.

12 Q    And what else did you cover in the supplemental letter?

13 A    I covered a little about Mrs. Lopez's health condition

14 because the circumstances are significantly different

15 upcoming.  And so I wanted to provide information to people

16 that the circumstances at home are changing.

17 Q    Now, what's your understanding of when Mrs. Lopez's

18 cancer recurrence was diagnosed?

19 A    She had just had that information when I--when I saw

20 them.  And so she had just gotten that information just prior

21 to November 10th.

22 Q    Okay.  Now, in--in your opinion if Mrs. Lopez isn't

23 available to Mr. Lopez to provide the services that she had

24 been providing how would that affect your opinion in terms of

25 Mr. Lopez's future needs?

1  A    It would affect them significantly.  Mr. Lopez has a lot

2  of difficulty functioning on a day-to-day business in the

3  household.  And without the support of someone there most of

4  the time I don't think he'll be able to stay living

5  independently; part of it is that he just needs someone there

6  to notice and--and pay attention.  And the other is he really

7  needs supervision in the use of his medications because he's

8  now so forgetful.

9  Q    If Mrs. Lopez is not available to provide the services

10 that she had been providing what factor of increase in your

11 life care plan would there be?

12 A    Oh, at least four or five times in the--in the

13 assistance section.

14 Q    Have the opinions that you've expressed all been to a

15 reasonable degree of probability?

16 A    Yes.

17      MS. BROWN:  May I have a moment, Your Honor.

18      THE COURT:  Yes.

19      (Pause.)

20      MS. BROWN:  All right.  Thank you.  Those are all my

21 questions.

22      THE COURT:  All right.  Mr. Wu?

23                          CROSS-EXAMINATION

24 BY MR. WU:

25 Q    Good morning, Ms. Woodard.

1   place, to San Luis and then we park it.  And we use it when

2   we go to San Luis because that's where we were born.  And

3   then we bring it back home.  That's the only time we drive

4   it.

5   Q    And that's like a 24-foot trailer; is that right?

6   A    Yes.  Can I make a comment?

7        THE COURT:  No.

8   Q    (by Mr. Pestal)  And, Ms. Lopez, I'm not sure I quite

9   heard you as to whether you said when Dr. Kindt and Dr.

10  Waller came into the waiting room whether you said that they-

11  -they said that the surgery had gone well or had not gone

12  well?

13  A    Had not gone well.

14  Q    They said that the surgery had not gone well?

15  A    Right.

16       MR. PESTAL:  No further questions, Your Honor.  Thank

17  you.

18       THE COURT:  Any redirect?

19       MS. BROWN:  Briefly.

20                     REDIRECT EXAMINATION

21  BY MS. BROWN:

22  Q    Mrs. Lopez, you were asked about driving and driving

23  with a 5th wheel.  Do you have concerns about Mr. Lopez's

24  driving?

25  A    Yes, I do.  In fact, Dr. Woods from the VA told him, "If

1  you get caught, you're under narcotics.  You will get a DUI."

2  And I am so stressed out and I tried to do most of the

3  driving when I can.  And when we come to Denver, I drive all

4  the way to Castle Pines and he'll take it from there because

5  I hate to drive in Denver, so it's changed my life in that

6  respect.  That I am so stressed out when we go anywhere.  And

7  he tells me, "You are going to just have to start driving

8  everywhere we go."  And I don't really like to drive.

9  Q    Do you think that he's an unsafe driver?

10   (Pause.)

11   THE COURT:  Perhaps the question could be whether she

12  feels safe with him driving.

13   MS. BROWN:  Thank you, Your Honor.

14  Q    (by Ms. Brown)  Do you feel safe with Mr. Lopez Driving?

15  A    No.

16  Q    Thank you.

17   MS. BROWN:  No further questions.

18   THE COURT:  All right.  And I take it she may be

19  excused?

20   MS. BROWN:  Yes, Your Honor, and she can--we will not be

21  recalling her, so she can remain in the courtroom.

22   THE COURT:  Yeah.

23   MR. PESTAL:  Thank you, Your Honor.  No objection.

24   THE COURT:  All right.  You may step down?

25   THE WITNESS:  Thank you.  Thank you, Your Honor.

1  Q    And when he fell on the job, what would you and his co-

2  workers do?

3  A    We would go ask him if he was okay.  We would not touch

4  him.  He would be up and you don't do that to Leonard; he's

5  too proud of a man to let somebody help him up.

