1  we're talking about in say 2008 through 2011?

2  A    I would say definitely yes.

3  Q    All right.  When it says that they must be credentialed

4  and privileged as defined in this handbook does must imply

5  this is a nondiscretionary function?

6  A    No.  To--to me there is nothing discretionary about

7  credentialing and privileging.  It is an absolute requirement

8  and certainly from a Joint Commission's perspective when we

9  see it not done properly we are quite severe on the hospital.

10  Q    Okay.  And in terms of following the outline of the VHA

11  handbook why is it important that this is not discretionary?

12  A    Well, if it was discretionary a chief of service or a

13  medical director or a governing board of a hospital could--

14  could chose to allow a physician to practice without similar

15  credentials and would allow privileges without a similar

16  investigation.  And I think--I just can't imagine anybody who

17  would advocate that.

18  Q    All right.  I want to look at Exhibit 46 page 5 because

19  I want to look at a couple of definitions that we're going to

20  be talking about.  The first one is credentialing, what is

21  the definition of credentialing as applies in this case?

22  A    We usually, just to make it understandable, we usually

23  separate credentialing and privileging as kind of two aspects

24  of qualifying a physician to practice in a hospital.  The

25  credentialing is their--their--their formal background, their

EXHIBIT

tabbies*

1   --I looked through it carefully and didn't see anything to do

2   with peer review and as I--as I said to you at that time.

3   Later you sent me--I guess you had been provided with more

4   documents and I did an addendum to my report.  Again, I

5   didn't see any evidence of peer review much less aggregate

6   data or any more modern performance monitoring.

7           And very recently just in the last few weeks you

8   sent me I guess some further material that had been sent.

9   And again there was no actual data, either individual or

10  aggregate on Dr. Kindt.

11  Q    How did--so we talked about peer review, is that

12  different than peer recommendations?

13  A    Yes, it's--it's somewhat confusing.  I--I liked--for

14  peer recommendations I liked to use the term letters of

15  reference because I think people understand that much better.

16  But in the Joint Commission language for some reason they use

17  the term peer recommendation; that's not peer review that's a

18  peer, typically a department or section chairperson,

19  assessing the quality data and making a--making some summary

20  comments about it.

21  Q    And again in terms of peer recommendations is the idea

22  that the peer who is making the recommendations--in this case

23  say Dr. Brega recommending Dr. Kindt is the idea that they're

24  actually looking at charts or a specific patient review?

25  A    That--that's absolutely the Joint Commission

1   Q    Okay.

2   A    I think those are--that--I think that's the totality of

3   the documents I reviewed.

4   Q    Based upon your review of those documents, based upon

5   your education, experience, and training, do you have an

6   opinion whether the Denver VA met the standard of care in

7   terms of its evaluation of Dr. Kindt during the credentialing

8   and privileging process in 2009?

9   A    Yes, I do have an opinion.

10  Q    And what is your opinion?

11  A    My opinion is that the credentialing--the credentialing

12  and privileging--or I would say the re-credentialing and

13  privileging activities in 2009 did not meet--did not meet the

14  standard of care.

15  Q    Okay.  I'm going to talk first about their use or nonuse

16  of aggregate data and then we'll talk about their actual

17  actions in 2009 and 2011.  What aggregate data based upon

18  your review of the depositions in this case was available to

19  Dr. Whitehill in 2009 for use as part of the privileging and

20  credentialing process?

21  A    Well, I don't think any way.  I mean I read his

22  deposition several times.  He does refer sort of vaguely to

23  some aggregate data but I--but I--I didn't get a clear sense

24  of whether there was any that he--that was available to him.

25  Q    Was--

1   A    Certainly none of it was physician specific.  I think

2   that was pretty clear.

3   Q    Well, when you say it wasn't available, do you mean it

4   didn't exist or no one sought it ought?

5   A    I can't be sure of that.  I don't know was the answer I

6   think to that.  I--I hope it existed, but if it did he didn't

7   seem to be very aware of it.

