IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 12-cv-02259-RPM

LEONARD E. LOPEZ,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____

## MEMORANDUM OF DECISION
_____

      Leonard E. Lopez underwent spinal surgery at the Denver Veterans

Administration Hospital (VA) on March 5, 2010, to repair a herniated disc at the L5-S1

level of his lower back.  Dr. Glenn Kindt, M.D., a neurosurgeon employed by the

University of Colorado, and Dr. Samuel Waller, M.D., a second year surgical resident at

the VA performed the surgery.  The procedure has been described as a partial lumbar

discectomy in which the bulging disc material is removed, thereby decompressing the

nerve root and alleviating the back and leg pain Mr. Lopez had been experiencing.  That

was accomplished but after the surgery Mr. Lopez felt severe pain in his left foot.

      Mr. Lopez filed this civil action against the United States claiming under the

Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* that Dr. Waller was negligent in

performing this surgery and against Dr. Kindt, exercising supplemental jurisdiction under

28 U.S.C. § 2671 on the same allegations of negligence.  The plaintiff has an additional

claim against the Government for negligent credentialing and privileging of Dr. Kindt

who was 79 years old at the time of the operation.

Dr. Kindt was dismissed from this civil action by stipulation on August 12, 2013. After trial of the claims against the Government this Court now makes these findings and conclusions in narrative form in this Memorandum of Decision pursuant to Fed.R.Civ.P. 52(a).

It is not disputed that Leonard Lopez has severe pain in and around his left foot which has been diagnosed as Chronic Regional Pain Syndrome (CRPS) which is disabling and for which he takes pain medication and since 2012 has been wearing an implanted peripheral nerve stimulator on the sciatic nerve in his left thigh.

There is no doubt that some nerve injury happened during this surgery causing this condition.  What is contested is what specific injury happened and whether the surgeons peformed below the standard of care for neurosurgeons in this type of surgery.

The key fact urged as support for the Plaintiff's claim is in the Operation Report dictated by Dr. Kindt on March 5, 2010, and signed by him on March 20, 2010.  He wrote:

> The nerve roots were found to be located laterally and the L5 and S1 nerve roots appeared to be very close together.  The dura was retracted medialward, and the bulging disk material was excised.  During this process, a small nerve root was removed.  There was no motion or movement which would suggest any motor root involved.  No spinal fluid was noted.

Exhibit 1(e)-0002

Dr. Waller wrote a Surgery Operation Note on March 5, 2010, saying:

2

Findings:
 disc causing compression, aberrant anatomy with 2 nerves above L5, small nerve removed, discectomy

Complications:
 possible durotomy

Condition:
 stable, extubated to PACU

Exhibit 1(e)-0006

The relevant trial testimony from Dr. Waller was the following:

THE WITNESS: So as we were exposing the disc and Dr. Kindt was taking it out he pulled out a small piece of tissue that was, I don't know an inch or so long, that looked a little bit like a piece of angel hair pasta or something along those lines. And he was--pulled it out and said oh, man, that must be nerve, let's send that to pathology.

And from that point the tone of the operation changed a little bit in that he started looking for cerebrospinal fluid leak and certainly his kind of normal light, chipper, demeanor was a little more serious at that moment. And I think that's what stands out to me most.

Tr. p. 425, l. 18 to p. 426, l. 3.

Q  Sure. Can you demonstrate for the Court using the Kerrison what you saw in the operation when the piece of angel hair pasta like tissue was removed?

A  Yes. So Dr. Kindt was on the patient's left side doing the operation. I was standing on the other side holding the retractor on the nerve root and, you know, the incision is, you know, about that long. And so the exposure you have is you're looking down on a hole somewhat like this I guess and you're standing up as--holding the retractor trying to get your head out of the way so that Dr. Kindt could lean over.

And when you're standing out you're reaching down into that opening and you're grabbing little pieces at a time with consecutive motions with the Kerrison where you reach down, you grab, and you pull it out, and each time--and then in one of the motions he pulled out and saw

that little stringy piece and kind of held it out and said that must be nerve,

3

let's send it to pathology.

And at that point he started looking around for cerebrospinal fluid leak. He'd like to--he--he typically used what he called a double ended, which is a--kind of modified Blitzen (phonetic) dissector for which he would manipulate around and look for things as well as free up tissue. And he pulled one of those out and started looking along the sides to see if there was any cerebrospinal fluid leak, which is clear colorless fluid that would start coming out pretty readily during an operation if you get an opening in the coverings around the nerve root or the dura--at least at that location. And we never found any.