6  Q    Okay.  I wanted to ask you about whether you--you saw

7  him driving.

8  A    I've witnessed him driving quite often and followed him

9  home.

10 Q    Why would you follow him home?

11 A    To make sure he got home safe.

12 Q    Why did you feel like you needed to follow him to make

13 sure?

14 A    Because I think the medicines that he was taking was

15 making him not coherent.

16 Q    Did you have an opportunity to see Mr. Lopez's left foot

17 in this 2010 timeframe?

18 A    It took me about maybe two weeks to ask him to let me

19 see it, to see his leg, and it was on a weekend when nobody

20 was around and he showed me his--his leg that was--didn't

21 seem to be quite normal.  It was dark in color and I actually

22 asked him, "Is it living?"  And he says, "Yes, it's living.

23 It's there."  I says, "Does it hurt or what?"  He says, "Yes,

24 all the time."  I says, "How do you handle that pain?"  And

25 of course, you know, he just shrugged me off.

1   what I would like to do is just bring a chair up and have Mr.

2   Lopez sit right here and just pull up his left foot and his

3   right foot so the Court can see his muscle function?

4        THE COURT:  Sure.  Okay.

5        (Pause.)

6        THE WITNESS:  I'll put my shoe on.

7        THE COURT:  Mr. Pestal, you can move too, if you wish

8   to--

9        MR. PESTAL:  Thank you.

10       THE COURT:  --observe this.

11  Q    (by Mr. Leventhal)  Did you take your shoe off while you

12  were testifying?

13  A    Yes, I do.  I've had it off all morning.

14       (Pause.)

15  Q    (by Mr. Leventhal)  And I want you to start with your

16  right foot.

17       THE COURT:  I have to stand.

18       MR. LEVENTHAL:  I can move him back a little bit.

19       THE COURT:  Move back a little, yes.  Okay.

20  Q    (by Mr. Leventhal)  Now, I want you to pull your right

21  foot towards you and I want you to do the same thing with

22  your left foot.  Is that as far as you can get it?

23  A    Yes, sir.

24  Q    Has it been like that since the surgery?

25  A    Yes, it has.

1    motion or movement associated with it?

2    A    I have personally done tumor cases where you're inside

3    the spinal cord sac and removing a tumor that is on a nerve

4    root.  And you stimulate the nerve root, not with just your

5    own instrument hitting it, but with electrical stimulation

6    with a monitoring tech who is using sophisticated electrical

7    monitoring to determine motor versus sensory and so on.  And

8    then, based on that data, you make the decision to resect the

9    tumor or resect the nerve root and so on.

10          But in terms of a lumbar discectomy, "A small nerve

11   root was removed," I've never seen that or experienced that.

12   Q    Is that a breach of the standard repair?

13   A    I would suggest that it is, yes.  I would say it is.

14   Q    Now, in order to determine whether motion or movement is

15   suggesting motor root involvement, what would the physicians

16   have to do?

17   A    Well, that is something that you--it is a good warning

18   sign that can be used in surgery.  The way to describe it is,

19   it is neither sensitive nor specific, but it is something

20   that can give you information.

21          If you are doing a resection of arthritis around

22   the spine and it's particularly tight in that area, as you

23   put your instrument to bite away the arthritis, there will be

24   some transient pressure on the nerve root.  The nerve root

25   will fire because of that pressure, and the patient's leg or

1    There's a tumor on it, it has to be removed.  Well, what you

2    do is you dissect proximal and distal on the nerve root.  You

3    ensure there is no tension between the part where you're

4    going to resect and the main spinal cord sac.  And then you

5    make a very careful incision without increasing tension.

6              Having done that, you then peel the nerve root

7    away from the main nerves.  The reason for that is they're

8    all connected.  And if you pull on a nerve root hard--when

9    you pull on one branch of the Christmas tree, you're pulling

10   on the whole tree.  The whole tree shakes.  And so a Kerrison

11   is a blunt, pulling instrument; it's not a delicate, fine,

12   incising instrument.  And so if you pull a nerve root out

13   with a Kerrison as is described in the depositions, you're

14   not just pulling that nerve root, you're pulling the whole

15   cauda--a good portion of the cauda equina.  And that's quite

16   a shock and shudder.