8   Q    Was it the standard of care in 2009 to not only have

9   aggregate data but to actually use it to look at physician

10  specific performance?

11  A    Most assuredly, yes, that's correct.

12  Q    We have heard--you weren't here for opening statements

13  but heard Mr.--one of the U.S. Attorneys say that every six

14  months five or six cases of physicians including Dr. Kindt

15  was being reviewed as part of ongoing physician evaluation.

16  Was there any evidence of that at all in the credentialing

17  and privileging file?

18  A    I haven't been shown anything that would allow me to

19  substantiate that.

20  Q    In light of the failure of the VA, the Denver VA to

21  utilize aggregate data, either because they didn't have it or

22  because they had it and didn't look at it, in light of that

23  failure was Dr. Kindt in your opinion properly credentialed

24  and privileged--privileged in 2009?

25  A    No, I don't believe he was.

 1   Q    Should Dr. Kindt have been operating or supervising

 2   residents if his ability to continue the practice of

 3   neurosurgery was not adequately investigated during the

 4   credentialing and privileging process?

 5   A    Well, my view would be--and I think I would speak, you

 6   know, for the Joint--certainly for the Joint Commission view,

 7   but certainly my own personal view--and I think a few would

 8   disagree with me--is a doctor shouldn't be practicing at all

 9   in a hospital in any capacity unless he's properly

10   credentialed and privileged and that process is redone every

11   two years; that's the Joint Commission standard, that's the

12   VA standard, and that's the national practice virtually

13   everywhere you go.

14   Q    So not just your personal opinion but by industry

15   standards he should not be operating unless he's been

16   adequately investigated as part of the credentialing process?

17   A    That is correct.

18   Q    All right.  Let's talk specifically about 2009 and then

19   we'll look at some documents.  In 2009 was there anything

20   that should have triggered a more in-depth investigation of

21   Dr. Kindt and his physical and cognitive abilities?

22   A    Well, I--I think as I pointed out to you when you sent

23   them to me, Dr. Kindt had just relinquished, voluntarily

24   relinquished his--his--his privileges to do cranial surgery

25   and was applying for privilege to do spinal surgery.  I would

1   think that a credentials committee and a department would

2   want to look into that rather carefully.  For a surgeon not

3   to do cranial surgery is a pretty central move.

4   Q    In your review of the depositions of doctors Whitehill,

5   Brega, and Kindt, did there seem to be a lack of

6   understanding among them as to the reason for the reduction

7   of privileges in 2009?

8   A    I did--don't get the impression that they really

9   understood--at least from what they said in their depositions

10  of why he had given up his privileges and they didn't seem to

11  be curious as to why he had.  I would think they would have

12  been intimately involved and--and what to know the reason for

13  that and use that as potentially a red flag to investigate

14  that further.

15  Q    If there had been further investigation in 2009 such as

16  specific interviews with the head of the hospital or other

17  neurosurgeons, that sort of thing, should that have been

18  reflected in the credentialing and privileging file?

19  A    Absolutely.  I mean--

20  Q    And was there anything--any additional investigation

21  once there was the reduction of privileges into to why those

22  were reduced and conclusions made about fitness for practice?

23  A    There--there's certainly no statement in that regard in

24  their recommendation that I've seen.  And in--and in their

25  depositions I did not get any clear answer from them as to

1  A    Whitehill, yes.

2  Q    So let's look at question number three up above.

3       MS. BROWN:  If we can blow that up please, Kylie.

4  Q    (by Ms. Brown)  Dr. Brega had to answer the question

5  whether any action had been taken regarding this

6  practitioner's clinical privileges including but not limited

7  to denial, suspension, reduction, or revocation, and she

8  answered, no, right?

9  A    Correct.

10 Q    Was that true?

11 A    Well, it--it's certainly not true if Dr. Kindt is

12 relinquishing his privileges.  It's true that it wasn't--at

13 least as far as we know done under duress or as a--as a

14 disciplinary action, but it--it certainly was a reduction.