And once he was satisfied that there wasn't we proceeded with the operation, made sure the nerve root was free of any compression and then closed. He, you know, made sure that we had spent extra time carefully closing the fascia layer because that's--some people think anyway is important for preventing post-operative issues related to a cerebrospinal fluid leak. And then I think I closed the rest of the incision.

Tr. p. 427, l. 5 to p. 428, l. 15.

Q  When you described a small nerve removed were you describing the L5 spinal nerve root?

A It certainly was not a nerve root.

Q You also typed in possible durotomy, what did you mean by that?

A So at that time my understanding of a durotomy and CSF leak, the main thing was that it's important--at least with some surgeons that you keep the patient flat post-operatively. And if you don't both have an order in that explains that you want the patient flat and have some sort of indication people might at night when you're not there decide to have the patient get up or move and then so it's important to document that you were concerned that there would have been a durotomy.

Q Do you recall after the surgery was performed that there was a note or an order requiring Mr. Lopez to lie flat on his back for some time?

A  My recollection is we had him lie flat overnight.

Tr. p. 467, l. 2-19.

Dr. Kindt was deposed by the plaintiff's counsel on March 4, 2013, for nearly

seven hours in a manner that was aggressive, accusatory and disjointed in an apparent effort to exploit his diminishing ability to remember details of this surgery due to his advanced age.  That deposition transcript was taken into evidence as trial testimony because Dr. Kindt was unable to testify at trial.  Relevant portions of the deposition follow:

Q  Okay.  So you do have an independent recollection of this surgery?

A  Oh, yes, Yes.

Q  All right.

A  Because we were concerned about that–that filament of nerve that came out with the disc.

Q  Well, the nerve root that came out with the disc?

A  Well, that's questionable, because I don't think they found a specific nerve root that doesn't function; although, I don't know whether somebody did that since then, but we thought that he had this area of pain and so on involving his foot and his ankle and so forth, which would go along with a sensory nerve, but–

Q  Right.

A  –it didn't make him so he couldn't walk or weak or anything like that.

Q  Right.  It just gave him unrelenting severe pain.

Tr. p. 105, l. 4-22.

Q  (By Ms. Brown) Do you dispute that Mr. Lopez is having pain because of the nerve root that was removed during the jury of March 4?

A  Well, he could be having pain for the reason that he had pain even before the surgery or before the disc.  Our viewpoint was he had pain, the studies showed a big herniated disc, we took the disc out, and now there's no longer a disc in there causing pain.

In the process, now, a small nerve fragment was observed and was removed with the disc.  That's the truth, as far as we know it.

Tr. p. 106, l. 25 to p. 107, l. 1.

Q  Was the nerve root that was removed visible to the naked eye without use of the microscope?

A  Yes, it was–it wasn't a microscopic nerve root or we would have never seen it without the microscope.  So it became visible–well, again, maybe this was said.  The main nerve root was retracted off of the disc.  The disc was removed, and then when the disc came out, a small nerve fiber was noted separate from the nerve root.

Q  (By Ms. Brown) Okay.  Well, now you're saying it was a small nerve fiber that was different and separate from the nerve root?

A  Yes, definitely.

Q  So it was not a conjoined nerve root?

A  Well, it could have been a conjoined nerve root, which is an extra nerve root.

Q  That's different than a nerve fiber, right?

A  Yeah, but it was so small that it wasn't covered by dura and that sort of thing.  It was just a nerve fiber.

Q  It was large enough to be visible to the naked eye?

A  Yes, but then when that came out, no spinal fluid came out.  So our thought was, well, there's no hole in the dura, and that extra nerve was probably part of a conjoined nerve root which is present sometimes.  And the patient didn't jump or anything, so we thought that there was no harm done by that nerve root coming out.  And it was much smaller than the main S1 nerve root or L5, which were retracted out of the way to get–to pull the disc material out.

Tr. p. 167, l. 25 to p. 169, l. 9.

Q  Well, you wouldn't want to cut the nerve if, when you pull on it, then, that he kicks the instruments off the table, right?

A   That's right.  And that didn't happen either.