17   Q    So the fact that according to whoever wrote--well, the

18   fact that Dr. Kindt wrote in this note, "No motion or

19   movement" which would suggest any motor root involved, does

20   that rule out the fact that this nerve that was removed had

21   motor--or created motor function for Mr. Lopez?

22   A    It's neither sensitive nor specific enough data to draw

23   a valid conclusion from intraoperatively.  It certainly is

24   helpful to make sure that you don't see the leg twitch when

25   you push on it, but it's not reassuring enough to decide to

1   amputate the root.

2   Q    And even if it wasn't a motor nerve root, even if it was

3   purely sensory, is it okay to take it out?

4   A    If the situation demands it, and there are clinical

5   situations where that can occur.  But in a routine, lumbar

6   discectomy, to sacrifice even a sensory root in the vast

7   majority of situations, and certainly in this specific

8   clinical situation, would not be considered a good move.

9   Q    Okay.  Let's look down a little bit lower then, right

10  here where it talks about complications.  And is this is Dr.

11  Kindt's notes.

12  A    Uh-huh.

13  Q    And it says, "Complications, none."  Is that true?

14  A    I would--I would have worded that differently.  I would

15  have put complication, ambiguous anatomic dissection with

16  removal of a nerve root--or removal of a nerve element.

17  Decision made to keep patient recumbent for 24--something

18  along those lines that would have said this is what we've

19  found.

20  Q    Does the fact that Dr. Kindt did not consider this to be

21  a complication raise any question in your mind about his

22  level of competence?

23  A    In his deposition when discussing nerve root and nerve

24  root removal at surgery and so on, he mentions or he

25  estimates that it was, I think, 12 or some number of times

1  fashion?

2  A    The op note, his immediate pain after surgery in the

3  recovery room, the continuing of that pain with increasing

4  severity in a very characteristic pattern of nerve root

5  injury that evolved into CRPS, and his motor dysfunction and

6  sensory dysfunction in the lower extremity, all those

7  strongly suggest that he had a nerve root injury.

8  Q    When you were talking about the motor dysfunction, what

9  motor dysfunction does Mr. Lopez have that indicates to you

10 that the L5 root was amputated or at least injured in some

11 fashion?

12 A    Well, the post-op, day one op note from the resident

13 says, "Unexplained motor and sensory dysfunction" without

14 going into more detail than that.  Many of his post-op notes

15 demonstrate incomplete motor function in the lower extremity,

16 usually rated at four out of five.

17        And there's always a caveat, that his pain precludes

18 a formal detailed exam which is, again, unfortunately often

19 seen in these cases.  It hurts so much to examine them that

20 you can't do the formal, detailed, muscle by muscle exam that

21 you tried to do.  So again, all very characteristic of nerve

22 root injury.

23 Q    What part of the body does the L5 nerve root innervate?

24 A    It goes down as part of the sciatic nerve and then will

25 ultimately innervate the motion of the foot that we call

1  it; is that right?

2      THE WITNESS:  That is correct, sir.

3      THE COURT:  So it's sort of like a cable?

4      THE WITNESS:  Yes.  Exactly like a cable.

5      THE COURT:  So you could damage one or two or multiple

6  fibers without severing the nerve root?

7      THE WITNESS:  That is correct, sir.  And that's

8  well-described in literature; a partial nerve root amputation

9  is the term that's used where part of it is bit.  There's a

10  partial injury.  Interestingly, you tend to get all elements,

11  motor, sensory, proprioception, so on, probably because of

12  the pulling part that occurs when the nerve is bit.  But yes,

13  a partial nerve root amputation and then injury patterns.

14      THE COURT:  And would you be able to describe these

15  fibers within the nerve root as angel hair?

16      THE WITNESS:  Yes, sir.  That's kind of what they look

17  like.  It's used--not my term, used by many, many people.  I

18  can't take credit for it, but that's what they look like.

19      THE COURT:  Thank you.

20  Q    (by Mr. Pestal)  And so, Doctor, in terms of the

21  following up on the Court's question then, where you've

22  indicated here, this nerve root would be covered with dura

23  matter?

24  A    Yes.  At some point the dura tapers out, and there's

25  some variability in that.  It tapers out, and then you have

1    The issue with the charting here is that a note from, you

2    know, less than 12 hours before notes a deficit, and all the

3    notes afterward note a deficit.  And he had this one note

4    that says things are okay which calls into question the

5    accuracy of that note.