15 And--which they were acknowledging and presumably agreeing

16 to.

17 Q    Under the standard of care for privileging and

18 credentialing, first of all, should that have been a yes?

19 A    I should think it would have been a yes if she

20 understood the question.  There's--I mean the reduction is

21 quite clear.

22 Q    And certainly when Dr. Whitehill cosigned that document

23 on December 18th even if Dr. Brega was somehow confused what

24 should Dr. Whitehill have done if he was following the

25 standard of care for credentialing and privileging this

1    If all of that doesn't work, and I've had two or

2    three cases in my career where it was just too ambiguous, I

3    take a cotton patty, it's a small, little piece of cotton

4    that has a radio labeled--radiopaque label on it.  So you can

5    see it on a CAT scan or an x-ray.  And I cut the strings off

6    of it, and I put it in the area where I'm confused.  I close

7    the wound up, patient is still sleep, they go down to CAT

8    scan, and we take a CAT scan.  And I look at where that patty

9    is on the CAT scan.  And then usually everything makes sense.

10    Then you come back up to the OR, they redrape and

11    prep the patient.  I go out and talk to the family and tell

12    them exactly what we did and why we took a break in the

13    middle of the surgery, and then we resume the surgery.

14    But you don't just bludgeon your way through and,

15    well, I'm not sure what this is, and I pushed on it.  And the

16    leg didn't move, so it's coming out now.  Anatomical

17    confusion can occur in any surgery, but you're trained in

18    residency as to what to do when that happens.  And what--the

19    strong suggestion here is just they kind of proceeded.

20    Q    From reading the op note, does that tell us who removed

21    the nerve?

22    A    It does not.

23    Q    And from reading the depositions, do those tell us who

24    removed the nerve?

25    A    Each one suggests the other guy did it.

1   Q    And whether it was Dr. Waller or Dr. Kindt, was it a

2   breach of the standard of care?

3   A    Yes.

4        MS. BROWN:  Your Honor, I have probably another 20

5   minutes to go, and this is a good stopping point.

6        THE COURT:  All right.  We'll take a 15-minute recess.

7        (10:22 a.m. - Recess accordingly.)

8        (At 10:37 a.m. on December 16, 2014, with counsel for

9   the parties present, the following proceedings were had:)

10       THE COURT:  Please be seated.  Please continue.

11       MS. BROWN:  Thank you, Your Honor.

12  Q    (by Ms. Brown)  Dr. Poffenvarger, we had looked at the

13  op note, and there was nothing in the op note about efforts

14  made to repair this--the end of the nerve, you know,

15  which--where the nerve was removed; right?

16  A    That is correct.

17  Q    And based upon the op notes, is it clear to you that

18  whoever removed this nerve was well-aware that they took it

19  out?

20  A    Yes.  Yes.  It's dictated in a very straight-forward

21  fashion.  Nerve was removed.

22  Q    Once this occurs, what's the surgeon's obligation as far

23  as attempting to ameliorate the damage?

24  A    Well, I guess the first thing is don't remove the nerve

25  root.  But having done that, you would hope to remove the

1   something in VetPro, whose job is it to verify that it's

2   true?

3   A     Well, we go through and we ensure that it all

4   corresponds, you know that we don't have any gaps.  Central

5   office is the one that made--made this program to where it

6   would work to benefit the provider, the patient and the

7   facility.

8   Q     All right.  Well, let's look at Exhibit 11, page 13.

9   And I think you went over this with Mr. Wu.  This is part of

10  the--

11      MS. BROWN:  If we can blow up, please, number--paragraph

12  number 13.

13  Q     (by Ms. Brown)  This is part of Dr. Kindt's 2009

14  paperwork that went through your office, correct, Mr.

15  Maestas?

16  A     That's correct.  These are the--a copy of the minutes

17  that was generated on Dr. Kindt.