Q   So you–

A   There was no motion–first of all, it was a nerve fiber, a small fiber that we thought was part of a–it came out with the disc.  When we pulled the last pieces of disc out, we noticed, oh-oh, there's a nerve fiber attached to the disc, but it didn't go through with the disc.  So we pulled out the disc material and then that little nerve fiber was–it looked like it was incomplete.

Q   At what point did you cut the nerve?

A   Didn't really cut it.  We just pulled the disc off the nerve and it was broken.

Q   How did it get broken?

A   By pulling the disc off of it.

Q   So the nerve was torn by pulling the disc?

A   Yes.

Q   So you're saying that the nerve was adherent to the disc?

A   Yes.

Q   So a portion of the nerve was stuck to the disc and came out with the disc?

A   Yes.

Q   So then whatever was submitted to pathology should have had nerve tissue attached to it if in fact the nerve was adherent to the disc, true?

A   The nerve fiber was so small compared to the size of the herniated disc material that it would hardly have been visible, and I guess

to answer, you're probably right, we didn't make a special effort to have pathology look for the small nerve root.

Q   Okay.  Let me just back up here.  Your testimony under oath is

7

that this nerve was adhered to the disc material that you removed?

A  Yes.

Q  And the reason the nerve came out is that it was essentially torn away from the rest of the nerve when you removed the disc material?

A  Yes.

Q  And this piece of nerve that was torn away was large enough that you were able to see it with the naked eye?

A  Yes, but it still was very small–

Q  But large enough–

A  –compared to the nerve root itself.

Q  Right.  You didn't tear the whole nerve root off, you tore a part of it off?

A  Well, partially; although, we didn't see where it was attached necessarily.

Q  Okay.  But if it was attached to the disc material, then it should have gone to pathology along with the disc, right?  You didn't separate it in the OR?

A  We didn't make a point to have a pathologist look for a nerve root.

Q  I didn't ask that question.  If the nerve was adherent to the disc material–

A  Yes.

Q  –it should have been part of the pathology sample submitted, true?

A  We didn't–the disc material, when it came off, it was attached to this extra nerve root, a tiny nerve root, and it pulled the tiny nerve root when the specimen was given.  So we didn't cut a piece of the nerve, this extra nerve, and then give that to pathology.  It pulled off of the disc material.

8

Q  So it was not adherent to the disc material?

A  Well, that's when, for the first time, we could see the little nerves, when we pulled on the disc material and it was attached to that little nerve and then we pulled it off, and then we left the nerve root alone.  We didn't take the nerve root as a specimen.

Q  Okay.  Was the nerve root adherent to the disc material?

A  Somewhat adherent.

Q  And when you pulled the disc material out, the nerve root, which was adhered to it, came with it?

A  Yes.

Q  And then after the disc material came out with the nerve root attached–

A  Yes.

Q  –at that point, did you then detach the nerve root from the disc material?

A  We gave everything as a specimen, as I recall.

Q  Right.  So if in fact the nerve root were adherent to the disc material, there should be nerve with the specimen sent to pathology?

A  I suppose that's true.  We, at the time, weren't thinking of having pathology verify that we had pulled a nerve–a piece of nerve out because we saw the nerve.  So there it is.  There's a little piece of nerve, but we didn't verify that.  We recorded it, that a small, thin fiber or piece of nerve came out with the disc and sent it as a specimen, but we didn't ask pathology to verify that that was a nerve segment.  We saw it, so we didn't think it was necessary for pathology to verify that.

Q  Well, you didn't ask pathology to verify anything.  You just sent them the tissue and they reported back on what it was?

A  Yes.

Q  That's how it works?

A  That's exactly right.

Q  And they did not report back that you sent them any nerve?

A  Yeah.  Well, and they didn't find any nerve, I guess.

Q  Right.  So can we fairly conclude that there wasn't any nerve adherent to the disc material?

A  Well, the disc material was resting on the nerve.  Whether it was stuck to it and how strong it was stuck to it was not–was not thought of, but the disc came out and the little nerve fiber came out, too, is all that I can say for sure.

So in the end, there was the regular nerve root, there was no spinal fluid coming out, and we saw that–we thought this was a nerve root that was aberrant, or the term that was used that we didn't know whether the nerve was doing anything or not, and of course our hope was that maybe that little nerve was what was causing his pain.

So we took out the disc and took out the little piece of nerve and he didn't jump, so he was going to be as strong as he ever was, and that's–that was our thinking at the end of the procedure.