6            The brass tacks of discharge summaries is that many

7    times the resident tasked with doing them is in a hurry and

8    he just churns it out, and so sometimes it's not the most

9    accurate of all the charting in the chart.  Not disparaging

10   this guy that wrote the note, but if we have notes before and

11   after that say something very different and his stands out as

12   the one that shows an intact exam, it calls into question the

13   note.

14   Q    Well, obviously, he had surgery to correct the pain in

15   his leg and back; true?

16   A    Correct.

17   Q    So we can sort of hope that things changed.  And Mr.

18   Lopez's back pain did improve, and his leg pain did improve

19   after the surgery; true?

20   A    I think there's a note saying his back pain had

21   improved.  I didn't see a note saying his leg pain--there's

22   no consistent notes that say his leg pain improved.  There

23   are many notes to say his leg pain was actually worse as you

24   look at his post-op follow-up.

25   Q    Okay.  With respect to--so one would expect if the L5

1   nerve root had been cut or damaged to, one would expect to

2   see a motor loss in the peripheral location of the nerves

3   along the outside of the calf and in front of the bottom of

4   the leg and the dorsal aspect of the foot; true?

5   A    Yeah.  That statement is correct within the variability

6   of human exam and human anatomy.  You can--there is

7   interchangeability and innervation of the L4/L5 and S1 nerve

8   roots, and there's interchangeability in the manifestations

9   of injury to those roots.  So yes, you would expect to see

10  some changes.  You can't hang your hat on saying it has to be

11  just like this because there is just some real variability in

12  that.

13  Q    Sure.  But more likely than not, one--this is normal

14  anatomy, and so one has to assume more likely than not that

15  this is the anatomy that Mr. Lopez had; true?

16  A    Correct.

17  Q    Absent--because you looked at the MRI films before the

18  surgery; true?

19  A    Yes, I did.

20  Q    And you didn't see any aberrant anatomy there; true?

21  A    I did not see any conjoined nerve roots, congenital

22  changes, things like that, that's correct.

23  Q    And you got to see the MRI after the--the post-op MRI;

24  true?

25  A    Yes, I did.

1    Q    --or they can trip, that they might have to wear an

2    orthotic in their shoe?

3    A    Correct.  They have to lift their foot up too high so

4    the dragging foot clears carpets, stairs, and things.  Maybe

5    you have to wear an orthotic, those sorts of things.

6    Q    And that's not the same as walking on the outside of

7    your foot; true?

8    A    No.  No.  Walking on the outside of your foot is a lay

9    term that can be a thousand different things.  A foot drop is

10   a fairly specific term relating generally to a nerve injury.

11   Q    And based on Dr. Newman's report, discharge note,

12   there's no evidence of foot drop here, is there?

13   A    There's no evidence of foot drop on Dr. Newman's

14   discharge note.

15   Q    And there's no documentation of any motor loss in this

16   discharge note; true?

17   A    That is correct.  Dr. Newman's note from earlier shows

18   motor and sensory problems, and the notes after in the clinic

19   show those problems.  But his isolated discharge summary does

20   not show those.

21   Q    And the extensor hallucis longus and the flexor hallucis

22   longus, those are both innervated by the L5 nerve; true?

23   A    That is correct.

24   Q    So no indication on Dr. Newman's exam that there was any

25   problem with those muscles; true?

1  A    Yes, ma'am.

2  Q    And this note, if we look at the second page, is signed

3  by the same Dr. Newman who the following day found no

4  deficits?

5  A    Yes, ma'am.

6  Q    And no pain?

7  A    Yes, ma'am.

8  Q    I'm going to have--I'm go to put up Exhibit 1-J page 1.

9        MS. BROWN:  I'll just put it up here, Kylie.

10        This is a stipulated exhibit, Your Honor.

11  Q    (by Ms. Brown)  This is, Doctor, can you see the date on

12  this progress note?

13  A    That's May 5th, 2010.

14  Q    And it's from the Neurosurgery Resident Clinic?

15  A    Yes, ma'am.  Neurosurgery Resident Clinic at the VA.

16  Dr. Sun is seeing him.

17  Q    And is this the--another one of the notes to which you

18  were referring on cross-examination demonstrating decreased

19  strength, sensation, before and after?