18  Q     So the question number 13 is, "Does quality assurance

19  data provided indicate unsatisfactory performance during the

20  last two years appointment?"  Now, that would be from 2007 to

21  2009, correct?

22  A     That's correct.

23  Q     "If yes, please describe the follow-up actions and

24  improvements."  So do we know from this document that the

25  answer concerning Dr. Kindt in December of 2009 was yes?

1  There had been quality assurance data that indicated

2  unsatisfactory performance, true?

3  A    That's correct.

4  Q    And as a result of his unsatisfactory performance in the

5  two years before December of 2009, his operative privileges

6  were limited, true?

7  A    According to this, yes.

8       MR. WU:  Objection, misstates testimony, Your Honor.

9       THE COURT:  Well, what is limited operative privileges

10 delineated mean?

11 Q    (by Ms. Brown)  Mr. Maestas, it means that his operative

12 privileges were limited, right?

13 A    That's correct.

14 Q    So this wasn't a voluntary reduction; this is somebody

15 telling Dr. Kindt we're taking away some of your privileges?

16      MR. WU:  Objection, foundation.

17      THE COURT:  Overruled.

18      THE WITNESS:  Well, it doesn't necessarily mean that.

19 It means that the provider could have also requested this.

20 Q    (by Ms. Brown)  Well, when it says that quality

21 assurance data indicates unsatisfactory performance, wouldn't

22 that indicate to you, someone involved in privileging and

23 credentialing, that as a result the follow-up action was

24 limiting those privileges?

25 A    Yes.

1    Q    Okay.  And that was probably not a voluntary reduction

2    but somebody saying to Dr. Kindt we're going to limit your

3    privileges because of unsatisfactory performance, true?

4    A    Well, according to this, yes, which is filled out by Dr.

5    Whitehill.

6    Q    Okay.  So this is Dr. Whitehill in--what was the date on

7    this?  Can you tell from either the preceding page or--

8    unfortunately I received redacted pages, so all I know is--

9    A    The page--I'm sorry, the page is 11--

10   Q    No, no, the date.

11   A    Oh, the date.

12   Q    All we know is this was December of 2009?

13   A    Well, I don't see a date on here, so I don't know.

14   Q    Okay.  But we know from this document that in December

15   of 2009 Dr. Whitehill knew that Dr. Kindt had had

16   unsatisfactory performance and, as a result, his privileges

17   were limited, right?

18   A    According to this sheet.

19   Q    All right.  So let's look at Exhibit 44, page 4.  And

20   this is the--we'll blow this up so it's a little clearer.

21   This is the peer reference questionnaire completed by Dr.

22   Brega and signed off by Dr. Whitehill in that exact same

23   timeframe, right?

24   A    That's correct.

25   Q    And so when in question number 3 that says, "Has any

1  action taken regarding this practitioner's clinical

2  privileges, including but not limited to denial, suspension,

3  reduction, or revocation, the answer to that should have been

4  yes, right?

5  A    Well, that's correct.

6  Q    Did you do it--take any steps to verify, knowing that we

7  have this VetPro form that says that there was inadequate

8  performance that resulted in reduced privileges?  When you

9  got this document, did you question why that said no?

10  A    I did not.

11  Q    Did anyone question why that said no?

12  A    Not that I know of.

13  Q    And would there be any way--once all this paperwork gets

14  to the Performance Standards Board, would there be any way

15  for them to know that this wasn't true, that in fact there

16  was a reduction in privileges?

17  A    Well, it's--it's up to the board to review all of these

18  documents, and so this is something that they would have

19  reviewed at that time.

20  Q    Okay.  But you missed it?

21  A    Right.  I don't read all of these.  I just gather the

22  documents and I forward them on is what I do.