Tr. p. 170, l. 7 to p. 175, l. 19.

The Nurse Intraoperative Report for this surgery made no mention of a nerve root

and did not show that any material was sent to the laboratory for analysis.

Ex. 2(e)-0004,

There is a Pathology Report containing the following:

GROSS DESCRIPTION:
Received in formalin labeled Lopez, Leonard E. #0541 is one specimen designated "disc L5-S1."  The specimen consists of multiple fragments of fibro? Discs measuring 2.0 x 2.0 x 0.3 cm. In aggregate, and weighing 1.8 grams.  No bone is palpable within the specimen.  The specimen is entirely submitted in cassette A1.

DIAGNOSIS:
DISC L5-S1, DISCECTOMY:
- Benign fibrocartilage and bone with degenerative changes

consistent with disc material.

Ex. 1(g)-0001.

Dr. Kerry Brega, M.D., a CU neurosurgeon in service to the V.A. Hospital, shared

office space with Dr. Kindt on March 15, 2010.  She gave the following testimony

concerning this surgery:

> A  ...Dr. Kindt came in at the conclusion of the operation and talked-
> -told me about having pulled up some tissue that he thought looked like it
> could be some nerve, told me about the procedure, and was waiting there
> for the resident to come in to tell us that the patient was awake so that he
> could go do an exam to--as he was anxious to examine his lower
> extremity.

> Q  (by Mr. Pestal) And you think that conversation happened fairly
> shortly after the surgery was completed?

> A  It must have been right at the conclusion of the surgery.

> Q  And it's your memory that Dr. Kindt said that he pulled up that
> tissue that was at issue?

> A  Yes.

Tr. p. 670, l.1-14.

> Q  (by Mr. Pestal) And so what happened after you had the
> conversation with Dr. Kindt?

> A  Sometime after that he went to the recovery area and examined
> the patient. He did come later back to the office to let me know that he
> was relieved that he was able to move all the muscle groups that he
> tested in his leg and foot.

> Q  Do you recall whether or not Dr. Kindt indicated that whether
> there was a cerebrospinal fluid leak?

> A  Yes, I do, and there was not a spinal fluid leak.

Tr. p. 670, l. 19 to p. 671, l. 2.

11

The plaintiff's primary support for his claims of negligence is in the testimony of forensic medical witness, Dr. Glen Poffenbarger, M.D., a neurosurgeon.  The following exchanges took place during direct examination:

Q  Do you have an opinion within a reasonable degree of medical probability whether it's more likely than not that the L5 nerve root was amputated or injured in some fashion?

A  The clinical evidence strongly suggests that my opinion would be that yes, that is--that is the case.

Q  And what is the clinical evidence that suggests to you that it was the L5 nerve root amputated or injured in some fashion?

A  The op note, his immediate pain after surgery in the recovery room, the continuing of that pain with increasing severity in a very characteristic pattern of nerve root injury that evolved into CRPS, and his motor dysfunction and sensory dysfunction in the lower extremity, all those strongly suggest that he had a nerve root injury.

Q  When you were talking about the motor dysfunction, what motor dysfunction does Mr. Lopez have that indicates to you that the L5 root was amputated or at least injured in some fashion?

A  Well, the post-op, day one op note from the resident says, "Unexplained motor and sensory dysfunction" without going into more detail than that. Many of his post-op notes demonstrate incomplete motor function in the lower extremity, usually rated at four out of five.

And there's always a caveat, that his pain precludes a formal detailed exam which is, again, unfortunately often seen in these cases. It hurts so much to examine them that you can't do the formal, detailed, muscle by muscle exam that you tried to do.  So again, all very characteristic of nerve root injury.

Tr. p. 300, l. 19 to 301, l. 22.

Counsel's questions artfully conflated "ampulated or injured."  Dr. Poffenbarger's answer is therefore ambiguous but he  then limited his testimony to "nerve root injury."

12

On cross examination, the following testimony was given.

Q  Okay. And let's--before we have you sort of circle the likely place, is it your testimony that the nerve root was cut or just injured in some fashion?

A  I don't think there's enough specificity to really--in the data to say that. However, the fact that he dictates a nerve root was removed or a portion of the nerve was removed and that they both knew that positions say that there was a piece of nerve that looked like angel hair spaghetti, that would--I mean, you've got to cut that to take it out. And that's--and he says he did it with a Kerrison. And so the Kerrison cuts that and it comes out. So that's where I draw that conclusion from.