20  A    Yeah.  Yes, ma'am.  My point, although maybe not as

21  eloquently stated as it should have been, is that we have

22  multiple data points here in the post-op period ranging from

23  the recovery room on down many years.  And all of those

24  points but one point to motor and sensory deficits in the

25  left foot and leg.  And then we have the discharge summary

1   going to have a spinal fluid leak.  And we--we certainly did

2   not discover one.  As--as--we had no motor movement during

3   surgery that I recall.  And certainly if you touch one of

4   these nerves the patient usually will have big firing of--of

5   motor function and kick or something.  And as I recall his

6   neurologic function did not demonstrate loss of a nerve root.

7   Q    How--how significant is--would the removal of a L5--L5

8   spinal nerve root be in a neurosurgery case?

9   A    It would be quite significant.  The patient would have

10  dramatic loss of sensation and loss of motor function,

11  particularly in their ability to dorsiflex their foot and

12  control their toes--dorsiflexion--which typically those

13  patients cannot ambulate without an orthotic on their leg.

14       (Pause.)

15  Q    (by Mr. Pestal)  Dr. Waller, if you could look at

16  Exhibit 1-E.

17  A    Uh-huh.

18  Q    And do you recognize this document, sir?

19  A    I do.

20  Q    And what is it?

21  A    This is Dr. Kindt's operative dictation.

22  Q    If you'll turn to page 2, Exhibit 1-E page 2, Dr. Kindt

23  in his operative report described removal of a small nerve

24  root, do you see that?

25  A    I do.

1   way by whether a person is in pain?

2   A    It is usually significantly affected by pain, and the

3   pain response that it appears Mr. Lopez had, I would think

4   would have compromised his ability to move with full

5   strength.  Patients with this type of pain, an allodynic type

6   of severe pain, have a lot of trouble showing us the full

7   motor exam.  It's very difficult to examine them usually at

8   all.

9   Q    So, Dr. Arle, do you have an opinion as to whether or

10  not Mr. Lopez's diagnosis of CRPS is correct?

11  A    I do.

12  Q    And what's that opinion?

13  A    I think that he does have CRPS.

14  Q    And so if the CRPS cannot be accounted for--well, let

15  me--so it's your opinion that the L5 nerve root was not cut

16  or injured; is that correct?

17       MR. LEVENTHAL:  Objection; leading, Your Honor.

18       THE COURT:  Overruled.

19       THE WITNESS:  Not at least in the region that we just

20  spoke of.

21  Q    (by Mr. Pestal)  Of the three "x's."  So given that Mr.

22  Lopez has CRPS, how do you account for--or what do you

23  believe caused it?

24  A    I was trying to reconcile these two issues in the case,

25  and I think it was helpful for me to work my way backwards, I

1  guess, from Mr. Lopez's condition as I could discern it from

2  the information given now and that he does have CRPS.  He

3  seems to have responded beneficially from a spinal cord

4  stimulator.  That's a very good treatment for that.

5           So how could this have occurred, and how could I

6  account for the post-operative course that he had where he

7  had severe pain initially, an allodynic type of pain by all

8  accounts, that then resolved within a day or two.  There were

9  steroids and Neurontin given during that time, and then it

10 developed more fully after that.  And it seems to me, going

11 through everything, highly unlikely, especially with the lack

12 of a CSF leak, that there was a direct injury to the L5 nerve

13 root, the nerve root sleeve where the dura is, or the fibers

14 of the L5 nerve root within that.

15          However, he has a congenitally narrow canal.  The

16 nerve roots were a little bit closer together, probably

17 because of that, and there are in some cases, small anomalous

18 strands, as we call them, of rootlet that don't travel with

19 their normal nerve root.  So there could be a sensory fiber,

20 a rootlet, that was in the thecal sac, is normally going to

21 be part of the L5 nerve root most of the time, but in some

22 people they travel along the edge of the dura, under the

23 dura, on their own, and they go out with the next nerve root

24 down, in this case the S1 nerve root.  And they are extremely

25 hard to see.  Most of the time they can look like ligament or

1   other pieces of even disc material, which can be sort of

2   strand-like sometimes as you're pulling out disc material.

3          So I think that could be a possible explanation for

4   how Mr. Lopez had the symptoms he had initially.  It was

5   treatable very early on with those medications.

6          MR. LEVENTHAL:  Excuse me, Your Honor.  I object and

7   move to strike his response as to what could be possibly an

8   explanation.