23  Q    So it's not about what's actually truthful about the

24  documents; it's about the process--

25        THE COURT:  Well, this is rhetorical now.

1       THE COURT:  I don't know what--

2       THE WITNESS:  I'm sorry, I'm not--

3       THE COURT:  --your question is.

4       MS. BROWN:  Okay.

5   Q   (by Ms. Brown)  You don't have any knowledge--

6       THE COURT:  You're asking in the negative.

7   Q   (by Ms. Brown)  Well let me--I'm going to come back to

8   this in a moment on part of my cross, because I have gotten

9   ahead a little bit.

10          So let's go back to 2009.  So the brain lab had

11  actually been in use since 2004; right?

12  A   I think so, yes.

13  Q   So for the first five years of the use of the brain lab,

14  no one was complaining about Dr. Kindt's or anyone else's

15  inability to use it; right?

16  A   I assume that's correct.

17  Q   So can we presume from that that Dr. Kindt was able to

18  use brain lab at least up until 2009 when people began to

19  complain?

20  A   I can tell you that he was never the one who set that up

21  in the operating room.

22      THE COURT:  You're getting away from the microphone.

23  It's hard to hear you.

24      THE WITNESS:  Oh, I'm sorry.  No, he was never the

25  person that set that up in the operating room at any time in

1    Q    And they need to be truthful?

2    A    Yes.

3    Q    Because if they're not, then someone who maybe shouldn't

4    be credentialed might get credentialed.

5    A    Yes.

6    Q    You had filled out many of these forms for Dr. Kindt

7    over the years?

8    A    That's possible; I'm not sure.

9    Q    Well if I were to represent to you that there were

10   several, at least, in his credentialing file going back more

11   than a decade, would you have any reason to disagree?

12   A    No.

13   Q    And was he filling them out for you, too?

14   A    It's possible.

15   Q    Do you remember?

16   A    No, I don't.

17   Q    All right.  Did you ever do anything to independently

18   verify that the information you were putting on that form was

19   true?

20   A    No.  These forms we fill out is to the best of our

21   knowledge based on our practice with that individual.

22   Q    Let's look at Question Number 3.

23   A    Okay.

24   Q    Did you do anything to verify whether any action had

25   been taken regarding Dr. Kindt's clinical privileges,

1    including, but not limited to, denial, suspension, reduction,

2    or revocation.

3    A    No.

4    Q    If you had known that his privileges, his operative

5    privileges had been limited in 2009 because quality assurance

6    data indicated unsatisfactory performance, would you have

7    answered that question differently?

8         MR. PESTAL:  Objection, Your Honor; speculative.

9         THE COURT:  What?

10        MR. PESTAL:  It's speculative, Your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  I'm sorry, will you say it again?

13   Q    (by Ms. Brown)  Sure.

14   A    Yeah.

15   Q    If you had known, Dr. Brega, in 2009 when you were

16   completing this form that in fact Dr. Kindt's operative

17   privileges had been limited because quality assurance data

18   indicated unsatisfactory performance, would your answer have

19   been different?

20   A    Yes.

21   Q    The correct answer would have been "Yes" to Number 3;

22   right?

23   A    If there was some quality concerns regarding Dr. Kindt

24   that I felt were relevant or appropriate.  I suppose if I had

25   been concerned that there was a problem, then the answer

1   A      It was--that's probably a good guess.

2   Q      So as of December of 2009, the decision had been made

3   that he would stop operating in June of 2010.

4   A      That was what we had talked about, yes.

5          MS. BROWN:  May I have a moment, Your Honor?

6          THE COURT:  Yes.

7          MS. BROWN:  Thank you.  I have no further questions.

8          THE COURT:  Any redirect?

9          MR. PESTAL:  No, thank you, Your Honor.  This witness

10  may be excused.

11         THE COURT:  All right.  You may step down.  You're

12  excused.

13         MS. BREGA:  Thank you.

14         THE COURT:  So where are we?

15         MR. PESTAL:  Your Honor, at this point we just have Dr.

16  Whitehill, and he's scheduled for tomorrow morning.  That was

17  the schedule.  Attempted to contact him but haven't been able

18  to reach him yet, so if we could potentially just recess--and

19  tomorrow morning I don't expect him to be more than the

20  morning.