Q  Okay. And so with respect to your conclusion, are you saying that it's more likely than not that the nerve, L5 nerve root was severed, cut?

A  At least some portion of it, yes. There just isn't enough specificity to really say whether the whole nerve root part of it, exactly where. I can give you probabilities, but there just isn't enough information or immediate post-op anatomic studies.

Again, typically, if you have a situation like this intraoperatively where, okay, we think we injured a nerve root, or the anatomy was ambiguous; you get intraoperative studies as I described; putting a patty and getting a CAT scan; you get a post-op MRI; you do various flexural studies, things to try and delineate exactly what occurred. Because those weren't performed, it's very difficult to say with specificity exactly what the injury was and where it happened other than to say, generally, there was an injury that appears to localize to the left L5 nerve root with the expected findings.

Tr. p. 314, l. 20 to p. 315, l. 25.

On further cross examination, Dr. Poffenbarger confused the issue:

Q  (by Mr. Pestal) So, Dr. Poffenbarger, the basis of your testimony that the L5 nerve root was actually cut was based on the deposition testimony of both doctors, Waller and Kindt, who've described a piece of stringy-like angel hair pasta that was removed from the operative field with the Kerrison?

A  Correct. As well as the op note that says the nerve root was--

there was some portion of a nerve root was removed, yes.

Q  Okay. And so is that the evidence that leads you to say more likely than not that the nerve root was actually cut and removed?

A  Yes. That along with the clinical find--his clinical (inaudible) and constellation leads me to that conclusion, yes.

Q  And so when there's a reference to--I mean, so that would include nerve injury; right? I mean, the cutting and removal of that angel hair pasta-size piece of tissue, that's a nerve injury?

A  Yes, sir.

Q  And I don't believe your report describes any other type of nerve injury such as an injury from overretraction for instance.

A  Correct. You can have a number of ways to injure nerve roots in lumbar surgery, retracting too much, cauterizing too close to the nerve root, any other mechanisms that don't come to mind right now. But yes, there are a number of ways to cause injury to a nerve root at surgery.

Q  But in this case your opinion is that the injury was from a cutting, a severing and removal of the L5 nerve root; is that true?

A  That is correct.

Tr. p. 316, l. 8 to p. 317, l. 14.

The pathology lab report is not definitive because the small piece of tissue was not kept separate from the pieces of disc material when placed in the single container sent to the lab and there was no marking to direct attention to look for nerve tissue on the container or otherwise.  The nurse's note quoted does not report anything about a specimen going to the lab.

The lack of precision in terminology in the records and in the testimony of the physicians in this case makes it difficult to determine the injury.

Dr. Poffenbarger gave this testimony:

> So where the nerve root attaches to the spinal cord is not like a branch on a tree, but rather, it's like somebody has taken a bunch of tiny little fibers, tiny little threads, and sewn the nerve root leaving a space in between the spinal cord and the nerve root. So those tiny little fibers can be torn, injured, traumatized very easily.

Tr. p. 299, l. 9-14.

Later, in response to the Court's questions the doctor said that a nerve root is like a cable.

The Government's forensic medical testimony was given by Dr. Jeffrey Arle, M.D., a neurosurgeon.  He also described "strands of rootlets that have come down from the spinal cord and merged together, coalesced, if you will, into forming the nerve root itself."  Tr. 600.  The thrust of his causation opinion follows:

> So how could this have occurred, and how could I account for the post-operative course that he had where he had severe pain initially, an allodynic type of pain by all accounts, that then resolved within a day or two. There were steroids and Neurontin given during that time, and then it developed more fully after that. And it seems to me, going through everything, highly unlikely, especially with the lack of a CSF leak, that there was a direct injury to the L5 nerve root, the nerve root sleeve where the dura is, or the fibers of the L5 nerve root within that.

> However, he has a congenitally narrow canal. The nerve roots were a little bit closer together, probably because of that, and there are in some cases, small anomalous strands, as we call them, of rootlet that don't travel with their normal nerve root. So there could be a sensory fiber, a rootlet, that was in the thecal sac, is normally going to be part of the L5 nerve root most of the time, but in some people they travel along the edge of the dura, under the dura, on their own, and they go out with the next nerve root down, in this case the S1 nerve root. And they are extremely hard to see. Most of the time they can look like ligament or other pieces of even disc material, which can be sort of strand-like sometimes as you're pulling out disc material.