9          THE COURT:  Overruled.  Proceed.  You may proceed.

10         THE WITNESS:  Okay.  So there's some question as to

11  whether the surgeons removed a small piece of tissue that was

12  a piece of nerve or not.  If you took a bite of something

13  like this, it would be a small length usually, because it

14  doesn't have a lot of resistance.  You would bite through it

15  like a piece of ligament, and it might look very much like

16  the other tissues.  This is very common.  You wouldn't see it

17  readily, you wouldn't have any question that there was

18  abnormal anatomy that you needed to avoid, and it would be

19  most likely a sensory component of the L5 root, and that is

20  the most likely cause of his symptoms afterwards.

21         And the CRPS initially you would have that pain,

22  but the development of CRPS would be an unfortunate, more

23  rare development that you see--and we don't fully understand

24  it--but patients seem to have more of a response to injury in

25  some cases than other patients, so there are different

1   interleukins and psydokines that are released.  It tends to

2   be a systemic type of process that occurs, and it doesn't

3   occur immediately.  It takes several--at least days to weeks

4   in most cases to fully manifest.  So I think that's one

5   possibility.

6           If there's no injury to a nerve rootlet at all, it

7   is possible with just retraction injury the nerve is

8   sensitive from pressure from the disc or manipulation during

9   surgery, and that could lead internally to injury as well

10  that might lead to CRPS also.

11  Q    (by Mr. Pestal)  And let me just back up for a second.

12  You mentioned interleukins and psydokines.  Are those

13  components of an inflammatory response?

14  A    In general they are.  And, again, we don't fully

15  understand why some people actually get the whole CRPS

16  picture and others don't.  Others have some numbness, maybe

17  it's a little dysesthetic; they might have a little burning

18  when you touch the area that's abnormal, but they don't

19  actually have all of the other sequelae you see with CRPS.

20  Q    You described sort of an anomalous nerve strand.  Would

21  you be able to just draw that on the notepad up here as you

22  described it?

23  A    I can, yeah.  There are different categories or--people

24  have described these.

25          MR. LEVENTHAL:  Your Honor, he's going to use another,

1    different piece of paper?

2        MR. PESTAL:  Yes.

3        MR. LEVENTHAL:  Okay.

4        THE CLERK:  And, Doctor, if you would grab a microphone.

5        THE WITNESS:  Okay.  Trying to think of how best to

6    represent this, but--so here you have L5 coming off.  Here

7    you have S1 coming off the general thecal sac.  Within here

8    are these rootlets that come together and form this nerve

9    root.  And the amount of cerebrospinal fluid that can get in

10   here generally tapers down until the root is more or less

11   filling this cylinder surrounded by dura.  And that's why if

12   you're further distal on the nerve, if you took a bite here,

13   you wouldn't get a leak.  But this is very far out.  This is

14   past the pedicle, and they weren't anywhere in this vicinity.

15   But if you're in this area, if you took a piece out of

16   anywhere in here to get at the nerve, you would have to allow

17   the fluid to leak out.

18        Some of these rootlets don't make it into the nerve

19   root.  They might have a small exit on their own.  They don't

20   end up in the root sleeve, and they end up going out with

21   this nerve root.  And they're underneath the strands of

22   ligament that are running over this.  They might travel on

23   the underside of the dura of the thecal sac over the disc

24   area.  The disc may be pushing up on them as you're trying to

25   go into this area to get pieces of disc out.  You would never

1   a motor exam.  So it doesn't surprise me that I have--that

2   there's limited information on his real--real exam, his real

3   capabilities.

4   Q    Is one of the recognized consequences of an injury to

5   the nerve that Dr. Kindt said was injured some degree of foot

6   drop?

7   A    Not necessarily.  That would be from a motor component

8   of the L5 nerve root.

9   Q    So if in fact there was an injury to a motor component,

10  then the patient, Mr. Lopez, could experience some degree of

11  foot drop.

12  A    Yes.

13  Q    And would that manifest itself, for instance, if Mr.

14  Lopez were unable to fully bring his foot up?

15  A    Without pain?

16  Q    Let's just start with if he was unable to fully bring

17  his foot up.  Is that evidence of a foot drop?  Not

18  necessarily that there is one, because you have to consider

19  the pain, but is that evidence of a foot drop?

20  A    It would suggest there might be some weakness in that

21  muscle, the EHL.  One thing I found curious, if I might add--

22  Q    Actually, there isn't a question pending.  That was my

23  only question.

24  A    Okay.  Sorry.

25  Q    The op note doesn't really tell you where the surgeons