21         THE COURT:  Well, I can look at the Kindt deposition.

22  Do we have a cross-reference?

23         MS. BROWN:  Your Honor, I think I wanted to go over this

24  with you.  I've discussed it briefly with Mr. Pestal.  Most

25  of the exhibits used in the deposition have not previously

1    this case.

2         THE COURT:  Overruled.

3         THE WITNESS:  So answer that one?

4         MR. WU:  Yes.

5         THE COURT:  Yes.

6         THE WITNESS:  No, it doesn't indicate that the physician

7    has--necessarily has a problem.

8    Q    (by Mr. Wu)  I'm sorry it does or does not?

9    A    It does not.  Again, it looks at his system of care.

10        THE COURT:  Well, you said it has a problem and the

11   question was done something wrong, those are two different

12   things.  So--

13   Q    (by Mr. Wu)  So does it indicate that the physician has

14   done something wrong--necessarily done something wrong?

15   A    Not necessarily.

16   Q    Were the Root Cause Analyses that are referenced in this

17   document, Exhibit 17, were they considered as part of Dr.

18   Kindt's re-credentialing and re-privileging in 2009?

19   A    No.

20   Q    Do you recall the Root Cause Analyses that are

21   referenced in Exhibit 17?

22   A    I remember the one that had to deal with the wrong level

23   case.

24   Q    Okay.  Can you tell me about that case?

25   A    That was an instance where Dr. Kindt and his resident or

1   the spine surgeon or it's now used in ENT to do more accurate

2   resections of tumors in this case.

3          It involves setting up the computer in the

4   operating room, programming it to receive the CAT scan data

5   from the x-ray files and then programming I believe the--the

6   image arms that help the surgeon navigate.

7          It's a complex set up process and Dr. Kindt had a

8   lot of problems with that.  Many surgeons have problems with

9   that and I think at least at the University Hospital they do

10  have a technologist who does that exclusively for the

11  neurosurgeons so the device is not set up incorrectly.

12         So Dr. Kindt was having issues with the BrainLAB

13  and it was clear that talking with Dr. Brega and Dr. Lillehei

14  that the use--the expected use of BrainLAB was becoming a

15  standard of care.  And because Dr. Kindt was having

16  difficulties with the BrainLAB and it looked like this was

17  going to become an important modality to use in every case we

18  felt the best thing to do was just have Glenn stop doing

19  cranial surgeries because he had so many difficulties with

20  the product and it would basically require either more

21  technical support in his room or for Dr. Brega or someone

22  else to second attend so that the BrainLAB was used

23  correctly.

24  Q    Did Dr. Kindt voluntarily give up privileges for cranial

25  surgery?

1    A    He did.

2    Q    Was he not re-privileged for cranial surgery because of

3    unsatisfactory performance?

4    A    No.  We actually looked at the four craniotomies that he

5    did in the year prior and their outcomes were all uniformly

6    good.

7    Q    And if you look at question 13 it states that, "Does

8    quality assurance data provided indicate unsatisfactory

9    performance during the last two years appointment?"  And

10   underneath you wrote--or it was--it states, "Limited

11   operative privileges delineated."

12            Why does that sentence appear in--in this form--or

13   in response to this question?

14   A    Well, I think I made a mistake where I entered the

15   response.  Lower down on the form there's an area that says

16   additional comments and that's where it should have been

17   entered.  I clearly didn't have quality assurance data that

18   said he should have limited privileging so that's my mistake.

19   And I think it's because we were still learning how to use

20   this form.

21   Q    Have you ever voluntarily relinquished certain

22   privileges because of new technology?

23   A    I have.

24   Q    Can you tell us about a procedure or operation in which

25   you have reduced your privileges?

1   A    Correct.

2   Q    One would assume she would know who the other

3   neurosurgeon was, right?