> So I think that could be a possible explanation for how Mr. Lopez had the symptoms he had initially. It was treatable very early on

15

with those medications.

***

THE WITNESS: Okay. So there's some question as to whether the surgeons removed a small piece of tissue that was a piece of nerve or not. If you took a bite of something like this, it would be a small length usually, because it doesn't have a lot of resistance. You would bite through it like a piece of ligament, and it might look very much like the other tissues. This is very common. You wouldn't see it readily, you wouldn't have any question that there was abnormal anatomy that you needed to avoid, and it would be most likely a sensory component of the L5 root, and that is the most likely cause of his symptoms afterwards.

And the CRPS initially you would have that pain, but the development of CRPS would be an unfortunate, more rare development that you see--and we don't fully understand it--but patients seem to have more of a response to injury in some cases than other patients, so there are different interleukins and psydokines that are released. It tends to be a systemic type of process that occurs, and it doesn't occur immediately. It takes several--at least days to weeks in most cases to fully manifest. So I think that's one possibility.

If there's no injury to a nerve rootlet at all, it is possible with just retraction injury the nerve is sensitive from pressure from the disc or manipulation during surgery, and that could lead internally to injury as well that might lead to CRPS also.

Tr. p. 607, l. 5 to p. 609, l. 10.

The Court then asked whether Dr. Arle had an opinion with respect to the cause

of the plaintiff's CRPS within a reasonable degree of medical probability and he gave

this answer:

A   I think it's more likely than not that what I just described is the cause, but I would add that the pathology report did not reveal any nerve tissue, and so I don't have any direct evidence from anything I've read that actually a piece of nerve was removed. But, to me, it's either one of those two situations, because I can't see how direct injury to the root itself of L5 would explain all of the data.

Tr. p. 614, l. 21 to p. 65, l. 2.

The testimony that is most helpful in resolving this case is that of Dr. Giancarlo

16

Barolat, M.D., a neurosurgeon who treated Mr. Lopez by implanting a peripheral nerve stimulator. He examined Mr. Lopez in July, 2012.  His most relevant testimony follows:

Q  What was your impression then when you first saw Mr. Lopez?

A  That he had a severe--what we call Neuropathic Pain Syndrome caused by damage to the L5 and the S1 nerve roots.

Q  We have heard his pain syndrome described as CRPS or Chronic Regional Pain Syndrome, how does that relate to your diagnostic--diagnosis of Chronic Neuropathic Pain?

A  Well, CRPS, Chronic Regional Pain--Complex Regional Pain Syndrome is a subset of a neuropathic pain, so the--so the bigger categories that this gentleman has nerve damage pain.  Then when you have nerve damage pain it can fall into different categories and one of the categories would be what he has. And--but it doesn't matter exactly what box you put his diagnosis; he has a severe intractable permanent pain condition caused by damage to the nerve roots.

Tr. p. 795, l. 5-19

Q  Do you have an opinion, first of all, generally whether Mr. Lopez suffered a nerve injury during the single level disc decompression performed in March of 2010?

A  I do have an opinion.

Q  And what is that opinion?

A  That he did suffer damage to the L5 and the S1 nerve roots.

Q  And do you have an opinion on what kind of damage likely occurred to that nerve root to cause this type of pain?

A  So my experience is that this was not a clean cut like–that would be called a rhizotomy where we actually take a pair of scissors and we cut the nerve. Because if you cut the nerve--and I did many of these operations where you actually go in and--and the goal of the operation is to cut the nerves and--so if you go in and you just cut the nerve you don't get this kind of issue.  You get this issue when you rip the nerve, either you bang the nerve or you grab the nerve with an instrument and you basically squash it. So--and having been in neurosurgery for, you know, 30, 40 years I've seen--I've seen plenty of situations like this.

17

Tr. p. 797, l. 1-21.

Q  So let me--if I may--just ask you with respect to your opinions what--what is the basis for your saying that there was involvement with the S1 nerve root?

A  Because--well, because he has numbness in the bottom of the foot. So he has numbness on the top of the foot which usually is the L5 nerve root and he has numbness in the bottom of the foot which is the S1 nerve root.

Q  So your opinion is that both the L5 and S1 are involved with his-- are the cause of his Chronic Regional Pain Syndrome?