4   A    You are correct.

5   Q    Okay.  Now, was Dr. Brega then incorrect that Dr.

6   Kindt's retirement plan went back to 2000--December of 2009?

7   A    I'm having trouble hearing your voice if you could be a

8   little--

9   Q    Was Dr. Brega incorrect when she told us that Dr.

10  Kindt's retirement plan that was hatched in 2009--that was a

11  terrible question, let me try again.  Dr. Brega told us that

12  the plan for Dr. Kindt's retirement started in December of

13  2009, was she incorrect?

14  A    And--and what was the last part?

15  Q    Was she incorrect?

16  A    I never referred to it as a retirement plan, but we

17  stepped him back, you know, with his permission from the

18  cranial surgery and then in 2011 at that re-credentialing to

19  becoming a non-operative surgeon.  And he then left the VA in

20  2012.

21  Q    So you would dispute Dr. Brega's testimony--

22        THE COURT:  Why are you arguing with him that's his

23  testimony.

24        MS. BROWN:  All right.

25  Q    (by Ms. Brown)  Now, there were a number of people in

1    the VA system in the last years when Dr. Kindt was there who

2    were a little more concerned about Dr. Kindt's age and his

3    ability to perform well, true?

4    A    Yes.

5    Q    And they would often bring that up with Dr. Brega?

6    A    I don't know of those conversations.

7    Q    Do you recall having your deposition taken twice in this

8    matter?

9    A    I do recall the deposition.

10        THE COURT:  Well, if you're going to go to the

11   deposition let's produce it.

12        MS. BROWN:  Yes, Your Honor, Volume II.

13        THE COURT:  She'll get it for you.

14        MS. BROWN:  Okay.

15        (Pause.)

16        THE CLERK:  I'm handing the witness his deposition, the

17   transcript of his deposition taken November 22nd, 2013.

18   Q    (by Ms. Brown)  So if you would turn please, Dr.

19   Whitehill, to page 172 of that deposition.  And starting at

20   page 14--

21        THE COURT:  Line 14?

22        MS. BROWN:  Line 14, thank you.

23   Q    (by Ms. Brown)  Tell me--just reading along with me and

24   you can tell me if this was the testimony you gave, Question,

25   "And you were aware that Dr. Brega trained under Dr. Kindt?"

1   chain that goes all the way up, right?

2   A    Correct.

3   Q    You told us that the only reason you weren't using

4   aggregate data in 2009 is that the people higher up hadn't

5   provided it to you yet?

6   A    Again, the only thing that we had at that time were

7   these annual reports that showed how the hospital--the

8   surgical side of the hospital was doing and some of the

9   special--well, all the specials that we had were doing in

10  terms of mortality rate and rates of certain complications.

11  It was only sent to us by specialty so it wasn't provider

12  specific.  So it was hard to--you know, without drilling into

13  it somehow it was hard to really determine a provider's exact

14  portion of that data.

15       If I only had had one provider in a specialty and

16  that's the data I received that would be his or her aggregate

17  data, so that would be pretty easy to figure out.  But if I

18  had multiple providers I wouldn't know if my nurse who took a

19  report was rendering Dr. Kindt's outcomes or Dr. Brega's

20  outcomes, but it at least gave me, you know, a little bit of

21  data and that would be the best aggregate the VA provided at

22  that time.

23  Q    Okay.  Let me get back to my question, the reason I

24  think you told us earlier today that you weren't using

25  provider specific aggregate data is that nobody had given it

1    to you; is that true?

2    A    Provider--yeah, right, I had no provider specific data.

3    Q    If somebody up the chain at the VA had given it to you,

4    you would have used it?

5    A    Correct.

6    Q    You would have welcomed it because it's much more

7    objective and reliable?

8    A    Yes.

9    Q    And it was the standard of care in 2009 to be using

10   provider specific aggregate data, true?

11   A    I don't know that standard of care.

12   Q    Okay.  If it was the standard of care you would have

13   used it had somebody given it to you?

14   A    If it was, yes.

15   Q    Did you ever ask anybody for the provider specific

16   aggregate data?

17   A    We asked up the chain, chiefs of surgery and also the--

18   through the Business Surgical Consultants to the National

19   Surgery Office that we needed more specific data from them.

20   We talked to the statisticians, we talked to the leads, and

21   now in 2014 we're still not getting provider specific data

22   but we're getting more specific--at least case-based data--

23   let's say spine outcome data in this case--per site so we

24   can--we can--we can look at it at least a little more

25   objectively when we compare our providers against that data.

1   the applicant, Dr. Kindt, when he filled out his portion of

2   VetPro; it's self disclosure.

3   Q   Okay.  So it was likely that it was Dr. Kindt who

4   selected the "no" button in error in 2009?

5   A   Most likely.

6   Q   And no one at the VA caught that?

7   A   Correct.

8   Q   You mentioned on direct that there were safeguards

9   established by the Professional Standard Board, I believe, in

10  2009 concerning Dr. Kindt's practice.  Did I hear that

11  correctly?

12  A   Safeguard, yes.

13  Q   What were the safeguards that were instituted?

14  A   A supervisory plan was put in place that every procedure

15  that would be scheduled for Dr. Kindt would be reviewed by

16  Dr. Brega and to make sure that the scheduling was correct

17  and that they were cases that indeed he would do well.  And

18  it was designed to safeguard the patients and provide again

19  the supervisory aspect to Dr. Kindt's practice.

20  Q   So this was from December of 2009 going forward?

21  A   Correct.

22  Q   So Dr. Kindt was checking up on Dr.--excuse me, Dr.

23  Brega was checking up on Dr. Kindt to make sure that he

24  wasn't being given procedures that might have been beyond his

25  ability at that point?

1  Q    Well--

2  A    And I have to take in credibility fashion, I guess, the

3  form from the National Practitioner Board that shows no hits.

4  This may be a clerical error.

5  Q    Well, what investigation did you do to determine whether

6  it was a clerical error or whether there had been a hit?

7  A    Again, I look on the forms that Dr.--or Mr. Maestas

8  gives us in the Medical Staff Office if there is or not.

9  Maybe something came up between those two periods of time,

10  something changed that makes it appear here as if there was a

11  hit--

12  Q    Right.

13  A    --or at least a tort claim filed, something.

14  Q    So what did you do to investigation that?

15  A    Well, it was probably--it was probably disclosed, if

16  there was.  If this is--

17        THE COURT:  Well, no, not--not probably.  To the best of

18  your recollection.

19        THE WITNESS:  I'll just say I don't remember.

20        THE COURT:  All right.

21  Q    (by Ms. Brown)  Do you remember doing anything about a

22  National Practitioner Database hit for Dr. Kindt when you

23  were having this discussion about safeguarding patients, you

24  know, steering him to specific types of surgeries as opposed

25  to others?

1   A     I don't remember.

2   Q     When you were steering--creating your procedure for

3   safeguarding patients who were going to be operated on by Dr.

4   Kindt, was there any discussion about whether he would be

5   assigned to only senior residents or whether residents would

6   do the bulk of the surgery just with Dr. Kindt watching?

7   A     I don't know.

8   Q     That would have been up to Dr. Brega?

9   A     Correct.

10  Q     Thank you.

11        MR. WU:  Just one thing, Your Honor.

12        THE COURT:  Well, before you do that, turn--on Exhibit

13  11--

14        THE WITNESS:  Um?

15        THE COURT:  Exhibit 11 in front of you.

16        THE WITNESS:  I can't--

17        THE COURT:  Exhibit 11 that is in front of you.

18        THE WITNESS:  Oh.

19        THE COURT:  Turn to the first page.

20        THE WITNESS:  I'm on 11.

21        (Pause.)

22        THE COURT:  All right.  And it shows PSB members

23  present, and it lists--I take it these are the names of the

24  people who were on the board at this time?

25        THE WITNESS:  And those who were present at the meeting