A  Yes.

Q  Okay.

A  The distribution of the L5 and the S1. Now, when you have-- when you develop a Chronic Regional Pain Syndrome the symptoms might expand beyond the distribution of a nerve. But the fact that he has numbness in the top of the foot and the bottom of the foot is indicative to me of that.

Q  And with respect to--with respect to Chronic--CRPS, Chronic Regional Pain Syndrome, the etiology, the pathophysiology is not well understood, is that--is that fair?

A  I don't know there's two different things here. This man has a chronic severe neuropathic pain syndrome caused by damage to the nerve roots.  Now, his pain syndrome has taken some of the characteristics of Complex Regional Pain Syndrome, but is different. A Complex Regional Pain Syndrome most commonly is caused by a minor injury, twisting of the ankle, that's the part where it's not clearly understood. This one is very clearly understood, they damaged the nerves and the nerves are causing the symptoms that he has.

Q  And in terms of nerve damage that can occur through--it--it could occur in a surgery where there's no negligence, where everything is done correctly and through the normal retraction or movement of a spinal nerve that can precipitate the pain syndrome, true?

A  It could, yes.

18

Tr. p. 803, l. 13 to p. 804, l. 24.

THE WITNESS: Can I go there--so--so when you do a discectomy--first of all, let me say this, this gentleman had a severe stenosis which means that the structures of the spine were three times the size of what they should be and so it was--I am sure that it was very difficult to get to the nerve; I'm sure that it was very involved, but usually if you take out the disc here you have to expose this area from here to here and then you expose this.  Now, in his case I'm sure that they had to expose a lot more because the bones--there was a bone overgrowth there, so this is not like a regular little disc procedure that you do to somebody--that could be him--you know, where you just do a little thing and you take out the disc, they had to do a lot of work to remove the bones before they actually got to here. So how much exactly they removed I have no idea. I don't know that.

Tr. p. 809, l. 11 to p. 810, l. 1.

When asked whether in his treatment of Mr. Lopez Dr. Barolat was assuming that

a nerve root was removed, he said:

THE WITNESS: No, it's irrelevant.

THE COURT: --that a nerve root--

THE WITNESS: It's irrelevant. A nerve root was damaged.

THE COURT: Okay.

THE WITNESS: Whether it was removed or damaged or whatever it's irrelevant for the treatment.

THE COURT: Now, is it your understanding also that both nerve roots, L5 and S1 were damaged?

THE WITNESS: Correct.

Tr. p. 823, l. 22 to p. 824, l. 6.

The plaintiff's claim of medical negligence is that one of the surgeons removed

the L-5 nerve root.  That has not been proved by a preponderance of the evidence.

19

Even if the claim is modified to cutting into the L-5 nerve root, the evidence does not support it.

The reasonable probability is that the angel hair pasta sized tissue that came out with disc material was one of the fibers that coalesce into the L-5 nerve root but was not in the nerve root itself.  Removal of it was accidental given the patient's anatomy and it is not probable that it would have been seen and avoided even with greater illumination and magnification.  The unfortunate outcome of this surgery has not been shown to be caused by a failure to perform this surgery within the standard of care expected of a neurosurgeon in 2010.

Assuming that negligence has been shown, liability of the Government depends upon finding that the removal of nerve tissue was done by Dr. Waller.  The testimony of Dr. Waller on this issue is accepted as more credible than that of Dr. Kindt, who, in the end said he would accept what Dr. Waller said.  The attempt to impeach Dr. Waller by suggesting medical reports showing him as the surgeon was not persuasive.

The plaintiff has attempted to show that the VA should not have permitted Dr. Kindt to be the attending surgeon in this case.  There has been post-trial briefing on the applicability of negligent credentialing as a claim under the FTCA.  Assuming that there may be such liability, the evidence does not support that claim.  This was not a complex surgical procedure and this Court is persuaded by the testimony of Dr. Brega that Dr. Kindt was competent to perform it.  The failure of the VA to follow proper protocol in 2009 does not establish a claim that Dr. Kindt was not competent to perform this type of surgery in 2010.

The conclusion is that the plaintiff has failed to prove his claims by a preponderance of the evidence.  It is

ORDERED, that judgment shall enter for the defendant, United States of America, dismissing the plaintiff's claims and this civil action with an award of costs.

DATED: March 6, 2015

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge